**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RICHARD MOLINARI,<br><br>  Plaintiff, on behalf of himself and a class of similarly situated individuals,<br><br>v.<br><br>FINANCIAL ASSET MANAGEMENT SYSTEMS, INC.,<br><br>  Defendant. | 18-cv-01526<br><br>Honorable Judge Sara L. Ellis |

## **MOTION FOR CLASS CERTIFICATION**

NOW COMES Plaintiff RICHARD MOLINARI, by and through his attorney, James C. Vlahakis and moves to certify this civil action as a class pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3):

### I.    Introduction

1.     Plaintiff, Richard Molinari ("Plaintiff"), brings this motion to certify putative class actions that were filed pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227, et seq. ( "TCPA") and  the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, et seq. ("FDCPA").

2.     Section (b)(1)(A)(iii) of the TCPA makes it unlawful to make any call to cellular telephone using any "automated telephone dialing system" ("ATDS") or an "artificial or prerecorded voice" message without the consent of the person being called. Section 227(a)(1) of the TCPA defines an ATDS to mean "equipment which has the capacity (A) to store or produce number to be called, using a random or sequential number generator; and (B) to dial such numbers." FAMS violated Section (b)(1)(A)(iii) of the TCPA  when it played or left the following prerecorded voice messages on the cellular phones of persons like Plaintiff *without their consent*:

> Hello this is FAMS, a debt collector, this is an attempt to collect a debt. Our records indicate that we have not yet received one or more payments necessary to continue the reduced interest program. We are happy to assist with any questions you may have in this process. Please call us at 866-330-2703. Again that number is 866-330-2703. Thank you.

3. The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. §1692(e). This law "is designed to protect consumers from unscrupulous collectors, regardless of the validity of the debt." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997). The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements in connection with the collection of a debt. It also requires debt collectors to give consumers truthful information about their debts, and about their rights as consumers. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g. Consumers may act as "private attorneys general" to enforce the FDCPA. *Crabill v. Trans Union, LLC*, 259 F.3d 662, 666 (7th Cir. 2001).

4. As set forth in Count IV of the Complaint, FAMS violated Section (b)(1)(A)(iii) of the TCPA by calling, transmitting and/or delivering "artificial or prerecorded voice" messages onto the voicemail of Plaintiff's cellular telephone number - without his consent.

5. As set forth in Count VI of the Complaint, and Plaintiff's Memorandum of Law, FAMS violated the FDCPA by skip tracing debtors and then placing debt collection calls to third-parties in violation of the Sections 1692b(1), 1692b(2), 1692b(3),1692c(a)(1), 1692c(b), 1692d, 1692d(5), 1692e, 1692e(2) and 1692f of the FDCPA. FAMS also violated the FDCPA by skip tracing Plaintiff's telephone numbers and not first confirming whether this number belonged to the debtor in question before repeatedly calling Plaintiff's telephone number. FAMS violated the FDCPA on a classwide basis because it skip traced and called thousands of telephone numbers in a

similar manner. Further, Defendant violated the FDCPA by failing to identify its full name in its voice messages that it left for Plaintiff and thousands of class members.

## II. Summary of Undisputed Facts Supporting Certification

6. Plaintiff's cellular telephone number is 708-228-8132. Exhibit A, Plaintiff's deposition, p. 10, lines, 14-15, p. 20, lines 1-4.

7. Plaintiff has had this telephone number for at least a minimum of five years. *Id.* at p. 10, lines 16-18.

8. Plaintiff is the sole user of his cellular telephone number. *Id.* at p. 20, lines 5-6. *See also*, p. 25, lines 17-24.

9. Plaintiff testified that to his knowledge, his wife never provided his cellular telephone number as her own. Exhibit A, Pl.'s depo., p. 26, lines 1-3.

10. FAMS called Plaintiff's cellular telephone number in 2017 for the purpose of speaking with Plaintiff's wife for a debt allegedly *owed by Plaintiff's wife*. Exhibit A, Pl.'s depo., p. 23, lines 3-24, p. 24, lines, 24, lines 3-11, 13.

11. FAMS did not obtain Plaintiff's cellular telephone number from Plaintiff or his wife and did not have Plaintiff's consent to call him using "artificial or prerecorded voice" messages because FAMS used a third-party, LexisNexis to skip trace the telephone number associated with the debtor, Nicolette E. Campbell. Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Answer Nos. 1 and 2 ("Defendant obtained telephone number 708-228-8132 from LexisNexis. This was noted in Defendant's account notes which have been produced."). Exhibit C, FAMS's Response to Pl's First Set of Requests to Admit, No. 2.

12. FAMS knew that telephone number 708-228-8132 was a cellular phone number before it called this number. Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Answer Nos. 3.

3

13. When FAMS whether it "contend[s] that telephone number 708-228-8132 belonged to Nicolette E. Campbell, FAMS was asked to "identify all facts, documents, events and witness statements" that supports its interrogatory answer. Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Interrogatory No. 4. FAMS's response simply stated "Defendant obtained telephone number 708-228-8132 from LexisNexis as a telephone number for Nicolette E. Campbell. This is notated in Defendant's account notes which have been produced. Anne Gonzales and Howard Friedman would be witnesses. They are current employees of Defendant and may only be contacted through counsel." *Id.* FAMS's Answer to Interrogatory No. 4.

14. FAMS was asked whether it "manually dialed 708-228-8132 to confirm that this was a valid contact number for Nicolette E. Campbell? If YOU answer "yes," identify all facts, documents, events and witnesses and witness statements that YOU contend support YOUR answer." Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Interrogatory No. 5. FAMS answered by saying "Yes", but then immediately stated that "[FAMS] never had any live communication with anyone when it dialed 708-228-8132. This is notated in Defendant's account notes which have been produced." *Id.* FAMS's Answer to Interrogatory No. 5. The witnesses identify in this interrogatory response added nothing of substance to this answer. See Pl's Memorandum of Law, Section VII.

15. To press for a clear answer, FAMS was asked "[d]id YOU do anything to confirm that 708-228-8132 was a *valid contact number for Nicolette E. Campbell*? If YOU answer "yes," identify all facts, documents, events and witnesses and witness statements that YOU contend support YOUR answer." Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Interrogatory No. 6 (emphasis supplied). Again, FAMS again answered by saying "Yes", but its answer to Interrogatory No. 6 was less than

4

convincing, as FAMS sole basis for claiming that "708-228-8132 was a valid contact number for Nicolette E. Campbell" was basically because "Lexis-Nexis told us so". Here is what FAMS's answer to Interrogatory No. 6 said: "Defendant obtained telephone number 708-228-8132 from LexisNexis *as a telephone number for Nicolette E. Campbell*." (Emphasis supplied). The witnesses identify in this interrogatory response added nothing of substance to this answer. See Pl's Memorandum of Law, Section VII.

16. Defendant Plaintiff's cellular telephone number over a hundred times using its LiveVox HCI phone system. Exhibit B, FAMS's Response Interrogatory No. 10. See also, Exhibit C, FAMS's Response to Pl's First Set of Requests to Admit, Nos. 9-10, 27.

17. In reality, FAMS did nothing to confirm that 708-228-8132 was a valid contact number for Nicolette E. Campbell. Interrogatory No. 7 gave FAMS not wiggle room where it asked "Do YOU claim that YOU called 708-228-8132 and that an employee or agent of YOUR actually spoke to Nicolette E. Campbell?" Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, No. 7. FAMS answered "No." *Id.*

18. What FAMS has trouble admitting are four key points that support certification:

(1) Defendant never dialed 708-228-8132 and was able to confirm that this was a valid contact number for Nicolette E. Campbell;

(2) Defendant dialed 708-228-8132 over a hundred times using its LiveVox HCI phone system in an attempt to contact Nicolette E. Campbell regarding a debt she allegedly owed - *without* ever confirming that that this number was a valid contact number for Nicolette E. Campbell;

(3) Defendant caused at least ten (10) pre-recorded messages to be placed into the voicemail box of telephone number 708-228-8132 in an attempt to contact Nicolette E. Campbell regarding a debt she allegedly owed - *without* confirming whether this telephone number belonged to Nicolette E. Campbell; and

(4) Defendant dialed 708-228-8132 over a hundred times using its LiveVox HCI phone system in an attempt to contact Nicolette E. Campbell regarding a debt she allegedly owed - *without* ever obtaining Plaintiff's consent to do so; and

(5) Defendant caused at least ten (10) pre-recorded messages to be placed into the voicemail box of telephone number 708-228-8132 in an attempt to contact Nicolette E. Campbell regarding a debt she allegedly owed - *without* ever obtaining Plaintiff's consent to do so.

### III.  Summary of FAMS's Calls and Pre-Recorded Voice Messages

19.  Plaintiff testified that he learned that he had received a voice mail message from FAMS after receiving notifications of a missed call and a notification of a voicemail. Exhibit A, Pl's dep., p. 36, lines, 21-24, p. 37, lines, 1-10.

20.  When FAMS called Plaintiff, his caller identification display would list FAMS. *Id.* at p. 56, lines 19-24, p. 57, lines 1-6.

21.  In contrast to missed calls which would list FAMS as the caller, when FAMS would leave a voicemail in Plaintiff's voicemail box, the caller identification number would not transfer to the voice message, which required Plaintiff to check the voice message to learn that FAMS had contacted him. *Id.* at Pl's dep., p. 57, lines 9-18.

22.  Plaintiff testified that he believed that FAMS used an ATDS to call him because FAMS called Plaintiff's cellular phone around the same time FAMS called Plaintiff's mother's land-based telephone number. *Id.* at Pl's dep., p. 54, lines 14-24, p. 97, lines 5-13 ("They would literally call [my mother] right after me"), lines 15-16 ("So they would call my phone, not get ahold of me and go right to there [call my Mother's phone].").

### IV.  Plaintiff Has Suffered a Real and Cognizable Injury

23.  When Plaintiff was asked why he brought suit against FAMS, he testified because he believed he was being harassed as a result of FAMS's phone calls and where calls took place up to three times a day. Exhibit A, Pl.'s depo., p. 51, lines 2-6, 105, lines 14-16. Prior to answering this question, Plaintiff testified how it was mentally stressful for him to be called at work regarding his wife's other debts and how the calls caused him to suffer physical stress in the form of headaches, and increased blood pressure.

*Id.* at p. 42, lines 15-24, p. 43, p. 44, lines 1-20. Plaintiff also testified that FAMS's calls regarding his wife's debt caused him to suffer from "headaches[,]chest pains", "anxiety" and "stress" and that he consulted with a physician about these conditions. *Id.* p. 60, p. 64, lines 14-24, p. 65, p. 66, lines 11-14.

24. Plaintiff also testified that he was not supposed to take calls during working hours and that he could have been fired for doing so and FAMS's calls to him during working hours disrupted his daily life. *Id.* at p.59, lines 8-12, p. 61, lines 15-21. Plaintiff also testified that he felt that FAMS invaded his privacy because he had not given FAMS permission to call him. *Id.* at p. 64, lines 1-4.

### V. Numerosity Exists

25. As to putative class members, FAMS used Lexis-Nexis to obtain thousands of telephone numbers the same way in an attempt to skip trace telephone numbers of debtors. See Memorandum of Law, Section IV.A. In the case of Plaintiff and likely thousands of other persons, the skip trace effort resulted in a call to a number that did not belong to the debtor at issue.

### VI. Commonality and Typicality Are Satisfied

26. Plaintiff's circumstances and claims are typical of those of the proposed class members. As demonstrated above, Plaintiff's TCPA claims are based on same factual and legal theories that are being presented on behalf of the proposed class members. Plaintiffs' claims are typical of the class of persons he desires to represent in this putative class action. The proposed TCPA class consists of all persons who were called with pre-recorded voice messages without their consent. Plaintiff's circumstances are typical of the class members he hopes to represent.

27. First, Plaintiff's cellular number was obtained by way of a skip-trace service performed by Lexis-Nexis to locate numbers associated with an alleged debtor

7

(who happened to be his wife). Second, Defendant did not confirm if the number dialed belonged to the debtor in question. Defendant claims that its account notes shows no contact with anyone. Third, Defendant cannot show that it had Plaintiff's consent to call him and it is Defendant's burden to demonstrate consent under the TCPA before transmitting a pre-recorded message to a person's cellular telephone.

## VI. Plaintiff is a Knowledgeable and Adequate Class Representative

28. As described in the following paragraphs, Plaintiff is an extremely knowledgeable and more than adequate class representative.

29. For starters, Plaintiff has contributed to this case by providing his attorneys with records related to the subject voicemails and phone calls. Exhibit A, Pl.'s depo., p. 50, lines 13-23. When Plaintiff was asked about his knowledge relative to the FDCPA and TCPA, he testified that he was familiar with both statutes. In particular, with regard to he TCPA, Plaintiff testified that he generally understood that an "Automated Telephone Dialing System" (hereafter "ATDS") "auto dial[s] a bunch of phone numbers" for a company. Exhibit A, p. 52, lines 7-15.

30. He also testified that he knew "what a pre-recorded message is" and testified as follows:

> "[a] pre-recorded message is someone leaving a voicemail that's automated. It's not a live person. And they're saying to you -- They'll usually -- They may or may not use the company name and they'll say call back this number. [B]ut pretty much straight to the point, it's not a live person. It's pre-recorded by the company or whoever they use to say them to call back at this number.

Exhibit A, p. 52, lines 7-15.

31. Plaintiff testified that it was his understanding of the TCPA requires an entity using pre-recorded voice messages to have the permission of the recipient of that message before sending those messages and that FAMS did not have his permission place pre-recorded voice messages on his phone in an effort to contact his wife. *Id.* at

8

p. 89, lines 20-24, p. 90, lines 1-10. Plaintiff also testified that he understood that FDCPA prevented FAMS from calling him (and leaving voice drops, essentially a one-ring method of contact) without his permission. *Id.* at p. 52, lines 1-12.

32.     When Plaintiff was asked "what skip-tracing?", Plaintiff answered that "skip tracing is pretty much looking up phone numbers attached to either a person's [last name] or their family and calling everyone on that list." Exhibit A, Pl's dep., p. 53, lines 18-24. Plaintiff went on to testify, "[t]ypically they do last name so they'll take anyone with that last name and try to contact them with or without their permission." *Id.* at p. 54, lines 5-8.

33.     When Plaintiff was asked "What is it that you are trying to accomplish by suing FAMS?", "What is it that you want to happen?" What is the outcome that you want from this lawsuit?" and "Are you hoping to get money?", Plaintiff gave a multi-part answer which included the following: "No. [getting money] -- That's not exactly the whole reasoning behind things", "[i]t's definitely more than money", "[i]t's more of a -- Part of it's an understanding of what they've caused" and "I can't answer it acuratly enough." *Id.* at p. 66, lines 15-16, 23-24, p. 67, lines 4-6, 11, 13-14, 24, p. 67, line 1. Thereafter, FAMS's counsel said "[l]et's move on." *Id.* at p.68, line 4.

34.     Plaintiff testified that he understood what a class action is, acknowledged that this case was brought as a class action, and testified that lawsuit involved "pretty much getting" more than one person suing a company "for the same thing" and that "it's more of a group setting towards it." Exhibit A, Pl's dep. p. 68, lines 4-21.

35.     Plaintiff testified that he understood the proposed class action in this case consisted of "people who have been effected [sic] by these phone calls." Exhibit A, Pl's depo., p.69, lines 1-4. Plaintiff also testified that "instead of just [e]ffecting one person by phone calls or voicemails, now you're [e]ffect[ing] 20 people." *Id.* at lines 8-10.

Plaintiff testified that he understood that a class representative is "a person representing a class" where the person has "already experienced" and "suffered" from the same type of conduct and that he was serving as a class representative in the present case:

> I'm representing and I'm using me as an example because of how I've been affected and that I'm a good example of how can it be affected to represent those people because I already know what the -- I've already experienced it I also want to help them because I'm sure they – if I've suffered, I know they've suffered so that you're representing that class.

Exhibit A, Pl's depo., p.69, lines 11-24, p. 70, line 1.

36. Plaintiff understands that he is a proposed class representative in this lawsuit and testified that he understood that he was required to appear and testify as he was doing at the time of his deposition. Exhibit A, Pl's depo., p.70, lines 7-24, p. 71, lines 1-8. Plaintiff also testified that he attended a settlement conference for this case where he rejected FAMS's settlement offer at that time as well as FAMS's prior offer because he wanted use this lawsuit to obtain compensation for class members. Exhibit A, Pl's depo., p.76, lines 22-24, p. 77, lines 1-5, p. 93, lines 17-24, p. 94, lines 1-2.

37. Plaintiff also testified that one of his roles as a class representative involved "research", which he described as:

> you could research other people's situation to an extent because you are the class representative so you would want to know what happened to them because if I'm representing a class, I want to at least know how that affected them. So that's what I mean by research, is really understanding what happened to the other individuals involved.

Exhibit A, Pl's depo., p.70, lines 7-22. Plaintiff provided an example of his research when he was asked "[d]o you know anyone else that has received calls from FAMS?" and answered: "yes. Yeah. They're out of state. No [I don't know them]. I've seen . . . seen posts about [FAMS calling them] Online." *Id.* at p.73, lines 8-15.

38. When Plaintiff was asked "[w]hat kind of qualities do you think make a good class representative?", he testified as follows:

> someone that has experienced [the] situation[]. If you haven't experienced something, I don't know how you could qualify that. If you haven't experienced anything related to a class action lawsuit that the class action lawsuit is in - Again, I'm giving you an example. You're suing a workplace harassment and you've never been harassed. That's not a good candidate. You've got to been through [the same experience].

Exhibit A, Pl's depo., p.72, lines 3-15. Plaintiff added that "[I] have and understanding of people's situations, too. I think that's a big thing." *Id.* p.72, lines 19-21.

39. When Plaintiff was asked, "[w]ere you promised anything to be a plaintiff in this lawsuit?", he firmly and resoundingly answered "No. Nope. Never promised on thing." Exhibit A, Pl's depo., p.72, lines 22-23, p. 73, lines 5 & 7. Plaintiff understands that a judge would determine what type of compensation he would be entitled to for serving as a class representative. Plaintiff also understands that his counsel's compensation would be determined by a judge, and he understands that a judicially approved provision of attorney's fees is different that in an individual lawsuit. Exhibit A, Pl's depo., p.92, lines 19-24, p. 93, lines 1-12.

40. When Plaintiff received voicemails from FAMS his "phone rang [once] and then go to voicemail" after which he would receive a "pop-up" notification that would make a "ding" sound. Exhibit A, Pl.'s depo., p. 26, lines 4-21, p. 80, lines 9-22, p. 81, lines 1-17. Plaintiff testified that the "pop-up" notification would inform him that he had a voicemail message. *Id.* at p. 27, 1-3.

41. Plaintiff testified that if a person called his phone, it would ring more than once ("typically it's four, five rings"), in contrast to how his cellular phone would ring once before he received a voicemail from FAMS; "when [FAMS] called me several times,

11

it was a regular ring, but if it's one ring and then voicemail, that's what I'm saying." Exhibit A, Pl's depo., p. 84, lines 19-24, p. 85, lines 1-6, 11-24

42. When FAMS called Plaintiff's cellular phone number, he would receive call notifications any time that FAMS called him. Exhibit A, Pl.'s depo., p. 30, pp. 8-12. Plaintiff testified that missed call notifications would pop up on his phone go away. *Id.* at p. 30, lines 13-24, p. 31, lines 1-20.

43. Plaintiff testified that in addition to him receiving up to three dialed phone calls a day from FAMS (with a traditional ring of four to five rings), he might receive a voice drop pre-recorded message from FAMS which resulted in a single ring and a pop up notification. Exhibit A, Pl's depo., p. 86, lines 16-20, p. 87, lines 1-16.

44. Plaintiff understood that a third-party vendor, VoApps caused the voice drops in question to appear in the voicemail associated with Plaintiff's cellular telephone number and that the phone number associated with the voice mail was a number with an area code of 866. Exhibit A, Pl's depo., p. 88, lines 11-23, p. 89, lines 1-9.

45. Plaintiff also testified that when he answered a call from FAM, he was required to go follow a voice prompt ("Select 1 or 2") before he could speak with anyone. *Id.* at p. 91, lines 10-20, p. 92, lines 4-6, p. 99, lines 1-6, p. 102, lines 20-24, p. 103, lines 1-4, 6-7.

46. Plaintiff's counsel is well-versed in class actions and the prosecution and defense of both TCPA and FDCPA class actions.

**Superiority is Satisfied and the Class Members Are Ascertainable**

47. A class action is superior for the fair and efficient adjudication of the proposed class members' claims and the putative class members are ascertainable. Defendant's sole defense to Plaintiff's TCPA claims are that "Defendant did not make a call to a telephone number assigned to a paging service, cellular telephone service,

specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." See, Exhibit B, FAMS's Response to Pl's First Set of Interrogatories, Rog. No. 22 (which asked Defendant whether it "contend[s] that it is lawful to leave prerecorded messages on the answering machine or voicemail of the number YOU are trying to call?" and "[i]f YOU answer 'yes,' identify all facts, documents, events and witnesses and witness statements that YOU contend support YOUR answer.").

48. This defense has been categorically rejected by the district court in *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mi. 2018) where the debt collector used the same so-called "voice drop" system utilized by FAMS:

> Dyck O'Neal emphasizes that it did not dial Saunders' cellular telephone number. Instead, Dyck O'Neal "deposit[ed] a voicemail message directly on a voicemail service"—an action it insists is unregulated. "To do this, VoApp's patented Adapt-Sig technology created and transmitted a series of network signaling events into the network. Once a connection was established, the voice message was then played into the voice mail box from VoApp's server without ever placing a call to Plaintiff's mobile handset." (ECF No. 48 at PageID.492.)
>
> Dyck O'Neal's use of direct to voicemail technology is a "call" and falls within the purview of the TCPA. As a remedial statute, the Court construes the TCPA broadly in favor of Saunders. The statute itself casts a broad net—it regulates *any* call, and a "call" includes communication, or an attempt to communicate, via telephone. Both the FCC and the courts have recognized that the scope of the TCPA naturally evolves in parallel with telecommunications technology as it evolves, *e.g.*, with the advent of text messages and email-to-text messages or, as we have here, new technology to get into a consumer's voicemail box directly. The TCPA was enacted in 1991; the equivalent act at that time could be considered a party recording a message directly on an answering machine's cassette tape without ever calling the number—an infeasible technological feat absent physical access to a consumer's answering machine.
>
> Saunders received the notifications of Dyck O'Neal's voicemails on her phone. She listened to the voicemails on her phone. Voicemails are intrinsically tied to cellular phones. By leaving a voicemail directly in the server space associated with Saunders' phone, Dyck O'Neal was attempting to communicate with Saunders via her phone—which is the definition applied to the TCPA's use of "call." Further, Dyck O'Neal's

13

> automated message instructed Saunders to call them at a specific phone number—inviting additional communication over the telephone.
>
> The effect on Saunders is the same whether her phone rang with a call before the voicemail is left, or whether the voicemail is left directly in her voicemail box, *i.e.*, Saunders receives a notification on her phone that she has a new voicemail. The effect on Saunders is also the same in receiving a text message—which would fall under the TCPA—each time, she received a notification on her phone that she had a new message, and had to take steps to review or delete the message. In fact, voicemails are arguably more of a nuisance to consumers than text messages. To limit the TCPA to instances where Dyck O'Neal specifically dialed Saunders' phone number and then reached her voicemail, and exclude Dyck O'Neal's back door into Saunders' voicemail box, would be an absurd result. The TCPA was created to limit the harassment and nuisance that automated calls and messages place on consumers—which is precisely what Saunders alleges Dyck O'Neal has done. Dyck O'Neal cannot skirt the statute with VoApp's new technology.
>
> Accordingly, Dyck O'Neal's direct-to-voicemail messages are a "call" under the TCPA, and Saunders' claim will proceed. To hold otherwise "would elevate form over substance, thwart Congressional intent that evolving technologies not deprive mobile consumers of the TCPA's protections, and potentially open a floodgate of unwanted [voicemail] messages to wireless consumers." 30 F.C.C. Rcd. 7961 at ¶ 115.

319 F.Supp.3d at 912.

49. In further support of this motion, Plaintiff submits a Memorandum of Law.

**WHEREFORE**, for the reasons set forth above, Plaintiff respectfully requests that this Court enter an order: (**a**) certifying the proposed classes in this case; (**b**) appointing the Plaintiff as Class Representative; (**c**) appointing James C. Vlahakis as Class Counsel; and (**d**) for such other and further relief as the Court may deem appropriate.

*/s/ James C. Vlahakis*
James C. Vlahakis
2500 S. Highland Avenue, Suite 200
Lombard, IL 60148
Phone No.: 630-581-5456
Fax No.: 630-575-8188
jvlahakis@sulaimanlaw.com

*Attorney for Plaintiff Richard Molinari and the proposed class members*

15

**CERTIFICATE OF SERVICE**

I, James C. Vlahakis, certify that on October 10, 2019, I caused to be filed the above referenced document via the district's ECF system, which shall serve a file stamped copy of this document on all counsel of record.

/s/ James C. Vlahakis