Molinari vs Financial Asset Management Systems, Inc.

1:18-cv-01526

Deposition of: Richard Molinari

Taken on: May 10, 2019



LEXITAS™
180 North LaSalle Street, Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.lexitaslegal.com

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Page 1

Page 1

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT
                  NORTHERN  DISTRICT  OF  ILLINOIS
 2                     EASTERN  DIVISION

 3
     RICHARD  MOLINARI,  Plaintiff,    )
 4   on  behalf  of  himself  and  a   )
     class  of  similarly  situated    )
 5   individuals,                      )
                                       )
 6                   Plaintiffs,       )
                                       )
 7        vs.                          )  No.  1:18-cv-01526
                                       )
 8   FINANCIAL  ASSET  MANAGEMENT      )
     SYSTEMS,  INC.,                   )
 9                                     )
                     Defendant.        )
10

11

12         The  deposition  of  RICHARD  MOLINARI,  called  by

13   the  Defendant  for  examination,  taken  pursuant  to  notice

14   and  pursuant  to  the  Federal  Rules  of  Civil  Procedure  for

15   the  United  States  District  Courts  pertaining  to  the

16   taking  of  depositions,  taken  before  Christina  J.  Atto,

17   Certified  Shorthand  Reporter  and  Notary  Public,  at

18   2500  South  Highland  Avenue,  Suite  200,  Lombard,

19   Illinois,  commencing  at  10:00  a.m.  on  the  10th  day  of

20   May,  A.D.,  2019.

21

22

23

24
```



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Pages 2..5

Page 2

```
 1   APPEARANCES:
 2        SULAIMAN LAW GROUP, LTD.
          MR. JAMES C. VLAHAKIS
 3        2500 South Highland Avenue
          Suite 200
 4        Lombard, Illinois 60148
          Phone: (630) 413-9054
 5        E-mail:  jvlahakis@sulaimanlaw.com
 6             On behalf of the Plaintiffs;
 7        MESSER STRICKLER, LTD.
          MS. STEPHANIE A. STRICKLER
 8        225 West Washington Street
          Suite 575
 9        Chicago, Illinois 60606
          Phone: (312) 334-3469
10        E-mail:  sstrickler@messerstrickler.com
11             On behalf of the Defendant;
12        BEDARD LAW GROUP, P.C.
          MR. JONATHAN AUST (via telephone)
13        4855 River Green Parkway
          Suite 310
14        Duluth, Georgia 30096
          Phone: (678) 253-1871 Ext. 203
15
               On behalf of the Defendant.
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2   WITNESS                                PAGE
 3   RICHARD MOLINARI
 4        Direct Examination by Ms. Strickler ...... 4
          Cross-Examination by Mr. Vlahakis ........ 86
 5        Redirect Examination by Ms. Strickler .... 96
          Recross-Examination by Mr. Vlahakis ...... 102
 6        Redirect Examination by Ms. Strickler .... 105
 7
                  E X H I B I T S
 8
 9             (NO EXHIBITS MARKED)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1               (Witness sworn.)
 2   WHEREUPON:
 3               RICHARD MOLINARI,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6               DIRECT EXAMINATION
 7   BY MS. STRICKLER:
 8        Q.   Can you please state your name and spell it
 9   for the record, please?
10        A.   Richard Molinari.  R I C H A R D,
11   M O L I N A R I.
12        Q.   Have you ever had your deposition taken
13   before?
14        A.   Nope.
15        Q.   Okay.  I'm just going to start out with a few
16   ground rules so you know what to expect.
17        A.   Okay.
18        Q.   Today we have a court reporter here so it's
19   really important for you to give verbal responses.
20   She's taking down everything you say so she can't take
21   down shakes of the head, nods --
22        A.   Right.
23        Q.   -- whatever.  Make sense?
24        A.   Uh-huh.
```

Page 5

```
 1        Q.   Okay.  Also, because she is taking down
 2   everything we say, let's try to not talk over each
 3   other.
 4        A.   Uh-huh.
 5        Q.   Sometimes you might know where I'm going with
 6   something, so just let me finish my question and then
 7   I'll let you finish your answer, the same.  Also, I'm
 8   not here to confuse you with any questions.  If I ask
 9   you a question and you don't understand, please feel
10   free to let me know and I'll rephrase.  However, if you
11   do answer, I will expect that you understand it.
12             If at any time you need to take a break at
13   all, just let me know.  The only thing that I would ask
14   is if there is a question pending that you would answer
15   it before we take a break.
16        A.   (Nodding.)
17        Q.   And do you understand that your testimony is
18   under oath and that it is just the same as if it were
19   being -- if you were testifying before a judge or a
20   jury?
21        A.   I do.
22        Q.   Okay.  And are you currently taking any
23   medications that may affect your testimony today?
24        A.   Nope.
```



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                                  Pages 6..9

Page 6

1    Q.   Okay.  And is there any reason why you can't
2 give fair and accurate testimony today?
3    A.   No.
4    Q.   Okay.  All right.  So I represent the
5 defendant in this case.  For the record, Financial Asset
6 Management Systems, Inc.  I'm going to refer to them as
7 FAMS.  Is that okay?
8    A.   That's fine.
9    Q.   Okay.  And do you understand that you are here
10 today for me to take your deposition?
11    A.   Yes.
12    Q.   Okay.  Did you do anything to prepare for your
13 deposition today?
14    A.   Just briefing with my lawyer.
15    Q.   Okay.
16    A.   That's all.
17    Q.   And when did you speak with your lawyer?
18    A.   About ten, fifteen minutes ago.  That's about
19 it.
20    Q.   Okay.  Today?
21    A.   Yeah.  Nothing other than that.
22    Q.   Okay.  And it was -- Was it just Mr. Vlahakis
23 that's here today?
24    A.   Yes.

Page 7

1    Q.   Okay.  Did you review any documents?
2    A.   No documents reviewed.
3    Q.   Okay.  Can I have your date of birth, please?
4    A.   6-20-75.
5    Q.   And have you ever gone by any other name
6 besides Richard Molinari?
7    A.   No.
8    Q.   And am I pronouncing it correctly?  Molinari?
9    A.   Yeah.
10    Q.   Okay.
11    A.   Molinari, yeah.
12    Q.   Molinari?
13    A.   Uh-huh.
14    Q.   Are you currently married?
15    A.   Yes.
16    Q.   Okay.  And what is your spouse's name?
17    A.   Nicolette Molinari.
18    Q.   And has your spouse gone by any other name
19 besides Nicolette Molinari?
20    A.   No.  I mean, obviously before she was married.
21    Q.   Okay.
22    A.   But yeah.  No.
23    Q.   What's her maiden name?
24    A.   Campbell.

Page 8

1    Q.   Campbell.  And how long have you been married?
2    A.   Roughly around ten years.
3    Q.   Okay.
4    A.   About that.
5    Q.   What is your current address?
6    A.   6 Drake Lane in Beecher, Illinois 60401.
7    Q.   That's Beecher?
8    A.   Uh-huh.  Beecher.
9    Q.   Is it B ...
10    A.   It's -- I believe it's spelled B E E C H E R.
11 Yeah.
12    Q.   Got it.
13 MR. VLAHAKIS:  Where is Beecher near?
14 THE WITNESS:  Beecher is near Crete, Illinois.
15 MR. VLAHAKIS:  Okay.
16 THE WITNESS:  It's actually right on the border of
17 Illinois and Indiana.
18 MR. VLAHAKIS:  Okay.
19 MS. STRICKLER:  Oh.
20 THE WITNESS:  You go maybe ten miles you're out of
21 state.
22 MR. VLAHAKIS:  Okay.
23 THE WITNESS:  Yeah.  So ...
24 MR. VLAHAKIS:  I always wanted to ask him that.  So

Page 9

1 thank you.
2 THE WITNESS:  Yeah.
3 MS. STRICKLER:  I don't know a lot of the suburbs
4 around here so good to know.
5 MR. VLAHAKIS:  Oh, city slicker?
6 BY MS. STRICKLER:
7    Q.   So how long have you lived at that address?
8    A.   At Beecher, about four and a half years.
9    Q.   Okay.  And what -- Do you recall what your
10 address was just prior to this one?
11    A.   Right before Beecher it was in Schererville.
12    Q.   In Indiana?
13    A.   Indiana.
14    Q.   See.  I am from Indiana so I know the towns
15 there.
16    A.   Yeah.
17    Q.   Do you recall what your address was?
18    A.   It's 2120 Meadow Lane.
19    Q.   And how long did you reside there?
20    A.   About four years.
21    Q.   While you were living at these two addresses,
22 did you use any other address for any other purpose?
23    A.   No.
24    Q.   Okay.



Page 10

1    A.   Nope.

2    Q.   Do you reside with anyone?

3    A.   I live with my wife and my mother.

4    Q.   Okay.  And did you speak with anybody about

5  this lawsuit or have you spoken with anybody about this

6  lawsuit?

7    A.   No.

8    Q.   Okay.

9    A.   No.  Other than my attorney.  That's it.

10   Q.   Okay.

11   A.   Yeah.

12   Q.   No friends, family?

13   A.   No.  It's none of their business.

14   Q.   What is your current phone number?

15   A.   It's (708) 228-8132.

16   Q.   8132.  How long have you had that number?

17   A.   Oh, my God.  I think at least five years,

18  minimum.

19   Q.   Do you use any other phone number besides the

20  8132 number?

21   A.   Nope.

22   Q.   Do you have any children?

23   A.   No.

24   Q.   What is your highest level of education?

Page 11

1    A.   College graduate.

2    Q.   Okay.

3    A.   Bachelor's degree.

4    Q.   Bachelor's?

5    A.   Columbia College.

6    Q.   And is that in Chicago?

7    A.   Yeah.  Yep.

8    Q.   What was your degree in?

9    A.   Liberal Arts.

10   Q.   And do you recall when you earned that degree,

11  approximately?

12   A.   It was roughly 1999, I believe.  Yeah, June of

13  1999.

14   Q.   Do you hold any other licenses or

15  certificates?

16   A.   Nope.

17   Q.   And are you currently employed?

18   A.   Yes.

19   Q.   Where?

20   A.   Whole Foods Market.

21   Q.   And where?  Which Whole Foods?

22   A.   Oh.  Orland Park.

23   Q.   And how long have you been there?

24   A.   18 years.

Page 12

1    Q.   That's a long time.

2    A.   Oh, yes.

3    Q.   And what do you do there?

4    A.   Lead receiver.

5    Q.   Lead receiver?

6    A.   Uh-huh.

7    Q.   And what is a lead receiver?

8    A.   Pretty much any product that comes in to the

9  store, we're responsible for receiving it.

10   Q.   Okay.

11   A.   Overseeing that, doing the payments, paying

12  for the PO's.  Stuff like that.

13   Q.   Have you held that position the entire time

14  you've worked there?

15   A.   Oh, no.  I've held several different

16  positions.  I stayed with the company, but, you know,

17  I -- different -- different departments.  I recently got

18  into receiving maybe five years ago, but ... Yeah.

19   Q.   Okay.  What did you do just prior to being a

20  lead receiver?

21   A.   Oh, my God.  I did the warehouse, I did

22  grocery, I did whole body.  Pretty much almost every

23  department in the store.

24   Q.   Okay.

Page 13

1      MR. VLAHAKIS:  I didn't know Whole Foods had been

2  around for that long.

3      THE WITNESS:  Oh, yeah.  They've been around for --

4  yeah, around 30 years.

5  BY MS. STRICKLER:

6    Q.   Have you ever been a party to a lawsuit?

7    A.   Have I ever been what?

8    Q.   A party?  Do you --

9    A.   Oh, involved?

10   Q.   Uh-huh.  Yes.

11   A.   Yeah, I've been involved in one.  Yes.

12   Q.   Okay.  And can you tell me what that was?

13   A.   Do you want just like basic details, or ...

14   Q.   I guess, how many lawsuits have you been a

15  party to?

16   A.   One.

17   Q.   One, okay.

18   A.   Yes.

19   Q.   And do you recall what the name of that was,

20  the name of the case?

21   A.   I don't even recall the name.

22   Q.   Do you recall if you were the plaintiff or

23  defendant?

24   A.   Oh.  I was -- Yeah, I was the plaintiff.



Page 14

1  Yeah.
2      Q.   Okay.  Do you remember who you sued?
3      A.   I'm trying to think of the name.  I think it
4  was Comenity.  Yeah.
5      Q.   Do you recall about how long ago that was?
6      A.   Maybe a year or so ago.
7      Q.   And was this -- was the case here?
8      A.   Here?
9      Q.   In Chicago or Illinois?
10     A.   Yes.  Yeah, Illinois.  Yeah.
11     Q.   Okay.  And what was the -- What were your
12  claims in that case?
13     A.   What were my claims?
14     Q.   What was the case about?
15     A.   It was harassment.
16     Q.   Okay.  What kind of harassment?
17     A.   It was more emotional or harassment.
18     Q.   Could you kind of explain the -- I guess, the
19  underlying facts?  What was -- What did Comenity do to
20  harass?
21     A.   Well, they were pretty much harassing me by
22  phone.
23     Q.   Okay.  Was this also another -- I guess, a
24  debt collector case?

Page 15

1      THE WITNESS:  Is that considered a debt collector?
2      MR. VLAHAKIS:  You can't ask me any questions.
3      THE WITNESS:  Oh, my God.
4  BY MS. STRICKLER:
5      Q.   To the best of your memory or understanding.
6      A.   Yeah.  Yeah.
7      Q.   Was it similar to the case that we're here for
8  today?
9      MR. VLAHAKIS:  Object to the form of the question.
10         Go ahead and answer.
11  BY THE WITNESS:
12     A.   Yes and no.
13     Q.   Okay.  Can you explain why it is similar?
14     A.   Well, I believe phone calls to me is
15  harassment.
16     Q.   Okay.  And why is it dissimilar?
17     A.   So I --
18     Q.   Or go ahead.  Sorry.
19     A.   It's dissimilar because it's a different
20  company.  I mean ...
21     Q.   Is there anything else?
22     A.   (Shaking head.)
23     Q.   No?
24         Do you recall what the outcome of that case

Page 16

1  was?
2      A.   "Outcome" meaning what?
3      Q.   I guess, is it -- I mean, is it still pending?
4      A.   No, it's not.
5      Q.   Okay.  Did you go to trial?
6      A.   No.
7      Q.   Was there a settlement in the case?
8      A.   Yep.
9      Q.   Okay.  And have you ever been convicted of a
10  crime?
11     A.   Nope.  Never been arrested in my life.
12     Q.   Sorry.  I have to ask that.
13     A.   No.  That's -- That was interesting.  I've
14  actually never been arrested.
15     Q.   Good.
16     A.   Ever.
17     MR. VLAHAKIS:  You look nervous.
18     MS. STRICKLER:  I look nervous?  Nope.
19     MR. VLAHAKIS:  Would your answer be different?
20     MS. STRICKLER:  No.
21  BY MS. STRICKLER:
22     Q.   Okay.  Let's move on to this case.  So your
23  number ending in 8132, that's the number that's at issue
24  in the lawsuit, correct?

Page 17

1      A.   Uh-huh.
2      Q.   Okay.  Did --
3      MR. VLAHAKIS:  Oh, just going forward, uh-huh, she
4  can kind of take that down, but use yes or no's for the
5  court reporter.
6      THE WITNESS:  Okay.
7      MS. STRICKLER:  Thank you.
8      MR. VLAHAKIS:  Welcome, or uh-huh.
9  BY MS. STRICKLER:
10     Q.   So FAMS is the defendant in this case.  Did
11  FAMS contact you at that number?
12     A.   At the 228-8132?
13     Q.   8132?
14     A.   They've -- Yeah, they were calling there.
15     Q.   Okay.
16     A.   Uh-huh.
17     Q.   Did they call you at any other numbers?
18     A.   Well, they attempted to believe to call me or
19  my wife at my mother's phone number --
20     Q.   Okay.
21     A.   -- which that caused a lot of conflict,
22  but ...
23     Q.   What was that -- Do you know the phone number?
24     A.   It was (708) -- oh, my God -- 946-0284.



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                             Pages 18..21

Page 18

1   That's her phone number.
2        Q.   Your mother's?
3        A.   Yes.
4        Q.   Okay.
5        A.   So I have no connection whatsoever to that
6   phone number.  They probably -- That would just probably
7   be the address, perhaps, and she did talk to them
8   several times, so ...  But it's kind of hard for her to
9   answer the phone because she's handicapped.  She's in a
10  wheelchair.  That's why she lives with me.  I have to
11  take care of her when I'm not at work, so ...
12       Q.   Okay.  That number that you provided, is that
13  her cell phone number?
14       A.   No.  That's a home phone.  That's a landline.
15       Q.   Okay.  Okay.
16       A.   Yeah.  That was the land -- her landline.
17  She's had that landline in River Grove.  She had gotten
18  sick so I had to move her in with me and my wife to
19  Beecher, so she never changed her phone number.  She
20  just changed the address.
21       Q.   Okay.
22       A.   So ...
23       Q.   Do you recall when she was receiving these
24  phone calls?

Page 19

1        A.   It -- I know it was at least between six and
2   eight months ago, I believe.  That's when they started.
3        Q.   Okay.  Do you recall -- I mean, have they
4   stopped?
5        A.   They stopped so far, but for a while it was on
6   and off.
7        Q.   Okay.  Do you recall when the calls stopped?
8        A.   Maybe a month or two ago.  Roughly around
9   then.
10       Q.   Did you say that they were looking for you or
11  your wife?
12       A.   Oh, no.  They were on the phone with my mother
13  asking for Nicki.
14       Q.   Okay.
15       A.   And she's told them several times this is not
16  her phone number.  So I don't know what that's about.  I
17  was not physically there, but that caused a lot of
18  conflict.  And, again, I don't know how they got that
19  number, but my confusion in that part is the fact that
20  she specifically said this is not Nicki's phone number.
21  And she's in a wheelchair and it's even hard for her to
22  answer the phone.  So I understand one time, but she
23  spoke to people so I -- I -- Anyway, that's ...  I don't
24  want to go off on anything separate.

Page 20

1        Q.   That's all right.  I'm going to go back to
2   your phone number, 8132.  That's a cell phone number,
3   correct?
4        A.   Yes.
5        Q.   Okay.  And are you the only user of that
6   number?
7        A.   Of this number, yes.
8        Q.   Okay.  What kind of phone do you have?
9        A.   Sprint.
10       Q.   Sprint?
11       A.   I have --
12       Q.   Is it -- Is that ...
13       A.   Samsung.  It's I think the 3, older model.
14       Q.   Is that an Android?
15       A.   Galaxy 3.
16       Q.   Oh, a Galaxy?
17       A.   Yeah.
18       Q.   Okay.  Have you always had that type of phone
19  associated with the number 8132?
20       A.   No, not always.  I had before that -- I still
21  had a Samsung.  It was just a different brand.  To be
22  honest with you, I can't even remember the -- what other
23  brand it was.  That was a couple years ago, but that one
24  broke.  Same number, same plan, everything.  It's just a

Page 21

1   different version.  That's all.
2        Q.   Okay.  And you've --
3        A.   But --
4        Q.   -- had that phone for about two years you'd
5   say?
6        A.   Two or three, yeah.
7        Q.   Two or three, okay.
8        A.   And so you said that it's the same plan.  What
9   kind of plan do you have?
10       A.   It's pretty much unlimited.
11       Q.   Is it under any sort of family plan?
12       A.   No.  It's just like my wife's number is the
13  secondary, but it's my account.
14       Q.   Okay.  And do you pay for your cellular bill?
15       A.   Yes.  I pay for everything.
16       Q.   What do you mean by everything?  Your wife's
17  too, and ...
18       A.   Yeah.
19       Q.   Okay.
20       A.   Everything in general.
21       Q.   So you said you have an unlimited plan.  What
22  exactly does that mean?
23       A.   Pretty much unlimited calling, texting, data.
24       Q.   So since it's unlimited, do you receive any



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Pages 22..25

Page 22

1  sort of charges for incoming calls?
2      A.   No, not for incoming calls.  No.
3      Q.   What about outgoing calls?
4      A.   Not unless it's out of the -- what do you call
5  it? -- the -- Oh, what, do they call that?  The roaming.
6      Q.   Uh-huh.
7      A.   I had to look on my phone.  If it's roaming.
8      Q.   Okay.  Do you receive -- Or I'm sorry.  Do
9  you -- Are you charged for any text messages?
10     A.   Not unless -- There's certain rates.  Like, if
11  it's a business, you'll get a pop-up saying this may --
12  this may -- additional rate may be applied.
13     Q.   Okay.
14     A.   I know a few times I've seen it on the phone
15  where I've got charged for an additional rate, but
16  that's probably with the company.
17     Q.   Okay.
18     A.   I don't know exactly how that works, but, yes,
19  I was calling Sprint about my fabulous bill being
20  charged $25 late text one time, so ...
21     Q.   Okay.  That's an expensive text?
22     A.   Yeah.  That was amusing.
23     Q.   Are you charged for any of the voicemails that
24  you receive?

Page 23

1      A.   I'm not charged.  It's in actual plan.
2      Q.   In plan, okay.
3           And when did you start receiving calls from
4  FAMS?
5      A.   That I can recall?
6      Q.   That you can recall?
7      A.   I think it went all the way back to at least
8  2015, but I mean, it really -- it was kind of on and
9  off, but 2017 was really when -- a lot of phone calls.
10     Q.   Okay.  And who is the person that FAMS was
11  attempting to reach?  Was it you?
12     A.   I have no idea because I have no debt, so ...
13  I didn't even know what FAMS was about.  I know I -- I
14  spoke one time -- I spoke one time with my wife and she
15  said that was something that she thought was paid off.
16  So I'm like, well, if it's paid off, I mean, why am I
17  contacting someone that's paid off, but at the same
18  time, it's also bothering, but ...
19     Q.   Okay.  So I guess to your understanding, they
20  were contacting you in relation to an account that was
21  supposedly belonging to your wife?
22     A.   Supposedly?
23     Q.   (Nodding.)
24     A.   Yeah.

Page 24

1      Q.   Okay.
2      A.   I mean ... Yeah.
3      Q.   And when did you become aware that the calls
4  were in an attempt to reach your wife?
5      A.   To reach my wife?  Well, obviously, that
6  was -- I believe they said it on a voicemail.  I think
7  they said it on a voicemail.
8      Q.   What was said on the voicemail?
9      A.   They're trying to contact Nicki.
10     Q.   Okay.
11     A.   Nicolette.  So if someone is trying to contact
12  her, I'm going to tell her.  That's her responsibility
13  to call back that person.  That's not my debt.  They're
14  not trying to reach me so why would I call someone back
15  if they're asking for someone else?  I mean, if they
16  were asking for me, that's a different story.  If they
17  knew it was me and they specifically wanted to talk to
18  me, that's fine.  But if you're asking to speak to my
19  wife, call her on her number, not my number.  That's ...
20     Q.   Do you recall -- I guess you said that you --
21  that this was in a voicemail.  Do you recall when you
22  received this voicemail?
23     A.   I could possibly -- I could look it up on my
24  phone if you wanted the exact date.

Page 25

1      Q.   It's okay.  If you -- If you have a rough
2  estimate.  Was this in 2017?
3      A.   Yeah, 2017.  I mean, like I said, I could look
4  it up on my -- I've saved all the voicemails on my
5  phone, but to give an exact date, I would have to look
6  at that date.
7      Q.   All right.  And do you have a personalized
8  greeting on your voicemail?  Do you understand what I
9  mean by personalized greeting?
10     A.   It says Richard.
11     Q.   Okay.
12     A.   Yeah.
13     Q.   And have you always had that set-up?
14     A.   Yes.  It's always been my name.  Yeah.  I
15  hope.
16     Q.   A slightly different question, but ...
17          Does your -- So does your wife ever use your
18  cell phone?
19     A.   Nope.
20     Q.   And, to your knowledge, has she ever used that
21  number?
22     A.   My phone number?
23     Q.   (Nodding.)
24     A.   No.



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Pages 26..29

Page 26

1    Q.    To your knowledge, has she ever provided that
2  number as her own?
3    A.    No.
4    Q.    So when you -- You said you received
5  voicemails from FAMS.  Did your phone ring when you
6  received a voicemail?
7    A.    When the -- Yeah, the phone rings once.
8    Q.    Okay.  So the phone rang and then the
9  voicemail came?
10   A.    Uh-huh.
11   Q.    Okay.
12   A.    And then plus I get a pop-up.
13   Q.    What is the pop-up?
14   A.    I could show you as an example.  Let me see if
15 it's still there.  You see how it says e-mail
16 (gesturing)?  It will be the same thing like if I have
17 voicemail.
18   Q.    Okay.
19   A.    It pops up and then it dings.
20   Q.    A notification?
21   A.    Yeah, notification.
22   Q.    Okay.
23   A.    Until you clear that voicemail, you're going
24 to get that notification.

Page 27

1    Q.    Okay.  Does it just say voicemail, or ...
2    A.    It says voicemail and then you have to check
3  your voicemail.
4    Q.    Okay.
5    A.    Then you actually have to go to your voicemail
6  thing, either listen to it or call it in.
7    Q.    Okay.  How do you -- I guess, can you walk me
8  through how you retrieve your voicemails?
9    A.    I could show you, but I'm not going to play
10 something because that's --
11   Q.    No.  That's okay.  I guess --
12   A.    So you're going to have your notifications.
13 Okay.  Now, keep in mind also with the other phone, I
14 had to physically call in.  This is newer.
15   Q.    Okay.
16   A.    But --
17   Q.    The phone you had maybe before two, three
18 years ago?
19   A.    Even this is an updated version of voicemail.
20 My other voicemail, I physically had to call my number.
21   Q.    Okay.
22   MR. VLAHAKIS:  Uh-huh.  When -- The time you're
23 talking about physically having to call, when was that?
24 Why don't you nail that down.

Page 28

1    THE WITNESS:  It was beginning of 2017, I believe.
2    MR. VLAHAKIS:  Okay.
3    THE WITNESS:  Because I literally -- This voicemail
4  app is newer, so ...  But as of now, I can show you
5  this, but ...
6  BY MS. STRICKLER:
7    Q.    Okay.  And so when were you able to start
8  using it that way?
9    A.    I think around beginning of maybe February.
10   Q.    Of this year?
11   A.    2017.
12   Q.    2017?
13   A.    Yes.
14   Q.    Okay.  But before --
15   A.    But before then, you would have to call in.
16   Q.    Call in, okay.
17   A.    But this, you'd actually have -- you can
18 actually press on this and then you have to listen to
19 it.
20   Q.    Okay.
21   A.    But before then, it's pretty much calling in.
22 So you'd call your own number and ask for your password
23 and then you would be able to access your voicemail that
24 way.

Page 29

1    Q.    Okay.  When you received missed calls, is it a
2  similar notification that you receive?
3    A.    Uh-huh.
4    Q.    Okay.
5    A.    Missed calls will come up and then a dingle.
6  There will be a ding.
7    Q.    If there's a voicemail or even if there's --
8    A.    If there's a voice [sic] or even if it's a
9  missed call.
10   Q.    Just a missed call?
11   A.    Yes.
12   Q.    Are they separate notifications?
13   A.    It's the same, like, chirping sound because --
14 unless I change that in my phone.
15   Q.    I guess, what's displayed on your phone?  Is
16 it --
17   A.    Yeah.
18   Q.    -- separate?  It will say, you know, missed
19 call and then there's another one that says --
20   A.    Yeah.
21   Q.    -- voicemail?
22   A.    Yes, they're separate.
23   Q.    Okay.
24   A.    Yeah.  So, for example, if someone just called



Page 30

1  me, it's a missed call, it will show up as a missed
2  call, but if I had a voicemail, like two calls before
3  then, it will show voicemail.  So you could have actual
4  two separate notifications pop up if it's one right
5  after the other, but yeah --
6      Q.   I see.  Okay.
7      A.   -- it's different.
8      Q.   Were you receiving missed call notifications
9  from FAMS?
10     A.   Yes --
11     Q.   Okay.  And do you --
12     A.   -- anytime they call me.
13     Q.   Do you still have those records?
14     A.   Of missed calls?
15     Q.   (Nodding.)
16     A.   I mean, it's a notification that pops up.  It
17  will say missed call and then when you click on it, that
18  goes away.  So it will show missed call on here, then on
19  the phone symbol, it will show who called.  And then ...
20  Wait.  So the phone symbol, you see how, like, if you
21  have a text, there's a notification?  It's the same
22  notification with the number.
23     Q.   Okay.
24     A.   And then you'll have to click on that and then

Page 31

1  you'll have to go and it will show the missed call.
2      Q.   Okay.
3      A.   So that will stay in here, but the original
4  notification, that's how it goes through.
5      Q.   That goes away?
6      A.   So it goes through missed call on your regular
7  when your phone is locked and then it's the symbol and
8  then you click on that.
9      Q.   Okay.
10     A.   So if someone -- If I had to check a missed
11  call, that's pretty much the steps that I would have to
12  go through, is first you got to unlock your phone
13  because I have to keep it locked because I'm nine
14  times -- Well, mostly at work I keep it locked so it's
15  more of a habit to just save some and keep it locked.
16  Do the pin and then go through the steps of missed
17  calls.  So you click on missed call, then you would go
18  through your notification there, click on the
19  notification, and then the next screen you would
20  actually see where the missed call came from.
21     Q.   Okay.  Is there a way for you to see a list of
22  the missed calls that you have received?
23     A.   From which time?
24     Q.   Just anytime on your phone.

Page 32

1      A.   Yeah, up to a certain date.  Yes.
2      Q.   Okay.  So did you ever save the records from
3  the missed calls of FAMS?
4      A.   Did I ever save them?  I mean, I didn't
5  like -- I didn't erase them.
6      Q.   Okay.  I guess so we -- In this case, we have
7  from you produced, I guess, screen shots of the
8  voicemails.
9      A.   Right.
10     Q.   I'm wondering if you have screen shots of the
11  missed calls.
12     A.   Of the missed calls?  I don't think I have
13  screen shots.  I -- It's still on my phone, though.
14     Q.   It would still be on your phone?
15     A.   (Nodding.)
16     Q.   Okay.
17     A.   Up to a certain date.
18     Q.   Okay.
19     A.   I -- I -- Missed calls?  Oh, let me see how
20  far back it goes.
21     MS. STRICKLER:  I guess I would just ask, if there
22  are missed calls from the number of FAMS, if --
23     MR. VLAHAKIS:  We'll check that --
24     MS. STRICKLER:  Okay.

Page 33

1      MR. VLAHAKIS:  -- but I think initially when we
2  responded to discovery, we explained that Omar had --
3  for the complaint about that list, he got that off of
4  his phone.
5      MS. STRICKLER:  Uh-huh.
6      MR. VLAHAKIS:  I'll double-check to see -- I mean,
7  if you want to look right now to see how far back the
8  missed calls go, I think they do override at a certain
9  period of time.
10     MS. STRICKLER:  Right.
11     MR. VLAHAKIS:  But, yes, if there are anything that
12  we can produce, we'll do, but I think this might make
13  sense to see if he still has the FAMS one on his phone
14  because I know he showed -- he still has the voice drops
15  on his phone, the three of them that he has, but then
16  there's obviously the other seven that we don't have.
17     MS. STRICKLER:  Okay.
18     MR. AUST:  And this is Jonathan.  If you don't mind
19  if I -- I'm looking at the dates of the messages that we
20  have that were November 16th, 2017, November 24th, 2017,
21  and December 4th of 2017.  If he doesn't mind looking
22  for -- Even after the deposition, if he can look for the
23  screen shots or if the phone still has the records from
24  those dates.



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                    Pages 34..37

Page 34

1       MR. VLAHAKIS:  Well, we produced those to you
2   already.
3       MR. AUST:  Where are they because I'm looking for
4   it right now.
5       MR. VLAHAKIS:  They -- I imbedded those into an
6   e-mail to you.  And I have them -- I should still also
7   have them on my laptop from where he sent them to me as
8   well.  And let me double-check.  It shouldn't take me
9   too long for me to go through ... Because I think I
10  called it like screen shots as the -- whatever the image
11  that I saved and sent to you.  And I know I imbedded it
12  into an e-mail with you guys.
13      MR. AUST:  As I'm looking for it, I remember seeing
14  something in a -- maybe a letter --
15      MR. VLAHAKIS:  Should we just go off the record for
16  right now while we're doing -- looking for that?
17      MS. STRICKLER:  Sure.
18              (Discussion off the record.)
19  BY MS. STRICKLER:
20      Q.  Okay.  So I was previously asking you about, I
21  guess, the list of missed calls that you have.  Do you
22  know how long your phone retains missed calls?
23      A.  On that screen, two months.  On the website of
24  Sprint, I can go back two or three years at least.

Page 35

1       Q.  On the website?
2       A.  Yes.
3       Q.  Okay.  You were talking about how you retrieve
4   your voicemails.  You went through the steps.  Is the
5   screen showing the voicemails the same screen as the
6   missed calls?
7       A.  What do you mean by the same?  That this -- It
8   appears the same, you're saying?
9       Q.  Are they the same?  Are they on the same
10  screen?
11      A.  Yes.
12      Q.  Okay.
13      A.  Yes.
14      Q.  So you --
15      A.  So, for example, if I had both, they'd both be
16  here.
17      Q.  I guess when you actually get into the list of
18  the voicemails --
19      A.  Uh-huh.
20      Q.  -- though, is that also the same -- does it
21  have the missed calls and the voicemails on the same --
22      A.  They're separate.
23      Q.  They're separate?  Okay.
24      A.  You have to -- In order to -- Completely

Page 36

1   separate.
2       Q.  Okay.
3       A.  Missed calls, you go to missed calls.
4   Voicemail, you have to go to your voicemail.
5       Q.  There's different --
6       A.  Yes.
7       Q.  -- like steps you have to take to get to both?
8       A.  Right.  Right.
9       Q.  Okay.  Did you ever receive any text messages
10  from FAMS?
11      A.  I don't believe so.  No, I don't think I got
12  any texts.
13      Q.  How many voicemails did you receive from FAMS?
14      A.  Voicemails?  To my knowledge, ten.
15      Q.  For, I guess, any one of those voicemails,
16  would you see your phone ring and then you wouldn't
17  answer and it -- you would get a voicemail?
18      A.  Right.
19      Q.  That's the process?
20      A.  (Nodding.)
21      Q.  Was there ever a time where there was no
22  notification of a missed call, but there was a
23  notification of just voicemail from FAMS?
24      A.  No, not that I --

Page 37

1       Q.  So was it always --
2       A.  -- ever recall because it's going to tell you
3   both.
4       Q.  Okay.
5       A.  It's going to tell you that there's a missed
6   call and it's going to tell you that there's a
7   voicemail.
8       Q.  So from your recollection, it was always both
9   a missed call and a voicemail notification?
10      A.  Uh-huh.
11      Q.  Did you ever speak to a FAMS representative?
12      A.  I spoke to one, yes.
13      Q.  Okay.  So just one time then?  Or how many
14  times?
15      A.  That I can recall is one time.  I tried
16  calling one or two times and it was literally like a
17  pre-recorded message and then you click on that to speak
18  to a live person, so ...  I thought I was speaking to a
19  live person right away.  I was at work and I really
20  didn't need to do that, but I checked it anyway.
21      Q.  This time that you talked to the
22  representative, did you initiate the call?
23      A.  Yes, I did, but this is them calling me.
24      Q.  I guess I was just asking --

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                              Pages 38..41

Page 38

1    A.    Yeah.  Yeah.
2    Q.    -- for that one time, though.
3    A.    Yeah.  No.  I'm just -- So you understand it,
4    it's them calling me and picking up, not me calling them
5    back.  That's what I'm saying.  Like, I didn't just call
6    them back from a voicemail or something.  They actually
7    called me and it was on caller ID and I picked up.
8    That's when I told them not to call me.
9    Q.    So they called you?
10   A.    Correct.
11   Q.    You didn't call them?
12   A.    Right.
13   Q.    Okay.
14   A.    They called --
15   Q.    That's different?
16   A.    Right.  They called me.
17   Q.    You picked up?
18   A.    I picked up --
19   Q.    And said --
20   A.    -- and I said not to call me.
21   Q.    Okay.  Was that the -- You said that was the
22   only time you spoke to them.  Was that the only time you
23   told them to stop contacting you?
24   A.    Yes.

Page 39

1    Q.    Do you recall about when that was?
2    A.    I'm not sure of the exact date.  I mean ...
3    Q.    Was it springtime?  Was it fall?  Was it in
4    2017?
5    A.    Late 2017.
6    Q.    Perhaps, wintertime?
7    A.    Perhaps.  I mean, I would love to give you an
8    accurate date, but I can't remember the exact date.
9    Q.    Okay.  Did they stop contacting you after
10   that?
11   A.    At this number, yes.
12   Q.    But they were contacting you at a different
13   number?
14   A.    At my mother's after I told them to stop
15   calling or they were contacting Nicki, but they were
16   contacting.
17   Q.    Okay.  But they stopped calling your number of
18   8132?
19   A.    Well, let me put it to you this way.  After me
20   telling them don't call this number, call her number if
21   you want to contact her, they called my mother and asked
22   for her, so ...
23   Q.    Okay.
24   A.    Yeah.  That's how that worked.

Page 40

1    Q.    When you were receiving calls, do you recall
2    how often the calls were made?
3    A.    How often?  I can recall at least -- I -- Just
4    by the number of phone calls, I mean, at least once
5    every couple days.
6    Q.    How long did that go on?
7    A.    At least several months, minimum.
8    Q.    Would that be five months?  What's several to
9    you?
10   A.    Up to nine.
11   Q.    Up to nine?
12   A.    Because I don't remember the phone calls in
13   2015, but they did.
14   Q.    And you said that the calls have stopped,
15   correct?
16   A.    So far, yes.  I think they called my mother's
17   phone number again a couple weeks ago, but I wasn't
18   there.  I know she brought up the name again.
19   Q.    Has there been a time in the last five years
20   that you received calls similar to the ones you were
21   receiving from FAMS from a different company?
22   A.    Within five years?
23   Q.    Yeah.  Just in the past five years?
24   A.    Yeah.

Page 41

1    Q.    Okay.
2    A.    Within five years, yeah.
3    Q.    Do you recall who you received those calls
4    from?
5    A.    What do you mean?  The company?
6    Q.    Uh-huh.  Yes.
7    A.    Well, that was -- that was -- Comenity was
8    one.  Yeah, I think there was one other company that I
9    don't even remember the name of the company.
10   Q.    And when were you receiving the calls from
11   Comenity?
12   A.    2017.
13   Q.    And the other company, do you recall when you
14   were receiving those calls?
15   A.    2015.
16   Q.    And were any of these calls in relation to a
17   debt that you owed?
18   A.    Nope.  I don't owe debt.  I mean, me, yeah, I
19   don't owe debt.
20   Q.    Were you receiving any voicemails from those
21   calls?
22   A.    Yeah.
23   Q.    What did you do when you received those
24   voicemails?



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                          Pages 42..45

Page 42

1    A.   With the other company?
2    Q.   Correct.
3    A.   I contacted them after several calls and
4  voicemails and told them not to call me.
5    Q.   And did they stop?
6    A.   Not really.
7    Q.   Okay.  And then what did you do when they
8  didn't stop?
9    A.   Get an attorney.
10   Q.   Okay.  And did you keep records of those
11 calls?
12   A.   Yes.
13   Q.   And did you keep records of the voicemails?
14   A.   Yes.
15   Q.   And do you believe that you suffered any
16 damages as a result of those calls?
17   A.   Yes.
18   Q.   Okay.  And can you tell me -- can you explain
19 the damages that you suffered?
20   A.   With these debt collection calls?
21   Q.   For the calls, yeah.  The other companies.
22   A.   Over time, I'm pretty much getting a divorce
23 and I have an issue with my mother now that I'm taking
24 care of and she's sick.  So over time, the whole debt

Page 43

1  thing causes issues in your marriage and that's brutally
2  honest, so ...  Not to mention, I mean, obviously
3  stress, but when it's affected your marriage and your
4  relationship with your mother that you're taking care
5  of, that's definitely emotional and that can lead to,
6  you know, just physical stress, just ...  And affecting
7  my work performance because you know you do think about
8  that stuff and that's just fabulous to go through all
9  that stuff when you're at work, so ...
10   Q.   So you suffered physical stress.  Were you
11 experiencing symptoms?
12   A.   Headaches.
13   Q.   Headaches?
14   A.   I almost had a seizure.  I'm epileptic.
15   Q.   You are epileptic?
16   A.   Yes.
17   Q.   Okay.
18   A.   My blood pressure was up a few times and I'm
19 otherwise healthier.
20   Q.   So you haven't had issues with blood pressure
21 in the past?
22   A.   No.
23   Q.   Are you on medication for your epilepsy?
24   A.   Yes.

Page 44

1    Q.   Okay.  Any other physical symptoms that you
2  experienced?
3    A.   I mean, most of it was headaches, almost
4  having a seizure, and I had -- on and off I would have
5  chest pains.  Like, a few times I had to get it checked
6  out.
7    Q.   When did you do that?
8    A.   When did I get it checked out?
9    Q.   Uh-huh.
10   A.   This is in early 2017.
11   Q.   And was there any sort of result that
12 you received from them?
13   A.   They said it was stress.
14   Q.   Stress?
15   A.   I said what can I do to prevent this?  And I
16 mean, when a guy -- when a doctor says it's stress, man,
17 like just try to relax.  You could tell people that all
18 you want, but yeah, you know, I mean, it wasn't -- they
19 didn't prescribe anything for it.  I mean, doctors have
20 opinions, but, you know, stress is stress.
21   Q.   Okay.  Moving on.  Besides your attorneys, is
22 there anybody that you can think of that has knowledge
23 regarding this case?
24   A.   No.

Page 45

1    Q.   And how is it that you came to engage your
2  attorneys?
3    A.   That I -- Oh, how did I bring it up to them or
4  how did I ...
5    Q.   How did you meet them or how did you become
6  aware of them?
7    A.   Actually, I -- I actually got introduced to
8  them by a -- I think it was my wife, but that was like
9  before this obviously.
10   Q.   Okay.
11   A.   This is -- I already -- I already knew this
12 group, so ...
13   Q.   So you think you were referred to them by your
14 wife?
15   A.   Yeah.
16   Q.   Okay.  And your wife, does she not have any
17 knowledge about this case?
18   A.   (Shaking head.)
19   MR. VLAHAKIS:  Object to the form of the question.
20 BY MS. STRICKLER:
21   Q.   She has no knowledge about any of the claims
22 in this case?
23   A.   (Shaking head.)
24   MR. VLAHAKIS:  You have to answer yes or no.



Page 46

1   BY THE WITNESS:
2       A.   No.
3       Q.   Thank you.
4       A.   Capital N.
5       Q.   So you said that you had known your group of
6   attorneys before.  So had you retained them prior to
7   this lawsuit?
8       A.   Prior to the FAMS lawsuit?
9       Q.   Correct.
10      A.   Yes.
11      Q.   Okay.  Do you recall when you first met your
12  lawyers?
13      A.   I believe it was very, very end of 2016, maybe
14  early 2017.
15      Q.   When you were referred to these attorneys, did
16  you do any research of your own before you met them?
17      A.   Not really because it was, you know, just
18  wanted to see what they had to say about it.  I mean ...
19      Q.   Did you talk to any other people about hiring
20  this firm?
21      A.   No.  That was more just like me and my wife.
22  Yeah.
23      Q.   Do you know if you're paying attorney's fees
24  for this representation of this lawsuit?

Page 47

1       A.   If I'm paying attorney fees?  It depends on
2   the definition of fees.  Do you mean upfront?
3       Q.   Well, have you --
4       A.   Obviously, there's an attorney fee involved.
5       Q.   Okay.
6       A.   I can tell you that.
7       Q.   Okay.  So have you paid any fees up to this
8   date?
9       A.   No.
10      Q.   Okay.
11      A.   Not for this, no.
12      Q.   Okay.  And have you paid any costs with this
13  lawsuit up to this date?
14      A.   "Costs" meaning ...  What do you mean by costs
15  because we already went over the attorney fees.
16      Q.   Uh-huh.
17      A.   What -- And we went over that -- the texting
18  if that's chargeable.
19      Q.   Uh-huh.
20      A.   What would you mean -- Other than that, what
21  would you consider a fee?
22      Q.   What -- Have you had to pay anything -- any
23  monetary value for this lawsuit?
24      A.   Not yet, no.

Page 48

1       Q.   Okay.  Do you know if you have to pay any
2   costs associated with this lawsuit?
3       A.   It -- That depends on -- I mean, eventually,
4   yes.
5       Q.   What -- And you said it depends?
6       A.   Yeah.
7       Q.   What does it depend on?
8       A.   It depends on what happens with the case.  I
9   mean ...
10      Q.   So if, I guess, the outcome comes in your
11  favor, it could be one thing.  Is that what you mean?
12      A.   Yes.  I'll put it to you this way.  It could
13  be different fees.
14      Q.   Okay.
15      A.   Yep.
16      Q.   If you were to prevail or win in this case, do
17  you know whether your attorneys would get a portion of
18  whatever you are awarded?
19      MR. VLAHAKIS:  Object to the form and ...  I mean,
20  I guess I'm -- if he wants to generally answer it, but
21  are you asking -- I mean, I'll just go question by
22  question to see if it's something that you're going to
23  outside the realm of what would be allowable for, you
24  know, discovery as to this, as to, you know, class

Page 49

1   representation status, so ...
2          Go ahead and answer if you know, but if you
3   want to reask the question, if you forgot the
4   question --
5       THE WITNESS:  Yeah.
6       MR. VLAHAKIS:  -- the reporter can read it back
7   too.
8       THE WITNESS:  Yeah.
9              (From the record above, the
               court reporter read the following:
10             ("Q.  If you were to prevail or win
    in this case, do you know whether your attorneys would
11  get a portion of whatever you are awarded?")
12  BY THE WITNESS:
13      A.   I can say I'm not aware of the amount.  I
14  don't know.
15      Q.   Okay.  But, I guess, it's a yes or no
16  question.  If you don't know the amount, that's fine.
17      A.   Okay.
18      Q.   So ...
19      A.   But if you don't know, is that a yes or no?
20      Q.   If you don't know, you don't know.
21      A.   Right.  I don't know.
22      Q.   Okay.  Okay.
23      A.   So, I mean, that's kind of lying if I say yes
24  if I don't know, right?



Page 50

1    Q.   Okay.
2    A.   That's why I'm saying that.
3    Q.   Okay.
4    A.   Like, I really don't know the answer, so ...
5    Q.   Okay.  That's fine.  If you don't know, you
6  don't know.
7        MR. VLAHAKIS:  Before you ask another question, can
8  we just take a quick break then?
9        MS. STRICKLER:  Yeah.  That's fine.  Sure.
10       MR. VLAHAKIS:  Okay.
11                  (A short break was had.)
12  BY MS. STRICKLER:
13       Q.   All right.  Did you provide any documents to
14  your attorneys in this lawsuit?
15       A.   Any documents?
16       Q.   (Nodding.)
17       A.   Records.
18       Q.   Records?
19       A.   Yes.
20       Q.   Okay.
21       A.   Not paper, but yes.  Yes.
22       Q.   What kind of records?
23       A.   Voicemails and phone calls.
24       Q.   Was there anything else?

Page 51

1    A.   Nope.
2    Q.   And can you explain in your own words why it
3  is you filed this lawsuit?
4    A.   Why I filed it?
5    Q.   Correct.
6    A.   Because I felt that I was being harassed.
7    Q.   And do you know the laws under which you
8  are suing FAMS?
9    A.   Do I -- Am I aware of them?
10   Q.   Yes.
11   A.   Yes.
12   Q.   Okay.  Do you know what they are?
13   A.   Like, specifically?
14   Q.   Do you know the names?
15   A.   No.
16   Q.   Okay.  Have you heard of the Telephone
17  Consumer Protection Act?
18   A.   I've heard of the name, but I'm not that
19  familiar with it.
20   Q.   Okay.  Have you heard of the Fair Debt
21  Collection Practices Act?
22   A.   I've heard of it, yes.
23   Q.   And are you familiar with it?
24   A.   Somewhat.  Not extremely.

Page 52

1    Q.   To your knowledge, what is -- I'm going to
2  shorten it to the FDCPA.
3    A.   Uh-huh.
4    Q.   So, to your knowledge, what is the FDCPA?
5    A.   That's ...  To an extent people can't leave
6  voicemails or dropped phone calls or not calling you
7  without your permission to an extent.
8    Q.   What do you mean by dropped voicemail?
9    A.   Meaning where it's not a full ring.  You know
10  what I'm saying?  It's not like four rings and then it
11  goes to voicemail.  It literally rings once, you get a
12  notification, and then it goes into your voicemail.
13   Q.   Okay.
14   A.   Like that.  That's what I've heard.
15   Q.   Okay.
16   A.   I'm not obviously a lawyer, but that's what
17  I've heard about it.
18   Q.   Do you know what an Automated Telephone
19  Dialing System is?
20   A.   Yeah.  That's pretty much when they auto dial
21  a bunch of phone numbers.
22   Q.   And who's "they"?
23   A.   Whatever company is using it or whatever
24  program they hire to use that.

Page 53

1    Q.   Do you know what a predictive dialer is?
2    A.   I have never heard of that.
3    Q.   And do you know what a pre-recorded message
4  is?
5    A.   Yes.
6    Q.   Can you explain that to me in your own words?
7    A.   A pre-recorded message is someone leaving a
8  voicemail that's automated.  It's not a live person.
9  And they're saying to you -- They'll usually -- They may
10  or may not use the company name and they'll say call
11  back this number.  If it's some medical related ones,
12  they'll say who to call back, but pretty much straight
13  to the point, it's not a live person.  It's pre-recorded
14  by the company or whoever they use to say them to call
15  back at this number.
16   Q.   Do you know what skip tracing is?
17   A.   I've heard of it.
18   Q.   Okay.  To the best of your knowledge, what is
19  skip tracing?
20   A.   Skip tracing is pretty much looking up phone
21  numbers attached to either a person's ID or their family
22  and calling everyone on that list.
23   Q.   What do you mean by someone's ID?
24   A.   Did I say ID?  By their last name.  I'm sorry.



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                   Pages 54..57

Page 54

1    Q.   Last name?  Okay.
2    A.   Why did I say ID?
3    Q.   That's okay.  I just wanted to clarify.
4    A.   No.  By the -- either their last name or
5    whoever else is associated with the address.  Typically
6    they do last name so they'll take anyone with that last
7    name and try to contact them with or without their
8    permission.
9    Q.   Okay.
10   A.   Yes.
11   Q.   And I'm going to shorten Automated Telephone
12   Dialing System to ATDS.  Is that okay?
13   A.   Uh-huh.
14   Q.   Okay.  In your complaint you allege that FAMS
15   called you using an ATDS; is that correct?
16   A.   Uh-huh.
17   Q.   Okay.
18   A.   Yes.
19   Q.   What is your basis for making that allegation?
20   A.   They -- Number one, they didn't have my phone
21   number and they were still trying to con- -- They
22   weren't trying to contact me and they were doing that at
23   around the same time that they were trying to do it with
24   my mother's phone number.  So that -- That's where I'm

Page 55

1    getting that -- they're using that type of a system.
2    And I'll at least say that when I did speak to someone,
3    they openly admitted that they got my name off of a
4    list.  And when I asked what type of list, they refused
5    to answer.  So they admitted that they got my name off
6    of a list -- my number.  I'm sorry.  So I don't know
7    what list they're referring to, but that definitely
8    plays a part of that assumption.
9    Q.   Okay.  So that's your basis --
10   A.   Right.
11   Q.   -- for alleging they used an ATDS?
12   A.   Right.
13   Q.   Okay.  Is there any other reasons that you can
14   think of?
15   A.   Not off the top of my head.
16   Q.   Do you know what VoApps is?
17   A.   I've heard of the company.
18   Q.   Okay.  What is your understanding of what
19   VoApps is?
20   A.   I've literally just heard of the company.
21   Q.   Okay.
22   A.   So, no, I don't really understand what VoApps
23   is.
24   Q.   Okay.  Are you in possession of any documents

Page 56

1    showing that FAMS used an ATDS?
2    A.   Any documents?
3    Q.   Yeah.
4    A.   That depends on my Sprint records.  I may or
5    may not.  I mean ... Yeah, I really don't know that.  I
6    can't answer yes or no if I don't know.
7    Q.   Okay.
8    A.   I'm -- I've got to be honest.  I ...
9    Q.   I want you to be honest.
10   A.   No.  No.  I'm saying because I don't want to
11   say no and then if I really do know or maybe do know,
12   that's also lying, so ...
13   Q.   I understand.
14        The calls that you were receiving from FAMS,
15   were they always from the same number?
16   A.   No.
17   Q.   Do you recall what numbers you received calls
18   from FAMS?
19   A.   I know a lot of them were 866.  I do have
20   caller ID, but sometimes it would still change, the
21   number.  So it would pop up under FAMS, but the number
22   would be different.
23   Q.   So it actually displayed that it was --
24   A.   Caller ID.

Page 57

1    Q.   -- calling from --
2    A.   Yes.
3    Q.   Not just the number?  There was actual --
4    A.   FAMS.
5    Q.   -- identif- --
6    A.   It literally said FAMS on it.
7    Q.   Okay.
8    A.   Yeah.
9    Q.   Was this notif- -- I guess, was FAMS displayed
10   with the voicemails?
11   A.   Missed calls.
12   Q.   Missed calls?  Okay.
13   A.   Yeah.  Voicemails, you have to check.  It's
14   not going to tell you like on there -- Like, the caller
15   ID doesn't transfer to voicemail.
16   Q.   Okay.
17   A.   You still got to check your voicemail with
18   the -- Yeah.
19   Q.   Is there anyone that witnessed or observed you
20   receiving any calls from FAMS?
21   A.   There's a few.  I mean, they -- But I didn't
22   really talk about it.
23   Q.   Okay.
24   A.   But, yes, there's witnesses.

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                    Pages 58..61

Page 58

1    Q.   Do you recall who?
2    A.   There's someone that I used to -- I was
3  working on my house in River Grove with, but that was a
4  contractor, so ...
5    Q.   Do you know the name of this person?
6    A.   Yeah.  You want the full name?
7    Q.   Sure.  Yeah, if you have it.
8    A.   Yeah.  I've got him in my phone.  I know he
9  just goes by JT, but I don't know the full name.  I've
10  got his phone number.
11   Q.   Does he have any knowledge about the calls you
12  received?
13   A.   No.
14   Q.   Was there anybody else that observed you
15  receiving calls from FAMS?
16   A.   My old co-worker at work who's fired, but I
17  don't think I can contact him.
18   Q.   Do you remember his name?
19   A.   Yeah.  It was Jason.
20   Q.   Do you recall his last name?
21   A.   No.  He's just my co-worker.
22   Q.   Okay.  And did he have any knowledge about the
23  calls that you were receiving?
24   A.   He's just wondering who was -- Because I think

Page 59

1  that was a time where it was like two or three times in
2  a day.  He's like who keeps on calling you at work?
3    Q.   Do you recall when this was?
4    A.   Like, maybe six or seven months ago.  I don't
5  know offhand.  I don't talk about legal actions, but,
6  you know, people are going to ask.  They're like, who --
7  why is this person calling you like more than twice?
8  Because the thing is I'm at work in receiving.  I can't
9  receive phone calls and we can get in trouble for that,
10  like fired if it's caught so we tend to have an
11  understanding of telling people that we know don't call
12  me at work.  But, yeah, you're still going to get phone
13  calls and, you know, you get those sales calls.  I get
14  calls -- I got one call from India.  I can't tell India
15  to stop calling me, but ...  So they -- It alerts people
16  because when you normally don't get a lot of phone calls
17  at work and then you're starting to get phone calls,
18  they're kind of like who keeps on calling you?  Why
19  don't you just tell them to stop?  I'm just like I don't
20  want to talk about it.  Like, it is what it is.
21   Q.   Okay.  Is there anyone besides you and your
22  attorneys who have listened to the voicemails that FAMS
23  has left on your cell phone?
24   A.   Nope.

Page 60

1    Q.   Earlier we discussed some of the injuries that
2  you suffered from the calls you received from the other
3  companies?
4    A.   Uh-huh.
5    Q.   Would you say that you experienced similar
6  injuries from FAMS?
7    A.   Oh, definitely headaches and chest pains
8  especially when you're recreating a situation in some
9  sense.
10   Q.   And you were suffering the same kind of
11  symptoms then?
12   A.   Yeah.
13   Q.   Did you experience anxiety?
14   A.   Yes.
15   Q.   Have you suffered from anxiety in the past?
16   A.   Not since maybe 2017.  Not before I got --
17  began getting harassed, no.
18   Q.   Not before 2017?
19   A.   Right.
20   Q.   And did you see a doctor due to the anxiety?
21   A.   I saw them in 2017.  That's when they said
22  it's mainly stress.  They didn't give me anything.
23   Q.   Okay.  That was when you saw him for the chest
24  pains?

Page 61

1    A.   I -- Yeah.  It was the same thing.  They
2  pretty much labeled it anxiety and stress related.  They
3  wanted to put me on something, but they didn't want to
4  counteract with my seizure medications, so ...
5    Q.   I see.  Okay.  Did anybody witness you
6  experiencing these symptoms?
7    A.   My mother.
8    Q.   Was there anybody else?
9    A.   No.
10   Q.   What's your mother's name?
11   A.   Corinne Molinari.
12   Q.   How do you spell Corinne?
13   A.   It's spelled C O R I N N E and then Molinari
14  is the same, M O L I N A R I.
15   Q.   So one of the allegations in your complaint
16  states that FAMS or the unwanted calls severely
17  disrupted your daily life.  How did the calls severely
18  disrupt your daily life?
19   A.   Work.
20   Q.   So it took away from you working?
21   A.   Yes.
22   Q.   Anything else?
23   A.   Or if it wasn't that, it was driving.
24  Obviously, I'm not going to answer a phone if I'm

Page 62

1  driving, but it's distraction.
2      Q.   Anything else?
3      A.   Sleep a few times.
4      Q.   You couldn't sleep?
5      A.   No.  I get a phone call when I was sleeping.
6      Q.   Oh, I see.  I see.  Okay.
7      A.   So that kind of woke me up.  I'm like ...
8      Q.   One of the other allegations was that you said
9  that FAMS invaded your privacy.  Can you explain how you
10 felt that they invaded your privacy?
11     A.   Invaded my privacy?  What ...
12     MS. STRICKLER:  I can -- Let's mark this as -- Do
13 you care what we mark it as?
14     MR. VLAHAKIS:  No, not at all.
15     MS. STRICKLER:  Okay.  We'll just --
16     MR. VLAHAKIS:  Are you asking him in addition to
17 what's he's testified to earlier or do you just want him
18 to expand on it or what?
19     MS. STRICKLER:  It's an allegation in the complaint
20 so I'll point it to you so you can see it.
21     MR. VLAHAKIS:  Sure.
22     MS. STRICKLER:  So let's mark this as Defendant's
23 Exhibit 1.  That's fine.
24

Page 63

1              (Defendant's Deposition Exhibit
2               No. 1 marked for identification.)
3  BY MS. STRICKLER:
4      Q.   I'll have you take a look at that and let me
5  know when you are ready.
6      MR. VLAHAKIS:  You gave me the -- You gave us the
7  Comenity one I think.
8      MS. STRICKLER:  I did?
9      MR. VLAHAKIS:  Yeah.  Uh-huh.
10     MS. STRICKLER:  Oh.  Well, I know I have the other
11 one in here.
12     THE WITNESS:  What is Comenity doing here?
13     MS. STRICKLER:  Maybe I don't have it.  All right.
14 Let's take this out, the exhibit.
15 BY MS. STRICKLER:
16     Q.   Okay.  What I will say, so one of the
17 allegations in your complaint -- Do you know what I mean
18 when I say your complaint?
19     A.   Yes.
20     Q.   Okay.
21     A.   Yeah.
22     Q.   It stated that FAMS' calls invaded your
23 privacy.
24     A.   Okay.

Page 64

1      Q.   I'm asking what you mean by that.  Did you
2  feel like your privacy was invaded?
3      A.   Well, obviously, I didn't give them permission
4  to call me.
5      Q.   Okay.
6      A.   And they were calling from more than one
7  number.  I felt that definitely when they used my
8  mother's number, then she found out about that.  So I
9  definitely say that that definitely ...
10     Q.   Besides what we've already discussed today,
11 are there any other types of injuries you believe FAMS
12 has caused you?
13     A.   Nope.
14     Q.   Do you have any documentation, anything on
15 paper that supports the injuries that you have alleged?
16     A.   Paperwork supporting my injuries like when I
17 went?  What do you mean?
18     Q.   So I guess you said that you suffered stress.
19 Would you have anything that would explain this or any
20 sort of documentation that would support your symptoms?
21     A.   Other than what a doctor saw.  Obviously that.
22 There could be documentation of that.  I'd have to talk
23 to the doctor, but I'm sure I can arrange that.
24     Q.   The doctor that you saw, though, was that for

Page 65

1  the symptoms that you suffered because of FAMS?
2      A.   At the time, yes.
3      Q.   So was that the -- You were receiving calls
4  from FAMS when you saw the doctor?
5      A.   Yes.
6      Q.   Okay.  What was the doctor's name that you
7  saw, if you recall?
8      A.   Dr. Cosgrove.
9      Q.   Is that C O S --
10     A.   I believe so.
11     Q.   -- G R O V E?
12     A.   Yeah.
13     Q.   Where is Dr. Cosgrove's office?
14     A.   He's in Munster, Indiana.
15     Q.   Munster, Indiana?
16     A.   Yeah.  It's maybe about a half an hour.
17     Q.   Do you know what his practice is called?
18     A.   He's just -- I just know him under general
19 practice.  Yeah.
20     Q.   Okay.  He doesn't work at a hospital, or ...
21     A.   He works through the Munster -- I think he
22 used to work in St. Margaret.  I've got the -- He just
23 moved.  I don't know if I got his card, but I know he
24 works through the Munster Hospital.



Page 66

1    Q.   He just moved to Munster?

2    A.   No.  Moved to the new location, but yeah.

3    Q.   Okay.  And where did you say that was?

4    A.   What?

5    Q.   Where did you say that was?

6    A.   I just know it was in Munster.

7    Q.   Okay.

8    A.   Yeah.  I don't remember the name of the --

9 what the practice is called.  I just know him by just

10 going there.

11   Q.   But he was in Munster in 2017 --

12   A.   Right.

13   Q.   -- when you saw him?

14   A.   Yes.

15   Q.   Okay.  What is it that you are trying to

16 accomplish by suing FAMS?

17   A.   What am I trying to accomplish?

18   Q.   Correct.

19   MR. VLAHAKIS:  Object to the form of the question.

20 BY THE WITNESS:

21   A.   I can't really answer that yes or no so I

22 can't really describe that.

23   Q.   What is it that you want to happen?  What is

24 the outcome that you want from this lawsuit?

Page 67

1    MR. VLAHAKIS:  Object to the form of the question.

2 BY THE WITNESS:

3    A.   Yeah, I can't really answer that right now.

4    Q.   Are you hoping to get money?

5    A.   No.  I -- That's not exactly the whole

6 reasoning behind things.

7    Q.   But is that part of the reason?

8    A.   I don't even know how to answer that because I

9 could say -- you could say one percent is a part.  I

10 can't really answer that accurately.  If -- I mean ...

11 It's definitely more than money.  That's all I can say.

12   Q.   Okay.  But you can't --

13   A.   It's more of a -- Part of it's an

14 understanding of what they've caused.

15   Q.   Okay.

16   A.   But ...

17   Q.   What do you mean by that?

18   A.   An understanding of how it really affects and

19 how they really can affect it in something that just is

20 not money related where, oh, I'm going to start a

21 lawsuit because I want some money.  It's not about that.

22 But, yeah, I can't really -- I can't really answer that.

23   Q.   Okay.

24   A.   That's not a -- You know, I can't answer it

Page 68

1 accurately enough.

2    Q.   Okay.

3    A.   I can't.  I -- I ...

4    Q.   Let's move on.  Do you know what a class

5 action lawsuit is?

6    A.   Yes, I do.

7    Q.   Okay.  What does that mean to you?

8    A.   That a class action lawsuit instead of like a

9 person individually suing someone, you're pretty much

10 getting like 20 or 30 people's opinion and kind of 20 or

11 30 people are suing that company or that organization

12 for the same thing.  So let's just give an example here.

13 Say that a workplace was harassing 30 of their

14 employees.  Instead of one guy saying you're harassing

15 me, well, now those 30 people are getting together in a

16 class action and representing all -- anything that was

17 affected by each individual.  So it's more of a group

18 setting towards it.

19   Q.   Okay.  And you understand that this lawsuit is

20 a class action?

21   A.   Yes, I do.

22   Q.   Okay.  What is your understanding of what the

23 proposed class is in this lawsuit?

24   A.   What do you mean what the proposed ...

Page 69

1    Q.   I guess, what is your understanding of the

2 people that would be a part of this class?

3    A.   It's pretty much people who have been affected

4 by these phone calls, whether it's emotional, whether

5 it's physical, whether it's caused them to end

6 relationships, whether it's caused conflict.  It's

7 generalizing that in how many people it's affected.  So,

8 again, like instead of just affecting one person by

9 phone calls or voicemails, now you've affected

10 20 people.

11   Q.   Do you know what a class representative is?

12   A.   Yes.

13   Q.   Okay.  What does that mean to you?

14   A.   That's more of a person that's representing a

15 class in pretty much how that can affect.  So say -- I'm

16 just going to give you an example.  Say that I'm a class

17 representative and a bunch of people got harassed at

18 work.  I'm just using at work as an example.  I'm

19 representing and I'm using me as an example because of

20 how I've been affected and that I'm a good example of

21 how can it be affected to represent those people because

22 I already know what the -- I've already experienced it

23 and I also want to help them because I'm sure they -- if

24 I've suffered, I know they've suffered so that you're

Page 70

1  representing that class.  And that's the best way I can
2  describe it other than just going on a five-minute
3  speech, but ...
4      Q.   That works for me.  And you understand that
5  you're the class representative in this lawsuit?
6      A.   Yes.
7      Q.   Okay.  Do you know what your duties are as a
8  class representative?
9      A.   Yes.  There's -- Obviously, there's research.
10 And if I get called for anything, obviously, I have to
11 attend that.
12     Q.   What do you mean by research?
13     A.   Just doing research, seeing any, like -- How
14 should I say it?  Not really research because I don't
15 believe you can ...  I mean, you could research other
16 people's situation to an extent because you are the
17 class representative so you would want to know what
18 happened to them because if I'm representing a class, I
19 want to at least know how that affected them.  So that's
20 what I mean by research, is really understanding what
21 happened to the other individuals involved.  Maybe
22 research was the wrong wording.
23     Q.   You also said if you get called in for
24 something.  What do you mean by that?

Page 71

1      A.   Anytime -- Well, if any questioning that I
2  have to go to or anything legal related, that's what I
3  meant by calling in or --
4      Q.   Okay.  Like the --
5      A.   -- any other --
6      Q.   -- deposition today?
7      A.   Right.  Right.  Any of that or any other
8  depositions that I might have, yeah.
9      Q.   Can you think of any other duties that you
10 would have as a class representative?
11     A.   Just really be there for any support that the
12 other people need.
13     Q.   And do you believe that you are an adequate
14 representative?
15     A.   Yes, I do.  I'm an extreme case.  I'm getting
16 divorced because of this.  I've dealt with headaches.
17 This is seriously -- You know, there's different levels
18 of how it affects people and I feel that it affected me
19 very highly -- or very -- highly affected me not -- not
20 good high, but it was more of an extreme case.  Now,
21 let's say that I just said the only thing was that, oh,
22 I missed a stoplight and that was my only thing.  How am
23 I going to represent a class?  But I feel the class
24 representative should have that extreme case, that what

Page 72

1  if this can cause this or this can cause that.  That's
2  how I feel.
3      Q.   What kind of qualities do you think make a
4  good class representative?
5      A.   Someone that's approachable I believe and
6  someone that has experienced situations.  If you haven't
7  experienced something, I don't know how you could
8  qualify that.  If you haven't experienced anything
9  related to a class action lawsuit that the class action
10 lawsuit is in -- Again, I'm giving you an example.
11 You're suing a workplace harassment and you've never
12 been harassed.  That's not a good candidate.  You've got
13 to been through it, so ...
14     Q.   So prior experience before --
15     A.   Right.  Right.
16     Q.   Okay.
17     A.   But that, you know, anyone that's -- anyone --
18 people can -- they can feel they can, you know,
19 communicate with someone that's going to have an
20 understanding of people's situations, too.  I think
21 that's a big thing.
22     Q.   Were you promised anything to be a plaintiff
23 in this lawsuit?
24     MR. VLAHAKIS:  Object to the form of the question.

Page 73

1  BY MS. STRICKLER:
2      Q.   You can answer.
3      A.   (Shaking head.)
4      Q.   Verbally.
5      A.   No.
6      Q.   Okay.
7      A.   Nope.  Never promised one thing.
8      Q.   Do you know anyone else that has received
9  calls from FAMS?
10     A.   Do I know?
11     Q.   Yes.
12     A.   Well, yes.  Yeah.  They're out of state.
13     Q.   Do you know the names of these people?
14     A.   No.  I've seen them like -- I've seen posts
15 about it Online.  I don't know them.
16     Q.   Okay.  So you don't know anybody personally?
17     A.   Right.  Right.  I don't know them.
18     Q.   Okay.
19     A.   Except old co-workers that I no longer work
20 with, but yes.
21     Q.   They received calls?
22     A.   Yes.
23     Q.   Okay.  When did they receive the calls are you
24 aware?



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                    Pages 74..77

Page 74

1    A.   This is in like 2015 or '14.  I don't even
2  work with them anymore, though.
3    Q.   Okay.
4    A.   They have like ...
5    Q.   Do you know if you have retained an expert in
6  this lawsuit?
7    A.   Retained an expert as in ...
8    Q.   Did you hire anybody other than your attorneys
9  to give any sort of opinion related to this lawsuit?
10   A.   No.
11   Q.   If this case were to go to trial, do you know
12 any of the individuals you would -- you intend to call
13 as a witness?
14   MR. VLAHAKIS:  Object to the form of the question,
15 also since it's premature before any court deadline and
16 some of that may even involve work product as well.
17 If -- He can answer without discussing what we may have
18 discussed, I guess.
19   THE WITNESS:  Right.
20 BY THE WITNESS:
21   A.   Yeah, I can't answer that.
22   Q.   Are you aware of any settlement offers made by
23 FAMS in this case?
24   A.   No.

Page 75

1    Q.   Do you have any personal knowledge regarding
2  your attorney's experience in handling class actions?
3    A.   I'm sorry.  You have to repeat the question.
4    Q.   Sure.  Do you have any personal knowledge
5  about your attorney's experience handling class action
6  lawsuits?
7    A.   Not that much.  I -- No.
8    Q.   Just a general ...
9    A.   Just general.  General.
10   Q.   Do you have any documents supporting their
11 experience as class counsel?
12   A.   No, not that I know of.
13   MS. STRICKLER:  I think I'm almost done.  Do you
14 want -- We can take a break.
15   MR. VLAHAKIS:  Yeah.  I'll just ask a clarification
16 question -- I had too much coffee -- because, I mean,
17 you weren't there, but he was -- he attended the
18 settlement conference.  I think --
19   THE WITNESS:  Yeah.
20   MR. VLAHAKIS:  I don't know -- Because are you
21 uncomfortable answering that question because the judge
22 talked about the fact that what happened there has to be
23 confidential?
24   THE WITNESS:  Yes.

Page 76

1    MR. VLAHAKIS:  Okay.  In that context, you
2  remember, though, there was discussions about a monetary
3  compensation?
4    THE WITNESS:  Okay.
5    MR. VLAHAKIS:  They were trying to -- that FAMS
6  made to you in the context of the settlement conference,
7  correct?
8    THE WITNESS:  Right.
9    MR. VLAHAKIS:  Okay.  Do you want to ask him
10 anything about that?
11   MS. STRICKLER:  Sure.
12   MR. VLAHAKIS:  We could say --
13   MS. STRICKLER:  Yeah.
14   MR. VLAHAKIS:  We could say that it would be
15 subject to confidentiality in case part of this becomes
16 public record.
17   MS. STRICKLER:  Sure.
18   MR. VLAHAKIS:  Okay.
19   MS. STRICKLER:  And I don't have to ask the
20 nitty-gritty about it.
21 BY MS. STRICKLER:
22   Q.   So you attended the settlement conference in
23 this lawsuit?
24   A.   Yes.

Page 77

1    Q.   Okay.  And there was an offer that FAMS made
2  at that conference, correct?
3    A.   Yes.
4    Q.   Okay.  And did you reject this offer?
5    A.   Yes.
6    Q.   Okay.  Do you recall any other offers that
7  were made in this lawsuit?
8    A.   Not to my knowledge, no.  Not that I can --
9  No.
10   MS. STRICKLER:  Okay.  I think that works.
11   MR. VLAHAKIS:  Uh-huh.
12   MS. STRICKLER:  We'll just take a short break?
13   MR. VLAHAKIS:  Uh-huh.
14           (A short break was had.)
15 BY MS. STRICKLER:
16   Q.   All right.  I just have a few questions for
17 you.  Your current phone that you have right now, is
18 that the phone that you received the calls from FAMS?
19   A.   This phone (gesturing)?
20   Q.   Yes.
21   A.   It was the same phone, but not the same
22 voicemail app.
23   Q.   Okay.
24   A.   It was updated.

LEXITAS

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                    Pages 78..81

Page 78

1    Q.   There was an updated software within that
2  phone?
3    A.   Yes.
4    Q.   Okay.
5    A.   Uh-huh.
6    Q.   You said that as a result of these calls and
7  calls from the prior companies that you're getting a
8  divorce?
9    A.   Yes.
10   Q.   Okay.  Is that in the process?
11   A.   That's in the process.
12   Q.   Okay.
13   A.   I've already discussed it with a lawyer and
14  it's probably weeks away from starting.  I mean, it's --
15  it -- It's being done.
16   Q.   Okay.  Before, did your wife ever have
17  permission to use your number?
18   A.   Use my number?  No.
19   Q.   Okay.  Did you ever give her permission to use
20  your number as an emergency contact?
21   A.   I never gave her permission, no.
22   Q.   Do you know if she used your number as an
23  emergency contact?
24   A.   Not to my knowledge.

Page 79

1    Q.   Okay.  Earlier we were talking about the way
2  you receive calls and texts and voicemails.  Do you have
3  a different sound notification for phone calls,
4  voicemails, and text messages?
5    A.   Not unless I change it.
6    Q.   Okay.  So it's all the same?
7    A.   No.  Well, let me -- The voicemail and the
8  missed calls are the same.  It's different than if I
9  have e-mails, though.
10   Q.   Okay.
11   A.   So voicemail and missed calls are the same.
12   Q.   Okay.  What about when your phone rings?
13   A.   That's just a regular ring.  I mean -- You
14  mean, is it a different ring tone?
15   Q.   Yeah.
16   A.   Yeah.  Now, if it's -- it's a ding, it's a
17  different -- It's a regular ring tone.
18   Q.   Okay.
19   A.   Yeah.  It's not --
20   Q.   It's not just the ding?
21   A.   Right.  Right.
22   Q.   Okay.  When you were getting calls from FAMS,
23  you said there was one ring and then it would go to
24  voicemail?

Page 80

1    A.   Uh-huh.
2    Q.   Correct?
3    MR. VLAHAKIS:  Object to the form of the question.
4  I don't know if he said that was regarding to FAMS or is
5  he talking about the VoApp stuff.  You might want to
6  double-check.
7    MS. STRICKLER:  Okay.
8  BY MS. STRICKLER:
9    Q.   Were you receiving the -- I think you called
10  it the direct drop voicemail?
11   A.   Direct drop?
12   Q.   Do you recall that?
13   A.   What do you mean by direct drop?
14   Q.   Do you -- Let me see what you ...  When you
15  received voicemails from FAMS --
16   A.   Uh-huh.
17   Q.   -- did the phone ring and then go to
18  voicemail?
19   A.   Yes, the phone rang and then go to voicemail.
20   Q.   Okay.  Did it ring for a period of time,
21  or ...
22   A.   It rang once.
23   Q.   Okay.
24   A.   Yeah.

Page 81

1    Q.   Was that the regular ring tone that you
2  received for other calls?
3    A.   If the phone -- Yeah, if the phone rings, the
4  phone rings.
5    Q.   Okay.  It was just one ring --
6    A.   Yeah.  It was not -- Yeah.  Yeah.  I mean, the
7  phone only has one ring no matter what, so ...
8    Q.   Okay.
9    A.   It was a regular ring like someone is calling
10  you.
11   Q.   Uh-huh.  Okay.
12   A.   And then it went to voicemail.
13   Q.   How long did that ring last?
14   A.   One ring.  I mean ...
15   Q.   Okay.
16   A.   It's one ring, like however ring it takes.  A
17  second.
18   Q.   Was it enough time for you to answer?
19   A.   Not one ring.
20   Q.   Okay.
21   A.   No.  Especially at work I can't even answer
22  anyway.  But to answer your question, that was not --
23  One ring is not enough time to answer.  I mean, my phone
24  is over here and it rings once, if I go like that, I



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                  Pages 82..85

Page 82

1  might not answer it by one ring (demonstrating).
2     Q.   Okay.
3     A.   Just giving you a ...
4     Q.   No.  That's helpful.  And just to confirm what
5  we've talked about prior, did you testify that you
6  haven't paid anything to your attorneys for this lawsuit
7  so far?
8     A.   That I have not?  Not --
9     Q.   Yes.
10    A.   Not currently.
11    Q.   Okay.  And you don't know how they are going
12 to get paid; is that accurate?
13    MR. VLAHAKIS:  Object to the form of the question.
14 BY MS. STRICKLER:
15    Q.   Do you know how your attorneys will be paid in
16 this lawsuit?
17    A.   No.
18    Q.   Okay.  Earlier you said -- I think I was -- It
19 was when I was asking you what skip tracing was.  You
20 said that somebody told you that they received your
21 number from a list.  Do you remember that testimony?
22    A.   Yeah.
23    Q.   Okay.  Who was it -- Where did you get that
24 information?

Page 83

1     A.   I called them -- Or when I talked to them,
2  they said that.
3     Q.   Okay.  So it was a FAMS representative that
4  said that?
5     A.   Yes.  They literally said -- They literally
6  openly admitted to me, oh, yeah.  I got your name off
7  the list.  I'm like what do you mean a list?  And they
8  didn't want to go into that.  I'm like, well, you just
9  kind of brought up a list to me.  I'm like I think you
10 might want to elaborate on that and they refused to.
11 So that's their word.  That's FAMS' words saying they
12 got from a list.
13    Q.   Okay.  And that was the same call that you
14 said don't call me anymore?
15    A.   Yes.  Yes.  Yes.
16    Q.   Do you remember who you spoke to?
17    A.   Oh, God, no.
18    Q.   Okay.
19    A.   I wish.  I wish I remembered the name.
20    Q.   In this case, I'll represent to you that your
21 attorney sent a subpoena to Sprint for your records.  Do
22 you know what records were obtained from Sprint?
23    A.   I believe the voicemails, phone calls, and if
24 the phone rang or not during the voicemails.

Page 84

1     Q.   Have you seen anything obtained from Sprint in
2  this lawsuit?
3     A.   Have I physically seen it?
4     Q.   Yes.
5     A.   Not yet, no.
6     Q.   Okay.
7     A.   I've seen it on my end on Sprint.
8     Q.   Doing your own -- looking it up Online?
9     A.   Yes.  Yeah.  But yeah.
10    MS. STRICKLER:  Jon, do you want to take
11 another -- a quick break?
12    MR. AUST:  (No response.)
13    MR. VLAHAKIS:  He might have us on mute.
14    MR. AUST:  Ah, yes.  I'd like two minutes or so if
15 we can.
16    MS. STRICKLER:  Okay.  I'll be back.
17          (A short break was had.)
18 BY MS. STRICKLER:
19    Q.   Okay.  Not to belabor on your phone, but if we
20 could talk about the calls, the rings that you receive
21 when you get incoming calls.
22    A.   Uh-huh.
23    Q.   If someone were to call you right now, would
24 your phone ring more than once?

Page 85

1     A.   What?  A regular phone call?
2     Q.   Yeah.
3     A.   Yes.
4     Q.   Okay.  But that's different from the calls you
5  received from FAMS --
6     A.   Yes.
7     Q.   -- is that right?  Okay.
8     MR. VLAHAKIS:  Which calls are you referring to,
9  though?
10 BY MS. STRICKLER:
11    Q.   The calls that you received from FAMS where
12 they left a voicemail, you only received one ring?
13    A.   Yes.
14    Q.   That's different than if -- let's say if I
15 called your cell phone right now --
16    A.   Right.
17    Q.   -- it would ring more than once?
18    A.   Right.  Like, when they called me several
19 times, it was a regular ring, but if it's one ring and
20 then voicemail, that's what I'm saying.
21    Q.   Okay.  Okay.
22    A.   It's literally one ring.  But, yes, to answer
23 your question, if someone called me right now, typically
24 it's four, five rings, more than enough time for me to

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                                 Pages 86..89

Page 86

1   answer the phone unless I'm at work, but still.
2       Q.    Okay.  And then earlier I mentioned that there
3   were documents produced by Sprint in this lawsuit.  Do
4   you have any personal knowledge about the documents that
5   were produced?
6       A.    "Personal" meaning what?
7       Q.    Have you seen them?
8       A.    Have I seen the documents from Sprint?
9       Q.    Correct.
10      A.    Not -- Not yet, no.
11      Q.    Okay.  I just wanted to confirm.
12      A.    Yeah.
13      MS. STRICKLER:  That's all I have.
14                    CROSS-EXAMINATION
15  BY MR. VLAHAKIS:
16      Q.    Okay.  So to clarify, if I understand your
17  testimony correctly, you had mentioned there were times
18  where you would get phone calls from FAMS up to three
19  times a day?
20      A.    Yes.
21      Q.    Okay.  In terms of those phone calls, I think
22  are you -- were you making a distinction between phone
23  calls from FAMS as opposed to voice drops from FAMS?
24      A.    Yes.

Page 87

1       Q.    Okay.  So, for example, on a typical day, you
2   might have received -- and I think the phone records
3   show this -- that you may have received three phone
4   calls from FAMS.  Are you saying in addition to that,
5   you may have also received a voice drop from FAMS on a
6   day where the three phone calls would ring like a normal
7   call, but you received -- you also recall receiving a
8   voice drop with the notifications you've testified to?
9       A.    Yes.
10      Q.    Okay.  I know we don't have the records here
11  in front of you, but was there any day that you can
12  recall where you received more than three phone calls
13  from FAMS where there's a traditional ring that may have
14  been four or five rings?
15      A.    I can't remember an exact date, but it's
16  been -- it's well over one day that it's been three.
17      Q.    Okay.  Were there other days you recall where
18  you may have received two phone calls from FAMS when the
19  phone rang in a traditional four or five rings?
20      A.    Yes.
21      Q.    Were the phone calls that you received from
22  FAMS where they were traditional phone rings, did those
23  phone calls come at any set time on any given day or do
24  you recall them it was happening at random times?

Page 88

1       A.    Random.
2       Q.    And can you recall approximately how many
3   different phone numbers that FAMS may have called you
4   from where the calls resulted in the, you know,
5   traditional call with the four, five rings?
6       A.    At least three.
7       Q.    Okay.  And could you describe the
8   difference -- or the process you would have to go
9   through to -- when you heard the voice drops that -- Let
10  me back up for a second.
11          Do you have an understanding as to whether
12  FAMS did the voice drop or was there another entity that
13  caused the voice drops to be done?
14      A.    It's another entity.
15      Q.    And do you recall the name of that entity?
16      A.    I think it's Votex?  Vortex?
17      Q.    VoApps?
18      A.    VoApps.  I'm sorry.
19      Q.    Okay.  And do you have a general understanding
20  of how VoApps contends that it performs these voice
21  drops?
22      A.    I believe they do a -- They do one call -- one
23  ring and then it goes straight to voicemail.
24      Q.    And do you recall if there was a telephone

Page 89

1   number that was being associated with any of these voice
2   drops?
3       A.    Yes.  Mine.
4       Q.    Oh, I'm sorry.  No.  Was there a caller ID
5   that was included in any of the voice drops --
6       A.    Oh.
7       Q.    -- when you looked into your voicemail to see
8   who had called you?
9       A.    It would be an 866 phone number.
10      Q.    And you testified earlier to your general
11  understanding of what it meant to be a class
12  representative.  Is there -- Can you give me any other
13  examples of what your understanding is of what the role
14  you're serving for in this case is?
15      A.    I'm pretty much representing and they can have
16  permission to call me.  If they called me several times
17  a day, they probably called other people several times a
18  day.  So I'm really representing how that affected
19  people.
20      Q.    And is your understanding that under the
21  Telephone Consumer Protection Act that if an entity is
22  using pre-recorded voice messages, that they require the
23  permission of the recipient of that message before
24  sending those messages?



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                           Pages 90..93

Page 90

1    A.    Yes.
2    Q.    And is your contention that you're serving as
3  a class representative because you do not believe FAMS
4  had your permission to place voice messages in your
5  phone?
6    A.    Yes.
7    Q.    And are you serving as a class representative
8  because you believe that FAMS did not have permission to
9  call your telephone in an effort to contact your wife?
10   Q.    And in terms of -- You were asked earlier if
11 you understood what an automatic telephone dialer was.
12 Do you remember those questions?
13
14   A.    Yes.
15   Q.    Okay.  When you answered the phone call that
16 you mentioned to earlier in your testimony, did the
17 person -- did anybody immediately pick up that phone or
18 was there any -- a time lag?
19   A.    As far as when I called them?
20   Q.    Yes.
21   A.    You have to go through -- You have to go
22 through -- press 1 or 2 to talk to someone.
23   Q.    Okay.  So nobody automatically answered the
24 phone when you called in to FAMS?

Page 91

1    A.    Right.
2    Q.    Okay.
3    A.    Right.  You have to go to that -- through that
4  waiting thing where it's press 1 for this department or
5  2.  I don't know the exact -- what it said, but yeah.
6    Q.    And you called FAMS at a number that -- Did
7  you call it as a result of getting a voice drop or
8  because you saw that your caller ID had a number
9  associated with FAMS?
10   A.    Caller ID.  And, you know, also when they did
11 call and I picked up the phone, I still went through
12 that prompt to say speak to this 1, 2.  So when I picked
13 up that phone from FAMS, it's not like someone said
14 hello right away.  It's that prompt.
15   Q.    And what you mean by the prompt, there was
16 a -- was there a pause or --
17   A.    There's a pause, yeah.
18   Q.    Okay.  And so is your recollection that you
19 did answer a phone call that had been placed by FAMS?
20   A.    Yes.
21   Q.    Do you recall when that took place?
22   A.    I don't remember the exact date.
23   Q.    And is that what you're referring to in terms
24 of somebody identifying that they got your number from

Page 92

1  the list?
2    A.    Yes.
3    Q.    Okay.  So you're not suggesting --
4    A.    That was a live person that I spoke to that
5  even though I had to go through that automated to talk
6  to someone live, they literally said, oh, yeah.  I got
7  your number from the list like very casually.
8    Q.    And is this conversation you're referring to
9  separate from the one where you had then called in and
10 said to stop calling?
11   A.    No.  It's the same one.
12   Q.    Okay.  And how many times did you speak to
13 FAMS then?
14   A.    I believe just that one time.  I attempted
15 trying -- calling two other times, but it was just the
16 auto where it says press 1 or 2 and I was at work.  So
17 I'm not going to go through all that at work.  I
18 mean ...
19   Q.    And you were asked if you had an understanding
20 of compensation in this case and I want to ask you a
21 quick question if you understand.  In your capacity as a
22 class representative, do you understand what role the
23 court may have in determining the type of compensation
24 that might be provided to you?

Page 93

1    A.    Yes.
2    Q.    What's your understanding of that?
3    A.    That's based off of the judge's decision.
4    Q.    And do you have an understanding as to how my
5  firm might be compensated if we were to both prevail in
6  the class action?
7    A.    That's also up to the judge.
8    Q.    And do you know why it's up to the judge?
9    A.    Because that's -- Because it's a class action
10 lawsuit.  It's not like it's an individual where numbers
11 can be a little bit more determined by that particular
12 law firm.
13   Q.    Okay.  And prior to attending the settlement
14 conference, you recall receiving a copy of a
15 counteroffer that was provided to you by FAMS' lawyers?
16   A.    Yes.
17   Q.    Okay.  And prior to attending the settlement
18 conference without going into the specific dollar
19 figures that were mentioned, do you recall being told
20 that FAMS was offering a certain amount of money to
21 compensate you for this case on an individual basis?
22   A.    Yes.
23   Q.    Okay.  And your desire, though, is to take
24 this case to the certification stage in order to obtain



Page 94

1   compensation for class numbers, correct?
2       A.   Yes.
3       Q.   Okay.  And what's your basis for believing
4   that other individuals may have -- be in similar
5   circumstances to you in terms of FAMS not having their
6   permission to contact them with an Automated Telephone
7   Dialing System?
8       A.   Just based off of the stories that I've read
9   Online, people's posts.  There would be an enormous
10  amount of people stating on their end similar
11  experiences.  And, again, this is not me asking them.
12  This is just public knowledge.  So based off of those
13  numbers, I'll give you an example.  At least out of a
14  thousand people, I've seen maybe at least 400 people out
15  a thousand people, that type of ratio, so ...  Just
16  based off of that unless they're all lying.
17      Q.   And when did you --
18      A.   I'm just going by what they say.
19      Q.   When did you conduct that research?
20      A.   A few months ago, actually.
21      Q.   Okay.
22      A.   Yeah.  Yeah.  I believe it's -- To be exact, I
23  believe it was about -- about, yeah, three months ago
24  from last week.  So a little over three months ago.

Page 95

1       Q.   And in terms of the time frame of when you
2   were called by FAMS at work, is the best evidence of
3   that whatever the phone records may show as of the times
4   and the dates?
5       A.   Yeah.
6       Q.   And in terms of the recent phone calls to your
7   mother, can you pinpoint when you believe the most
8   recent call from FAMS was to your mother in relation to
9   your wife's debt?
10      A.   A few months ago.
11      MR. VLAHAKIS:  Okay.  And, Jonathan, that's the
12  first time I've heard about that so I don't know if
13  there's a new placement or if the records -- there's
14  some other debt that FAMS might be trying to collect
15  with Nicolette or something so we may want to look into
16  that, but I'm just alerting you to this.  This is the
17  first time I've heard about a more recent call and I
18  think that the -- at least the '17 placement ended
19  sometime in '18, the calls, so ...  You don't need to
20  answer now, Jonathan.  We can just talk about it off the
21  record later.
22      MR. AUST:  Okay.
23  BY MR. VLAHAKIS:
24      Q.   And in terms of what you've done to help

Page 96

1   gather evidence in this case, you were able to provide
2   PDF copies of your Sprint bills, correct?
3       A.   Yes.
4       Q.   Okay.  And do you have an understanding as to
5   whether the bills that you received from Sprint would
6   show all the calls that you may have received from FAMS?
7       A.   It depends on how you search it, but yeah.
8       MR. VLAHAKIS:  I've got nothing further.
9       MS. STRICKLER:  I have a few follow-up questions.
10              REDIRECT EXAMINATION
11  BY MS. STRICKLER:
12      Q.   Did you testify that FAMS called you from
13  approximately three different numbers?
14      A.   Well, it's my cell phone, my mother's phone,
15  and it was -- No.  No.  It was two.  I'm sorry.  I was
16  thinking of my wife's phone it was three.  They were
17  just calling her, though.
18      Q.   Was it --
19      A.   So it's two.
20      Q.   I'm sorry.  Go ahead.
21      A.   It's two.  It's my cell phone and my mother's.
22      Q.   Okay.  Was it always the same number from
23  FAMS?  So when you get the incoming call, was it always
24  the same number that FAMS was calling from?

Page 97

1       A.   No.  They switch numbers.
2       Q.   Okay.  Do you know how many numbers --
3       A.   Two or three they have.
4       Q.   Okay.  Do you recall what those numbers were?
5       A.   I'd have to look it up, but if I wanted to be
6   really accurate, I can just check my mother's phone
7   records or get her phone bills because they would call
8   her after me.
9       Q.   Okay.  But to your phone --
10      A.   Yeah.  Yeah.
11      Q.   -- it was different numbers?
12      A.   They would literally call her right after
13  me --
14      Q.   Okay.
15      A.   -- a few times.  Yeah.  So they would call my
16  phone, not get ahold of me and go right to there.
17      Q.   When was this?
18      A.   A few months ago.
19      Q.   So you were still receiving calls a few months
20  ago?
21      A.   No.  I mean, like six or eight.
22      Q.   Okay.
23      A.   Like, not few.  Like three or four, but ...  I
24  don't remember the exact date.



Page 98

1    Q.   So was it in 2019?
2    A.   No.  It was in 2018.
3    Q.   Okay.  2018?
4    A.   Yeah.  We're in, what, April?
5    Q.   May.
6    A.   May.
7    MR. VLAHAKIS:  Time flies.
8    THE WITNESS:  Yeah.
9    BY MS. STRICKLER:
10   Q.   So you were still receiving calls in 2018?
11   A.   Uh-huh.
12   Q.   And your mother was receiving them at the same
13   time, correct?
14   A.   Well -- Yeah, at the same time that I was, but
15   then she had them after me, too, after -- even after
16   twice of her speaking to a representative saying don't
17   call me.  For some reason, they felt the need to still
18   call her.
19   Q.   How many times did you pick up a call from
20   FAMS?
21   A.   I picked up once.
22   Q.   Okay.  And it's your testimony that the only
23   time you talked to FAMS was when they called you?
24   A.   Yes.

Page 99

1    Q.   Okay.  And to clarify, you said that when they
2    called you and you answered, you got the --
3    A.   It was not a live person right away.  It's
4    auto.  Like, it's a prompt saying --
5    Q.   You had to select something?
6    A.   Yeah.  Select 1 or 2 for this.
7    Q.   You testified that you do recall that there
8    were other settlement offers prior to the conference; is
9    that correct?
10   A.   Uh-huh.
11   Q.   But before, your testimony was you were
12   unaware of any other settlement offers; is that correct?
13   A.   I didn't understand the question correctly.
14   That's why.
15   Q.   Okay.
16   A.   I thought it meant if you knew of any other
17   settlement offers other than yourself.
18   Q.   What do you mean by that?
19   A.   Like, public record or anything like that.
20   That's literally what I thought the question meant when
21   you said any settlement offers.
22   Q.   That they were public record?
23   A.   Yes.
24   Q.   Okay.  As opposed to ...

Page 100

1    A.   As opposed to me personally did they offer me
2    any money --
3    Q.   Okay.
4    A.   -- or any settlement.  I understood --
5    misunderstood that question.
6    Q.   Okay.
7    A.   That's what I'm saying.
8    Q.   Okay.  So it's your testimony that you did
9    receive more than one settlement offer --
10   A.   Yes.
11   Q.   -- to you?
12   A.   (Nodding.)
13   Q.   Okay.  Earlier you said something about you
14   looked into other people affected by FAMS.  You said
15   something about 400 out of a thousand.  Where are you
16   getting the information from?
17   A.   Some of it's on Reddit, some of it's on
18   Facebook, but ... A few different sources.
19   Q.   Were there groups that you found, or ...
20   A.   There was one group, yeah.
21   Q.   What was that group?
22   A.   I can't remember the name of it to be honest
23   with you.
24   Q.   Was that on Reddit?

Page 101

1    A.   Yes.
2    Q.   And did you go through and count the people --
3    A.   Yeah.
4    Q.   -- to get the number 400?
5    A.   Yeah.
6    Q.   Or is that an approximation?
7    A.   No.  It's approximate, but, yeah, I kind of
8    just out of curiosity I counted.
9    Q.   Okay.
10   A.   I just felt that was a ridiculous amount of
11   people saying the same thing, so ...
12   Q.   Did you make a list of these people?
13   A.   Not currently, no, or not unless my attorney
14   wanted that information and I -- You know, I would -- I
15   can't just -- I'm not going to respond on Reddit and
16   say, Hey, you want to be a part of a lawsuit or
17   something?  I was just reading that.  I was doing
18   research.  I didn't respond to them.  That was not my
19   intention to respond.  I wanted to see exactly how many
20   there were.
21   Q.   Okay.  Was there a time that you did write
22   down a list of the people that you were researching?
23   A.   No.
24   Q.   Okay.



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Pages 102..105

Page 102

1     A.    Don't have to.  You could just research it
2  again.  I mean, unless their case ended, I mean ...
3     Q.    What is the 400 out of a thousand people?
4  What do you mean by that?
5     A.    It's just an example.  Like, out of a thousand
6  people survey, 400, like that type of a ratio.
7     Q.    Okay.  And that's just something you're
8  guesstimating?
9     A.    Yeah.  Just -- I'm just trying to give an
10 example.
11    Q.    Okay.
12    A.    It's not an exact like a thousand people were
13 interviewed.  This is an example.
14    MS. STRICKLER:  I think that's all I have.
15    MR. VLAHAKIS:  Jonathan, anything?
16    MR. AUST:  No.  I'm good.
17    MR. VLAHAKIS:  Quick clarification then.
18          RECROSS-EXAMINATION
19 BY MR. VLAHAKIS:
20    Q.    So when you spoke with the representative from
21 FAMS, was that when you placed an inbound call to FAMS
22 or when you had answered a call from FAMS?
23    A.    No.  I was answering.
24    Q.    Okay.  Got it.  And do you recall what -- Was

Page 103

1  there a pre-recorded message saying to hold for an
2  operator or did it -- was the pre-recorded message
3  prompting you to hit a certain number?
4     A.    It's saying hit a certain number.
5     Q.    Okay.
6     A.    I don't remember the exact wording word for
7  word, but I know it was you had to hit a certain number.
8     MR. VLAHAKIS:  Okay.  Jonathan, that's the first
9  that I'm hearing about a pre-recorded message being
10 played as sort of a hold thing.  Do you know if that's
11 what was being done at that era for FAMS or not?
12    MR. AUST:  I do not believe that that's the case,
13 but I -- That's the first I've heard of it.  I don't
14 think that's what's going on.
15    MR. VLAHAKIS:  Got it.
16    MR. AUST:  There's only one -- Are we on the
17 record?
18    MR. VLAHAKIS:  Oh, we can go off.
19    MR. AUST:  All right.
20          (Discussion off the record.)
21 BY MR. VLAHAKIS:
22    Q.    Mr. Molinari, just to make sure we've got this
23 buttoned down, do you recall when you told FAMS to stop
24 calling your telephone number?

Page 104

1     A.    I don't remember the exact date.
2     Q.    And there was obviously a bit of an
3  off-the-record discussion that we just had, but based on
4  what you can -- you heard from that, does -- are you --
5  what confidence level do you have that it was -- you
6  told them to stop calling you in relation to the call
7  you placed or a call that was placed in to you?
8     A.    Meaning that if they called me or if I called
9  them?
10    Q.    Yes.
11    A.    They called me.
12    Q.    Okay.
13    A.    I mean ...
14    Q.    And it's your testimony and your recollection
15 that you picked up the inbound -- the call that was
16 being placed to you and you were then -- you then spoke
17 with somebody from FAMS and you then told them to stop
18 calling you, correct?
19    A.    Yes.
20    Q.    Okay.  And if FAMS has records showing an
21 inbound call from you resulting in that phone
22 conversation, does that make you think that there's
23 another time you may have spoken with FAMS to tell them
24 to stop calling you in relation to a call that FAMS

Page 105

1  placed to you as opposed to an inbound call you placed?
2     A.    I mean, it's possible.
3     Q.    And can you estimate how many -- I mean, the
4  Live Box records that we have received show over a
5  hundred phone calls to your number ending in 8132, some
6  which were two a day, sometimes three a day.  Does that
7  total number of calls seem to jibe up with what your
8  recollection is of the amount of calls that Live Box --
9  or not Live Box -- FAMS made in a sort of a traditional
10 telephone ring call?
11    A.    Yes.
12    Q.    Okay.
13    A.    Minimum, or ...
14    Q.    In your mind, was it excessive and harassing
15 to you to be called up to three times a day by FAMS?
16    A.    Yes, especially at work and driving.
17    MR. VLAHAKIS:  I've got nothing further.
18          REDIRECT EXAMINATION
19 BY MS. STRICKLER:
20    Q.    Just to clarify what you just said now.  So is
21 it your testimony that you received over a hundred of
22 the traditional calls from FAMS?
23    A.    Yes.
24    Q.    That does not include the one call voicemail,

Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                    Pages 106..109

Page 106

```
 1   correct?
 2       A.   No, that does not include this.  I've got I
 3   think ten voicemails.
 4       MS. STRICKLER:  Okay.  That's all.
 5   BY THE WITNESS:
 6       A.   But no, that doesn't include that.  Yeah.
 7       Q.   Okay.
 8       A.   And I said a minimum a hundred.  I'm just
 9   guesstimating.  I mean, it's got to be a minimum, but
10   I'm not counting right now.
11       MR. VLAHAKIS:  I've got nothing further.
12            Jonathan, you good?
13       MR. AUST:  I'm good.
14       MR. VLAHAKIS:  Okay.
15       THE COURT REPORTER:  Signature?
16       MR. VLAHAKIS:  We will reserve.
17       THE COURT REPORTER:  Okay.
18                (Witness excused.)
19
20
21
22
23
24
```

Page 108

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                )   SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )
 4
 5       I, Christina J. Atto, Certified Shorthand
 6   Reporter and Notary Public, do hereby certify that
 7   RICHARD MOLINARI was first duly sworn by me to testify
 8   to the whole truth and that the above deposition was
 9   reported stenographically by me and reduced to
10   typewriting under my personal direction.
11       I further certify that the said deposition was
12   taken at the time and place specified and that the
13   taking of said deposition commenced on the 10th day of
14   May, A.D., 2019, at 10:00 a.m.
15       I further certify that I am not a relative or
16   employee or attorney or counsel of any of the parties,
17   nor a relative or employee of such attorney or counsel,
18   nor financially interested directly or indirectly in
19   this action.
20
21
22
23
24
```

Page 107

```
 1         IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
 3
     RICHARD MOLINARI, Plaintiff, on    )
 4   behalf of himself and a class      )
     of similarly situated              )
 5   individuals,                       )
                                        )
 6              Plaintiffs,             )
                                        )
 7        vs.                           ) No. 1:18-cv-01526
                                        )
 8   FINANCIAL ASSET MANAGEMENT         )
     SYSTEMS, INC.,                     )
 9                                      )
                Defendant.              )
10
11       I, RICHARD MOLINARI, state that I have read
12   the foregoing transcript of the testimony given by me at
13   my deposition on the 10th day of May, A.D., 2019, and
14   that said transcript constitutes a true and correct
15   record of the testimony given by me at the said
16   deposition except as I have so indicated on the errata
17   sheets provided herein.
18
19                      _____
20                          RICHARD MOLINARI
21
     SUBSCRIBED AND SWORN to
22   before me this _____ day
     of _____, 2019.
23
24   _____
           NOTARY PUBLIC
```

Page 109

```
 1       In witness whereof, I have hereunto set my
 2   hand and affixed my seal of office at Chicago, Illinois,
 3   this 21st day of May, A.D., 2019.
 4
 5
 6
 7
 8
 9
10   CHRISTINA J. ATTO, CSR, RPR
11   180 North LaSalle Street
     Suite 2800
12   Chicago, Illinois 60601
     Phone:  (312) 236-6936
13
14
     CSR No.  084-004321
15
16
17
18
19
20
21
22
23
24
```



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

Page 110

```
                                                     Page 110
1    Errata Sheet

2

3    NAME OF CASE: Molinari vs Financial Asset Management Systems, Inc.

4    DATE OF DEPOSITION: 05/10/2019

5    NAME OF WITNESS: Richard Molinari

6

7    Page _____ Line _____ Reason _____

8    From _____ to _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   _____

     SIGNATURE OF DEPONENT
```



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019                                                                    1

**$**

**$25** 22:20

**(**

**(708)** 17:24

**1**

**1** 62:23 63:2 90:22
91:4,12 92:16 99:6

**14** 74:1

**16th** 33:20

**17** 95:18

**18** 11:24 95:19

**1999** 11:12,13

**2**

**2** 90:22 91:5,12
92:16 99:6

**20** 68:10 69:10

**2015** 23:8 40:13
41:15 74:1

**2016** 46:13

**2017** 23:9 25:2,3
28:1,11,12 33:20,
21 39:4,5 41:12
44:10 46:14 60:16,
18,21 66:11

**2018** 98:2,3,10

**2019** 98:1

**2120** 9:18

**228-8132** 17:12

**24th** 33:20

**3**

**3** 20:13,15

**30** 13:4 68:10,11,
13,15

**4**

**400** 94:14 100:15
101:4 102:3,6

**4th** 33:21

**6**

**6** 8:6

**6-20-75** 7:4

**60401** 8:6

**7**

**708 228-8132**
10:15

**8**

**8132** 10:16,20
16:23 17:13 20:2,
19 39:18 105:5

**866** 56:19 89:9

**9**

**946-0284** 17:24

**A**

**access** 28:23

**accomplish**
66:16,17

**account** 21:13
23:20

**accurate** 6:2 39:8
82:12 97:6

**accurately** 67:10
68:1

**Act** 51:17,21 89:21

**action** 68:5,8,16,
20 72:9 75:5 93:6,
9

**actions** 59:5 75:2

**actual** 23:1 30:3

57:3

**addition** 62:16
87:4

**additional** 22:12,
15

**address** 8:5 9:7,
10,17,22 18:7,20
54:5

**addresses** 9:21

**adequate** 71:13

**admitted** 55:3,5
83:6

**affect** 5:23 67:19
69:15

**affected** 43:3
68:17 69:3,7,9,20,
21 70:19 71:18,19
89:18 100:14

**affecting** 43:6
69:8

**affects** 67:18
71:18

**ahead** 15:10,18
49:2 96:20

**ahold** 97:16

**alerting** 95:16

**alerts** 59:15

**allegation** 54:19
62:19

**allegations** 61:15
62:8 63:17

**allege** 54:14

**alleged** 64:15

**alleging** 55:11

**allowable** 48:23

**amount** 49:13,16
93:20 94:10
101:10 105:8

**amusing** 22:22

**Android** 20:14

**answering** 75:21
102:23

**anxiety** 60:13,15,
20 61:2

**anymore** 74:2
83:14

**anytime** 30:12
31:24 71:1

**app** 28:4 77:22

**appears** 35:8

**applied** 22:12

**approachable**
72:5

**approximate**
101:7

**approximately**
11:11 88:2 96:13

**approximation**
101:6

**April** 98:4

**arrange** 64:23

**arrested** 16:11,14

**Arts** 11:9

**Asset** 6:5

**assumption** 55:8

**ATDS** 54:12,15
55:11 56:1

**attached** 53:21

**attempt** 24:4

**attempted** 17:18
92:14

**attempting** 23:11

**attend** 70:11

**attended** 75:17
76:22

**attending** 93:13,
17

**attorney** 10:9 42:9
47:1,4,15 83:21
101:13

**attorney's** 46:23
75:2,5

**attorneys** 44:21
45:2 46:6,15 48:17
49:10 50:14 59:22
74:8 82:6,15

**AUST** 33:18 34:3,

13 84:12,14 95:22
102:16 103:12,16,
19 106:13

**auto** 52:20 92:16
99:4

**automated** 52:18
53:8 54:11 92:5
94:6

**automatic** 90:12

**automatically**
90:23

**awarded** 48:18
49:11

**aware** 24:3 45:6
49:13 51:9 73:24
74:22

**B**

**Bachelor's** 11:3,4

**back** 20:1 23:7
24:13,14 32:20
33:7 34:24 38:5,6
49:6 53:11,12,15
84:16 88:10

**based** 93:3 94:8,
12,16 104:3

**basic** 13:13

**basis** 54:19 55:9
93:21 94:3

**Beecher** 8:6,7,8,
13,14 9:8,11 18:19

**began** 60:17

**beginning** 28:1,9

**belabor** 84:19

**believing** 94:3

**belonging** 23:21

**big** 72:21

**bill** 21:14 22:19

**bills** 96:2,5 97:7

**birth** 7:3

**bit** 93:11 104:2

**blood** 43:18,20



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

2

**body** 12:22

**border** 8:16

**bothering** 23:18

**Box** 105:4,8,9

**brand** 20:21,23

**break** 5:12,15
50:8,11 75:14
77:12,14 84:11,17

**briefing** 6:14

**bring** 45:3

**broke** 20:24

**brought** 40:18
83:9

**brutally** 43:1

**bunch** 52:21
69:17

**business** 10:13
22:11

**buttoned** 103:23

---

**C**

**call** 17:17,18 22:4,
5 24:13,14,19
27:6,14,20,23
28:15,16,22 29:9,
10,19 30:1,2,8,12,
17,18 31:1,6,11,
17,20 36:22 37:6,
9,22 38:5,8,11,20
39:20 42:4 53:10,
12,14 59:11,14
62:5 64:4 74:12
83:13,14 84:23
85:1 87:7 88:5,22
89:16 90:9,15
91:7,11,19 95:8,17
96:23 97:7,12,15
98:17,18,19
102:21,22 104:6,7,
15,21,24 105:1,10,
24

**called** 4:4 29:24
30:19 34:10 38:7,
9,14,16 39:21
40:16 54:15 65:17
66:9 70:10,23 80:9
83:1 85:15,18,23
88:3 89:8,16,17

90:19,24 91:6 92:9
95:2 96:12 98:23
99:2 104:8,11
105:15

**caller** 38:7 56:20,
24 57:14 89:4
91:8,10

**calling** 17:14
21:23 22:19 28:21
37:16,23 38:4
39:15,17 52:6
53:22 57:1 59:2,7,
15,18 64:6 71:3
81:9 92:10,15
96:17,24 103:24
104:6,18,24

**calls** 15:14 18:24
19:7 22:1,2,3 23:3,
9 24:3 29:1,5 30:2,
14 31:17,22 32:3,
11,12,19,22 33:8
34:21,22 35:6,21
36:3 40:1,2,4,12,
14,20 41:3,10,14,
16,21 42:3,11,16,
20,21 50:23 52:6
56:14,17 57:11,12,
20 58:11,15,23
59:9,13,14,16,17
60:2 61:16,17
63:22 65:3 69:4,9
73:9,21,23 77:18
78:6,7 79:2,3,8,11,
22 81:2 83:23
84:20,21 85:4,8,11
86:18,21,23 87:4,
6,12,18,21,23 88:4
95:6,19 96:6 97:19
98:10 105:5,7,8,22

**Campbell** 7:24
8:1

**candidate** 72:12

**capacity** 92:21

**Capital** 46:4

**card** 65:23

**care** 18:11 42:24
43:4 62:13

**case** 6:5 13:20
14:7,12,14,24
15:7,24 16:7,22
17:10 32:6 44:23

45:17,22 48:8,16
49:10 71:15,20,24
74:11,23 76:15
83:20 89:14 92:20
93:21,24 96:1
102:2 103:12

**casually** 92:7

**caught** 59:10

**caused** 17:21
19:17 64:12 67:14
69:5,6 88:13

**cell** 18:13 20:2
25:18 59:23 85:15
96:14,21

**cellular** 21:14

**certificates** 11:15

**certification**
93:24

**change** 29:14
56:20 79:5

**changed** 18:19,20

**chargeable** 47:18

**charged** 22:9,15,
20,23 23:1

**charges** 22:1

**check** 27:2 31:10
32:23 57:13,17
97:6

**checked** 37:20
44:5,8

**chest** 44:5 60:7,23

**Chicago** 11:6 14:9

**children** 10:22

**chirping** 29:13

**circumstances**
94:5

**city** 9:5

**claims** 14:12,13
45:21

**clarification**
75:15 102:17

**clarify** 54:3 86:16
99:1 105:20

**class** 48:24 68:4,

8,16,20,23 69:2,
11,15,16 70:1,5,8,
17,18 71:10,23
72:4,9 75:2,5,11
89:11 90:3,7 92:22
93:6,9 94:1

**clear** 26:23

**click** 30:17,24
31:8,17,18 37:17

**co-worker** 58:16,
21

**co-workers** 73:19

**coffee** 75:16

**collect** 95:14

**collection** 42:20
51:21

**collector** 14:24
15:1

**College** 11:1,5

**Columbia** 11:5

**Comenity** 14:4,19
41:7,11 63:7,12

**communicate**
72:19

**companies** 42:21
60:3 78:7

**company** 12:16
15:20 22:16 40:21
41:5,8,9,13 42:1
52:23 53:10,14
55:17,20 68:11

**compensate**
93:21

**compensated**
93:5

**compensation**
76:3 92:20,23 94:1

**complaint** 33:3
54:14 61:15 62:19
63:17,18

**Completely** 35:24

**con-** 54:21

**conduct** 94:19

**conference** 75:18
76:6,22 77:2

93:14,18 99:8

**confidence** 104:5

**confidential**
75:23

**confidentiality**
76:15

**confirm** 82:4
86:11

**conflict** 17:21
19:18 69:6

**confuse** 5:8

**confusion** 19:19

**connection** 18:5

**considered** 15:1

**Consumer** 51:17
89:21

**contact** 17:11
24:9,11 39:21
54:7,22 58:17
78:20,23 90:9 94:6

**contacted** 42:3

**contacting** 23:17,
20 38:23 39:9,12,
15,16

**contends** 88:20

**contention** 90:2

**context** 76:1,6

**contractor** 58:4

**conversation**
92:8 104:22

**convicted** 16:9

**copies** 96:2

**copy** 93:14

**Corinne** 61:11,12

**correct** 16:24 20:3
38:10 40:15 42:2
46:9 51:5 54:15
66:18 76:7 77:2
80:2 86:9 94:1
96:2 98:13 99:9,12
104:18 106:1

**correctly** 7:8
86:17 99:13



**Cosgrove** 65:8

**Cosgrove's** 65:13

**costs** 47:12,14 48:2

**counsel** 75:11

**count** 101:2

**counted** 101:8

**counteract** 61:4

**counteroffer** 93:15

**counting** 106:10

**couple** 20:23 40:5, 17

**court** 4:18 17:5 49:9 74:15 92:23 106:15,17

**Crete** 8:14

**crime** 16:10

**CROSS-EXAMINATION** 86:14

**curiosity** 101:8

**current** 8:5 10:14 77:17

— D —

**daily** 61:17,18

**damages** 42:16, 19

**data** 21:23

**date** 7:3 24:24 25:5,6 32:1,17 39:2,8 47:8,13 87:15 91:22 97:24 104:1

**dates** 33:19,24 95:4

**day** 59:2 86:19 87:1,6,11,16,23 89:17,18 105:6,15

**days** 40:5 87:17

**deadline** 74:15

**dealt** 71:16

**debt** 14:24 15:1 23:12 24:13 41:17, 18,19 42:20,24 51:20 95:9,14

**December** 33:21

**decision** 93:3

**defendant** 6:5 13:23 17:10

**defendant's** 62:22 63:1

**definition** 47:2

**degree** 11:3,8,10

**demonstrating** 82:1

**department** 12:23 91:4

**departments** 12:17

**depend** 48:7

**depends** 47:1 48:3,5,8 56:4 96:7

**deposition** 4:12 6:10,13 33:22 63:1 71:6

**depositions** 71:8

**describe** 66:22 70:2 88:7

**desire** 93:23

**details** 13:13

**determined** 93:11

**determining** 92:23

**dial** 52:20

**dialer** 53:1 90:12

**Dialing** 52:19 54:12 94:7

**difference** 88:8

**ding** 29:6 79:16,20

**dingle** 29:5

**dings** 26:19

**direct** 4:6 80:10, 11,13

**discovery** 33:2 48:24

**discussed** 60:1 64:10 74:18 78:13

**discussing** 74:17

**discussion** 34:18 103:20 104:3

**discussions** 76:2

**displayed** 29:15 56:23 57:9

**disrupt** 61:18

**disrupted** 61:17

**dissimilar** 15:16, 19

**distinction** 86:22

**distraction** 62:1

**divorce** 42:22 78:8

**divorced** 71:16

**doctor** 44:16 60:20 64:21,23,24 65:4

**doctor's** 65:6

**doctors** 44:19

**documentation** 64:14,20,22

**documents** 7:1,2 50:13,15 55:24 56:2 75:10 86:3,4, 8

**dollar** 93:18

**double-check** 33:6 34:8 80:6

**Drake** 8:6

**driving** 61:23 62:1 105:16

**drop** 80:10,11,13 87:5,8 88:12 91:7

**dropped** 52:6,8

**drops** 33:14 86:23 88:9,13,21 89:2,5

**due** 60:20

**duly** 4:4

**duties** 70:7 71:9

— E —

**e-mail** 26:15 34:6, 12

**e-mails** 79:9

**earlier** 60:1 62:17 79:1 82:18 86:2 89:10 90:11,16 100:13

**early** 44:10 46:14

**earned** 11:10

**education** 10:24

**effort** 90:9

**elaborate** 83:10

**emergency** 78:20,23

**emotional** 14:17 43:5 69:4

**employed** 11:17

**employees** 68:14

**end** 46:13 69:5 84:7 94:10

**ended** 95:18 102:2

**ending** 16:23 105:5

**engage** 45:1

**enormous** 94:9

**entire** 12:13

**entity** 88:12,14,15 89:21

**epilepsy** 43:23

**epileptic** 43:14,15

**era** 103:11

**erase** 32:5

**estimate** 25:2 105:3

**eventually** 48:3

**evidence** 95:2 96:1

**exact** 24:24 25:5

39:2,8 87:15 91:5, 22 94:22 97:24 102:12 103:6 104:1

**EXAMINATION** 4:6 96:10 105:18

**examined** 4:5

**examples** 89:13

**excessive** 105:14

**excused** 106:18

**exhibit** 62:23 63:1, 14

**expand** 62:18

**expect** 4:16 5:11

**expensive** 22:21

**experience** 60:13 72:14 75:2,5,11

**experienced** 44:2 60:5 69:22 72:6,7, 8

**experiences** 94:11

**experiencing** 43:11 61:6

**expert** 74:5,7

**explain** 14:18 15:13 42:18 51:2 53:6 62:9 64:19

**explained** 33:2

**extent** 52:5,7 70:16

**extreme** 71:15,20, 24

**extremely** 51:24

— F —

**fabulous** 22:19 43:8

**Facebook** 100:18

**fact** 19:19 75:22

**facts** 14:19

**fair** 6:2 51:20



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

4

**fall** 39:3

**familiar** 51:19,23

**family** 10:12 21:11 53:21

**FAMS** 6:7 17:10, 11 23:4,10,13 26:5 30:9 32:3,22 33:13 36:10,13,23 37:11 40:21 46:8 51:8 54:14 56:1,14,18, 21 57:4,6,9,20 58:15 59:22 60:6 61:16 62:9 64:11 65:1,4 66:16 73:9 74:23 76:5 77:1,18 79:22 80:4,15 83:3 85:5,11 86:18,23 87:4,5,13,18,22 88:3,12 90:3,8,24 91:6,9,13,19 92:13 93:20 94:5 95:2,8, 14 96:6,12,23,24 98:20,23 100:14 102:21,22 103:11, 23 104:17,20,23, 24 105:9,15,22

**FAMS'** 63:22 83:11 93:15

**favor** 48:11

**FDCPA** 52:2,4

**February** 28:9

**fee** 47:4,21

**feel** 5:9 64:2 71:18, 23 72:2,18

**fees** 46:23 47:1,2, 7,15 48:13

**felt** 51:6 62:10 64:7 98:17 101:10

**fifteen** 6:18

**figures** 93:19

**filed** 51:3,4

**Financial** 6:5

**fine** 6:8 24:18 49:16 50:5,9 62:23

**finish** 5:6,7

**fired** 58:16 59:10

**firm** 46:20 93:5,12

**five-minute** 70:2

**flies** 98:7

**follow-up** 96:9

**Foods** 11:20,21 13:1

**forgot** 49:3

**form** 15:9 45:19 48:19 66:19 67:1 72:24 74:14 80:3 82:13

**forward** 17:3

**found** 64:8 100:19

**frame** 95:1

**free** 5:10

**friends** 10:12

**front** 87:11

**full** 52:9 58:6,9

**G**

**Galaxy** 20:15,16

**gather** 96:1

**gave** 63:6 78:21

**general** 21:20 65:18 75:8,9 88:19 89:10

**generalizing** 69:7

**generally** 48:20

**gesturing** 26:16 77:19

**give** 4:19 6:2 25:5 39:7 60:22 64:3 68:12 69:16 74:9 78:19 89:12 94:13 102:9

**giving** 72:10 82:3

**God** 10:17 12:21 15:3 17:24 83:17

**good** 9:4 16:15 69:20 71:20 72:4, 12 102:16 106:12, 13

**graduate** 11:1

**greeting** 25:8,9

**grocery** 12:22

**ground** 4:16

**group** 45:12 46:5 68:17 100:20,21

**groups** 100:19

**Grove** 18:17 58:3

**guess** 13:14 14:18,23 16:3 23:19 24:20 27:7, 11 29:15 32:6,7,21 34:21 35:17 36:15 37:24 48:10,20 49:15 57:9 64:18 69:1 74:18

**guesstimating** 102:8 106:9

**guy** 44:16 68:14

**guys** 34:12

**H**

**habit** 31:15

**half** 9:8 65:16

**handicapped** 18:9

**handling** 75:2,5

**happen** 66:23

**happened** 70:18, 21 75:22

**happening** 87:24

**harass** 14:20

**harassed** 51:6 60:17 69:17 72:12

**harassing** 14:21 68:13,14 105:14

**harassment** 14:15,16,17 15:15 72:11

**hard** 18:8 19:21

**head** 4:21 15:22 45:18,23 55:15 73:3

**headaches** 43:12, 13 44:3 60:7 71:16

**healthier** 43:19

**heard** 51:16,18,20, 22 52:14,17 53:2, 17 55:17,20 88:9 95:12,17 103:13 104:4

**hearing** 103:9

**held** 12:13,15

**helpful** 82:4

**Hey** 101:16

**high** 71:20

**highest** 10:24

**highly** 71:19

**hire** 52:24 74:8

**hiring** 46:19

**hit** 103:3,4,7

**hold** 11:14 103:1, 10

**home** 18:14

**honest** 20:22 43:2 56:8,9 100:22

**hope** 25:15

**hoping** 67:4

**hospital** 65:20,24

**hour** 65:16

**house** 58:3

**hundred** 105:5,21 106:8

**I**

**ID** 38:7 53:21,23, 24 54:2 56:20,24 57:15 89:4 91:8,10

**idea** 23:12

**identif-** 57:5

**identification** 63:2

**identifying** 91:24

**Illinois** 8:6,14,17

14:9,10

**image** 34:10

**imbedded** 34:5,11

**immediately** 90:17

**important** 4:19

**inbound** 102:21 104:15,21 105:1

**include** 105:24 106:2,6

**included** 89:5

**incoming** 22:1,2 84:21 96:23

**India** 59:14

**Indiana** 8:17 9:12, 13,14 65:14,15

**individual** 68:17 93:10,21

**individually** 68:9

**individuals** 70:21 74:12 94:4

**information** 82:24 100:16 101:14

**initially** 33:1

**initiate** 37:22

**injuries** 60:1,6 64:11,15,16

**intend** 74:12

**intention** 101:19

**interesting** 16:13

**interviewed** 102:13

**introduced** 45:7

**invaded** 62:9,10, 11 63:22 64:2

**involve** 74:16

**involved** 13:9,11 47:4 70:21

**issue** 16:23 42:23

**issues** 43:1,20



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

5

**J**

**Jason** 58:19

**jibe** 105:7

**Jon** 84:10

**Jonathan** 33:18
95:11,20 102:15
103:8 106:12

**JT** 58:9

**judge** 5:19 75:21
93:7,8

**judge's** 93:3

**June** 11:12

**jury** 5:20

**K**

**kind** 14:16,18 17:4
18:8 20:8 21:9
23:8 49:23 50:22
59:18 60:10 62:7
68:10 72:3 83:9
101:7

**knew** 24:17 45:11
99:16

**knowledge** 25:20
26:1 36:14 44:22
45:17,21 52:1,4
53:18 58:11,22
75:1,4 77:8 78:24
86:4 94:12

**L**

**labeled** 61:2

**lag** 90:18

**land** 18:16

**landline** 18:14,16,
17

**Lane** 8:6 9:18

**laptop** 34:7

**late** 22:20 39:5

**law** 93:12

**laws** 51:7

**lawsuit** 10:5,6
13:6 16:24 46:7,8,
24 47:13,23 48:2
50:14 51:3 66:24
67:21 68:5,8,19,23
70:5 72:9,10,23
74:6,9 76:23 77:7
82:6,16 84:2 86:3
93:10 101:16

**lawsuits** 13:14
75:6

**lawyer** 6:14,17
52:16 78:13

**lawyers** 46:12
93:15

**lead** 12:4,5,7,20
43:5

**leave** 52:5

**leaving** 53:7

**left** 59:23 85:12

**legal** 59:5 71:2

**letter** 34:14

**level** 10:24 104:5

**levels** 71:17

**Liberal** 11:9

**licenses** 11:14

**life** 16:11 61:17,18

**list** 31:21 33:3
34:21 35:17 53:22
55:4,6,7 82:21
83:7,9,12 92:1,7
101:12,22

**listen** 27:6 28:18

**listened** 59:22

**literally** 28:3
37:16 52:11 55:20
57:6 83:5 85:22
92:6 97:12 99:20

**live** 10:3 37:18,19
53:8,13 92:4,6
99:3 105:4,8,9

**lived** 9:7

**lives** 18:10

**living** 9:21

**location** 66:2

**locked** 31:7,13,14,
15

**long** 8:1 9:7,19
10:16 11:23 12:1
13:2 14:5 34:9,22
40:6 81:13

**longer** 73:19

**looked** 89:7
100:14

**lot** 9:3 17:21 19:17
23:9 56:19 59:16

**love** 39:7

**lying** 49:23 56:12
94:16

**M**

**made** 40:2 74:22
76:6 77:1,7 105:9

**maiden** 7:23

**make** 4:23 33:12
72:3 101:12
103:22 104:22

**making** 54:19
86:22

**man** 44:16

**Management** 6:6

**Margaret** 65:22

**mark** 62:12,13,22

**marked** 63:2

**Market** 11:20

**marriage** 43:1,3

**married** 7:14,20
8:1

**matter** 81:7

**Meadow** 9:18

**meaning** 16:2
47:14 52:9 86:6
104:8

**meant** 71:3 89:11
99:16,20

**medical** 53:11

**medication** 43:23

**medications** 5:23
61:4

**meet** 45:5

**memory** 15:5

**mention** 43:2

**mentioned** 86:2,
17 90:16 93:19

**message** 37:17
53:3,7 89:23
103:1,2,9

**messages** 22:9
33:19 36:9 79:4
89:22,24 90:4

**met** 46:11,16

**miles** 8:20

**mind** 27:13 33:18,
21 105:14

**Mine** 89:3

**minimum** 10:18
40:7 105:13 106:8,
9

**minutes** 6:18
84:14

**missed** 29:1,5,9,
10,18 30:1,8,14,
17,18 31:1,6,10,
16,17,20,22 32:3,
11,12,19,22 33:8
34:21,22 35:6,21
36:3,22 37:5,9
57:11,12 71:22
79:8,11

**misunderstood**
100:5

**model** 20:13

**Molinari** 4:3,10
7:6,8,11,12,17,19
61:11,13 103:22

**monetary** 47:23
76:2

**money** 67:4,11,20,
21 93:20 100:2

**month** 19:8

**months** 19:2
34:23 40:7,8 59:4

94:20,23,24 95:10
97:18,19

**mother** 10:3 19:12
39:21 42:23 43:4
61:7 95:7,8 98:12

**mother's** 17:19
18:2 39:14 40:16
54:24 61:10 64:8
96:14,21 97:6

**move** 16:22 18:18
68:4

**moved** 65:23 66:1,
2

**Moving** 44:21

**Munster** 65:14,15,
21,24 66:1,6,11

**mute** 84:13

**N**

**nail** 27:24

**names** 51:14
73:13

**nervous** 16:17,18

**newer** 27:14 28:4

**Nicki** 19:13 24:9
39:15

**Nicki's** 19:20

**Nicolette** 7:17,19
24:11 95:15

**nitty-gritty** 76:20

**no's** 17:4

**Nodding** 5:16
23:23 25:23 30:15
32:15 36:20 50:16
100:12

**nods** 4:21

**normal** 87:6

**notif-** 57:9

**notification**
26:20,21,24 29:2
30:16,21,22 31:4,
18,19 36:22,23
37:9 52:12 79:3



**notifications**
27:12 29:12 30:4,8
87:8

**November** 33:20

**number** 10:14,16,
19,20 16:23 17:11,
19,23 18:1,6,12,
13,19 19:16,19,20
20:2,6,7,19,24
21:12 24:19 25:21,
22 26:2 27:20
28:22 30:22 32:22
39:11,13,17,20
40:4,17 53:11,15
54:20,21,24 55:6
56:15,21 57:3
58:10 64:7,8
78:17,18,20,22
82:21 89:1,9 91:6,
8,24 92:7 96:22,24
101:4 103:3,4,7,24
105:5,7

**numbers** 17:17
52:21 53:21 56:17
88:3 93:10 94:1,13
96:13 97:1,2,4,11

————————

**O**

**oath** 5:18

**Object** 15:9 45:19
48:19 66:19 67:1
72:24 74:14 80:3
82:13

**observed** 57:19
58:14

**obtain** 93:24

**obtained** 83:22
84:1

**off-the-record**
104:3

**offer** 77:1,4 100:1,
9

**offering** 93:20

**offers** 74:22 77:6
99:8,12,17,21

**offhand** 59:5

**office** 65:13

**older** 20:13

**Omar** 33:2

**Online** 73:15 84:8
94:9

**openly** 55:3 83:6

**operator** 103:2

**opinion** 68:10
74:9

**opinions** 44:20

**opposed** 86:23
99:24 100:1 105:1

**order** 35:24 93:24

**organization**
68:11

**original** 31:3

**Orland** 11:22

**outcome** 15:24
16:2 48:10 66:24

**outgoing** 22:3

**override** 33:8

**Overseeing** 12:11

**owe** 41:18,19

**owed** 41:17

————————

**P**

**paid** 23:15,16,17
47:7,12 82:6,12,15

**pains** 44:5 60:7,24

**paper** 50:21 64:15

**Paperwork** 64:16

**Park** 11:22

**part** 19:19 55:8
67:7,9,13 69:2
76:15 101:16

**party** 13:6,8,15

**password** 28:22

**past** 40:23 43:21
60:15

**pause** 91:16,17

**pay** 21:14,15 47:22
48:1

**paying** 12:11
46:23 47:1

**payments** 12:11

**PDF** 96:2

**pending** 5:14 16:3

**people** 19:23
44:17 46:19 52:5
59:6,11,15 68:11,
15 69:2,3,7,10,17,
21 71:12,18 72:18
73:13 89:17,19
94:10,14,15
100:14 101:2,11,
12,22 102:3,6,12

**people's** 68:10
70:16 72:20 94:9

**percent** 67:9

**performance**
43:7

**performs** 88:20

**period** 33:9 80:20

**permission** 52:7
54:8 64:3 78:17,
19,21 89:16,23
90:4,8 94:6

**person** 23:10
24:13 37:18,19
53:8,13 58:5 59:7
68:9 69:8,14 90:17
92:4 99:3

**person's** 53:21

**personal** 75:1,4
86:4,6

**personalized**
25:7,9

**personally** 73:16
100:1

**phone** 10:14,19
14:22 15:14 17:19,
23 18:1,6,9,13,14,
19,24 19:12,16,20,
22 20:2,8,18 21:4
22:7,14 23:9 24:24
25:5,18,22 26:5,7,
8 27:13,17 29:14,
15 30:19,20 31:7,
12,24 32:13,14
33:4,13,15,23

**34:22 36:16 40:4,
12,17 50:23 52:6,
21 53:20 54:20,24
58:8,10 59:9,12,
16,17,23 61:24
62:5 69:4,9 77:17,
18,19,21 78:2
79:3,12 80:17,19
81:3,4,7,23 83:23,
24 84:19,24 85:1,
15 86:1,18,21,22
87:2,3,6,12,18,19,
21,22,23 88:3 89:9
90:5,15,17,24
91:11,13,19 95:3,6
96:14,16,21 97:6,
7,9,16 104:21
105:5

**physical** 43:6,10
44:1 69:5

**physically** 19:17
27:14,20,23 84:3

**pick** 90:17 98:19

**picked** 38:7,17,18
91:11,12 98:21
104:15

**picking** 38:4

**pin** 31:16

**pinpoint** 95:7

**place** 90:4 91:21

**placement** 95:13,
18

**plaintiff** 13:22,24
72:22

**plan** 20:24 21:8,9,
11,21 23:1,2

**play** 27:9

**played** 103:10

**plays** 55:8

**PO's** 12:12

**point** 53:13 62:20

**pop** 30:4 56:21

**pop-up** 22:11
26:12,13

**pops** 26:19 30:16

**portion** 48:17

49:11

**position** 12:13

**positions** 12:16

**possession**
55:24

**possibly** 24:23

**posts** 73:14 94:9

**practice** 65:17,19
66:9

**Practices** 51:21

**pre-recorded**
37:17 53:3,7,13
89:22 103:1,2,9

**predictive** 53:1

**premature** 74:15

**prepare** 6:12

**prescribe** 44:19

**press** 28:18 90:22
91:4 92:16

**pressure** 43:18,20

**pretty** 12:8,22
14:21 21:10,23
28:21 31:11 42:22
52:20 53:12,20
61:2 68:9 69:3,15
89:15

**prevail** 48:16
49:10 93:5

**prevent** 44:15

**previously** 34:20

**prior** 9:10 12:19
46:6,8 72:14 78:7
82:5 93:13,17 99:8

**privacy** 62:9,10,
11 63:23 64:2

**process** 36:19
78:10,11 88:8

**produce** 33:12

**produced** 32:7
34:1 86:3,5

**product** 12:8
74:16

**program** 52:24



**promised** 72:22 73:7

**prompt** 91:12,14, 15 99:4

**prompting** 103:3

**pronouncing** 7:8

**proposed** 68:23, 24

**Protection** 51:17 89:21

**provide** 50:13 96:1

**provided** 18:12 26:1 92:24 93:15

**public** 76:16 94:12 99:19,22

**purpose** 9:22

**put** 39:19 48:12 61:3

**Q**

**Q** 49:10

**qualify** 72:8

**qualities** 72:3

**question** 5:6,9,14 15:9 25:16 45:19 48:21,22 49:3,4,16 50:7 66:19 67:1 72:24 74:14 75:3, 16,21 80:3 81:22 82:13 85:23 92:21 99:13,20 100:5

**questioning** 71:1

**questions** 5:8 15:2 77:16 90:13 96:9

**quick** 50:8 84:11 92:21 102:17

**R**

**random** 87:24 88:1

**rang** 26:8 80:19,22 83:24 87:19

**rate** 22:12,15

**rates** 22:10

**ratio** 94:15 102:6

**reach** 23:11 24:4, 5,14

**read** 49:6,9 94:8

**reading** 101:17

**ready** 63:5

**realm** 48:23

**reask** 49:3

**reason** 6:1 67:7 98:17

**reasoning** 67:6

**reasons** 55:13

**recall** 9:9,17 11:10 13:19,21,22 14:5 15:24 18:23 19:3,7 23:5,6 24:20,21 37:2,15 39:1 40:1, 3 41:3,13 46:11 56:17 58:1,20 59:3 65:7 77:6 80:12 87:7,12,17,24 88:2,15,24 91:21 93:14,19 97:4 99:7 102:24 103:23

**receive** 21:24 22:8,24 29:2 36:9, 13 59:9 73:23 79:2 84:20 100:9

**received** 24:22 26:4,6 29:1 31:22 40:20 41:3,23 44:12 56:17 58:12 60:2 73:8,21 77:18 80:15 81:2 82:20 85:5,11,12 87:2,3, 5,7,12,18,21 96:5, 6 105:4,21

**receiver** 12:4,5,7, 20

**receiving** 12:9,18 18:23 23:3 30:8 40:1,21 41:10,14, 20 56:14 57:20 58:15,23 59:8 65:3 80:9 87:7 93:14 97:19 98:10,12

**recent** 95:6,8,17

**recently** 12:17

**recipient** 89:23

**recollection** 37:8 91:18 104:14 105:8

**record** 4:9 6:5 34:15,18 49:9 76:16 95:21 99:19, 22 103:17,20

**records** 30:13 32:2 33:23 42:10, 13 50:17,18,22 56:4 83:21,22 87:2,10 95:3,13 97:7 104:20 105:4

**RECR0SS-EXAMINATION** 102:18

**recreating** 60:8

**Reddit** 100:17,24 101:15

**REDIRECT** 96:10 105:18

**refer** 6:6

**referred** 45:13 46:15

**referring** 55:7 85:8 91:23 92:8

**refused** 55:4 83:10

**regular** 31:6 79:13,17 81:1,9 85:1,19

**reject** 77:4

**related** 53:11 61:2 67:20 71:2 72:9 74:9

**relation** 23:20 41:16 95:8 104:6, 24

**relationship** 43:4

**relationships** 69:6

**relax** 44:17

**remember** 14:2 20:22 34:13 39:8 40:12 41:9 58:18 66:8 76:2 82:21 83:16 87:15 90:13 91:22 97:24 100:22 103:6 104:1

**remembered** 83:19

**repeat** 75:3

**rephrase** 5:10

**reporter** 4:18 17:5 49:6,9 106:15,17

**represent** 6:4 69:21 71:23 83:20

**representation** 46:24 49:1

**representative** 37:11,22 69:11,17 70:5,8,17 71:10, 14,24 72:4 83:3 89:12 90:3,7 92:22 98:16 102:20

**representing** 68:16 69:14,19 70:1,18 89:15,18

**require** 89:22

**research** 46:16 70:9,12,13,14,15, 20,22 94:19 101:18 102:1

**researching** 101:22

**reserve** 106:16

**reside** 9:19 10:2

**respond** 101:15, 18,19

**responded** 33:2

**response** 84:12

**responses** 4:19

**responsibility** 24:12

**responsible** 12:9

**result** 42:16 44:11 78:6 91:7

**resulted** 88:4

**resulting** 104:21

**retained** 46:6 74:5,7

**retains** 34:22

**retrieve** 27:8 35:3

**review** 7:1

**reviewed** 7:2

**Richard** 4:3,10 7:6 25:10

**ridiculous** 101:10

**ring** 26:5 36:16 52:9 79:13,14,17, 23 80:17,20 81:1, 5,7,9,13,14,16,19, 23 82:1 84:24 85:12,17,19,22 87:6,13 88:23 105:10

**rings** 26:7 52:10, 11 79:12 81:3,4,24 84:20 85:24 87:14, 19,22 88:5

**River** 18:17 58:3

**roaming** 22:5,7

**role** 89:13 92:22

**rough** 25:1

**roughly** 8:2 11:12 19:8

**rules** 4:16

**S**

**sales** 59:13

**Samsung** 20:13, 21

**save** 31:15 32:2,4

**saved** 25:4 34:11

**Schererville** 9:11

**screen** 31:19 32:7, 10,13 33:23 34:10, 23 35:5,10

**search** 96:7



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

8

secondary 21:13

seizure 43:14 44:4
61:4

select 99:5,6

sending 89:24

sense 4:23 33:13
60:9

separate 19:24
29:12,18,22 30:4
35:22,23 36:1 92:9

serving 89:14
90:2,7

set 87:23

set-up 25:13

setting 68:18

settlement 16:7
74:22 75:18 76:6,
22 93:13,17 99:8,
12,17,21 100:4,9

severely 61:16,17

shakes 4:21

shaking 15:22
45:18,23 73:3

short 50:11 77:12,
14 84:17

shorten 52:2
54:11

shots 32:7,10,13
33:23 34:10

show 26:14 27:9
28:4 30:1,3,18,19
31:1 87:3 95:3
96:6 105:4

showed 33:14

showing 35:5
56:1 104:20

sic 29:8

sick 18:18 42:24

Signature 106:15

similar 15:7,13
29:2 40:20 60:5
94:4,10

situation 60:8
70:16

situations 72:6,20

skip 53:16,19,20
82:19

sleep 62:3,4

sleeping 62:5

slicker 9:5

slightly 25:16

software 78:1

someone's 53:23

sort 21:11 22:1
44:11 64:20 74:9
103:10 105:9

sound 29:13 79:3

sources 100:18

speak 6:17 10:4
24:18 37:11,17
55:2 91:12 92:12

speaking 37:18
98:16

specific 93:18

specifically 19:20
24:17 51:13

speech 70:3

spell 4:8 61:12

spelled 8:10 61:13

spoke 19:23 23:14
37:12 38:22 83:16
92:4 102:20
104:16

spoken 10:5
104:23

spouse 7:18

spouse's 7:16

springtime 39:3

Sprint 20:9,10
22:19 34:24 56:4
83:21,22 84:1,7
86:3,8 96:2,5

St 65:22

stage 93:24

start 4:15 23:3
28:7 67:20

started 19:2

starting 59:17
78:14

state 4:8 8:21
73:12

stated 63:22

states 61:16

stating 94:10

status 49:1

stay 31:3

stayed 12:16

steps 31:11,16
35:4 36:7

stop 38:23 39:9,14
42:5,8 59:15,19
92:10 103:23
104:6,17,24

stoplight 71:22

stopped 19:4,5,7
39:17 40:14

store 12:9,23

stories 94:8

story 24:16

straight 53:12
88:23

stress 43:3,6,10
44:13,14,16,20
60:22 61:2 64:18

STRICKLER 4:7
8:19 9:3,6 13:5
15:4 16:18,20,21
17:7,9 28:6 32:21,
24 33:5,10,17
34:17,19 45:20
50:9,12 62:12,15,
19,22 63:3,8,10,
13,15 73:1 75:13
76:11,13,17,19,21
77:10,12,15 80:7,8
82:14 84:10,16,18
85:10 86:13 96:9,
11 98:9 102:14
105:19 106:4

stuff 12:12 43:8,9
80:5

subject 76:15

subpoena 83:21

suburbs 9:3

sued 14:2

suffered 42:15,19
43:10 60:2,15
64:18 65:1 69:24

suffering 60:10

suggesting 92:3

suing 51:8 66:16
68:9,11 72:11

support 64:20
71:11

supporting 64:16
75:10

supports 64:15

supposedly
23:21,22

survey 102:6

switch 97:1

sworn 4:1,5

symbol 30:19,20
31:7

symptoms 43:11
44:1 60:11 61:6
64:20 65:1

system 52:19
54:12 55:1 94:7

Systems 6:6

———————

**T**

takes 81:16

taking 4:20 5:1,22
42:23 43:4

talk 5:2 18:7 24:17
46:19 57:22 59:5,
20 64:22 84:20
90:22 92:5 95:20

talked 37:21 75:22
82:5 83:1 98:23

talking 27:23 35:3
79:1 80:5

telephone 51:16
52:18 54:11 88:24

89:21 90:9,12 94:6
103:24 105:10

telling 39:20 59:11

ten 6:18 8:2,20
36:14 106:3

tend 59:10

terms 86:21 90:11
91:23 94:5 95:1,6,
24

testified 4:5 62:17
87:8 89:10 99:7

testify 82:5 96:12

testifying 5:19

testimony 5:17,23
6:2 82:21 86:17
90:16 98:22 99:11
100:8 104:14
105:21

text 22:9,20,21
30:21 36:9 79:4

texting 21:23
47:17

texts 36:12 79:2

thing 5:13 26:16
27:6 43:1 48:11
59:8 61:1 68:12
71:21,22 72:21
73:7 91:4 101:11
103:10

things 67:6

thinking 96:16

thought 23:15
37:18 99:16,20

thousand 94:14,
15 100:15 102:3,5,
12

time 5:12 12:1,13
19:22 22:20 23:14,
18 27:22 31:23
33:9 36:21 37:13,
15,21 38:2,22
40:19 42:22,24
54:23 59:1 65:2
80:20 81:18,23
85:24 87:23 90:18
92:14 95:1,12,17
98:7,13,14,23
101:21 104:23



Molinari vs Financial Asset Management Systems, Inc.
Richard Molinari - 05/10/2019

9

**times** 18:8 19:15 22:14 31:14 37:14, 16 43:18 44:5 59:1 62:3 85:19 86:17, 19 87:24 89:16,17 92:12,15 95:3 97:15 98:19 105:15

**today** 4:18 5:23 6:2,10,13,20,23 15:8 64:10 71:6

**told** 19:15 38:8,23 39:14 42:4 82:20 93:19 103:23 104:6,17

**tone** 79:14,17 81:1

**top** 55:15

**total** 105:7

**towns** 9:14

**tracing** 53:16,19, 20 82:19

**traditional** 87:13, 19,22 88:5 105:9, 22

**transfer** 57:15

**trial** 16:5 74:11

**trouble** 59:9

**type** 20:18 55:1,4 92:23 94:15 102:6

**types** 64:11

**typical** 87:1

**typically** 54:5 85:23

_____

**U**

**uh-huh** 4:24 5:4 7:13 8:8 12:6 13:10 17:1,3,8,16 22:6 26:10 27:22 29:3 33:5 35:19 37:10 41:6 44:9 47:16,19 52:3 54:13,16 60:4 63:9 77:11,13 78:5 80:1,16 81:11 84:22 98:11 99:10

**unaware** 99:12

**uncomfortable** 75:21

**underlying** 14:19

**understand** 5:9, 11,17 6:9 19:22 25:8 38:3 55:22 56:13 68:19 70:4 86:16 92:21,22 99:13

**understanding** 15:5 23:19 55:18 59:11 67:14,18 68:22 69:1 70:20 72:20 88:11,19 89:11,13,20 92:19 93:2,4 96:4

**understood** 90:12 100:4

**unlimited** 21:10, 21,23,24

**unlock** 31:12

**unwanted** 61:16

**updated** 27:19 77:24 78:1

**upfront** 47:2

**user** 20:5

_____

**V**

**verbal** 4:19

**Verbally** 73:4

**version** 21:1 27:19

**Vlahakis** 6:22 8:13,15,18,22,24 9:5 13:1 15:2,9 16:17,19 17:3,8 27:22 28:2 32:23 33:1,6,11 34:1,5, 15 45:19,24 48:19 49:6 50:7,10 62:14,16,21 63:6,9 66:19 67:1 72:24 74:14 75:15,20 76:1,5,9,12,14,18 77:11,13 80:3 82:13 84:13 85:8 86:15 95:11,23

96:8 98:7 102:15, 17,19 103:8,15,18, 21 105:17 106:11, 14,16

**Voapp** 80:5

**Voapps** 55:16,19, 22 88:17,18,20

**voice** 29:8 33:14 86:23 87:5,8 88:9, 12,13,20 89:1,5,22 90:4 91:7

**voicemail** 24:6,7, 8,21,22 25:8 26:6, 9,17,23 27:1,2,3,5, 19,20 28:3,23 29:7,21 30:2,3 36:4,17,23 37:7,9 38:6 52:8,11,12 53:8 57:15,17 77:22 79:7,11,24 80:10,18,19 81:12 85:12,20 88:23 89:7 105:24

**voicemails** 22:23 25:4 26:5 27:8 32:8 35:4,5,18,21 36:13,14,15 41:20, 24 42:4,13 50:23 52:6 57:10,13 59:22 69:9 79:2,4 80:15 83:23,24 106:3

**Vortex** 88:16

**Votex** 88:16

_____

**W**

**Wait** 30:2

**waiting** 91:4

**walk** 27:7

**wanted** 8:24 24:17,24 46:18 54:3 61:3 86:11 97:5 101:14,19

**warehouse** 12:21

**website** 34:23 35:1

**week** 94:24

**weeks** 40:17 78:14

**whatsoever** 18:5

**wheelchair** 18:10 19:21

**wife** 10:3 17:19 18:18 19:11 23:14, 21 24:4,5,19 25:17 45:8,14,16 46:21 78:16 90:9

**wife's** 21:12,16 95:9 96:16

**win** 48:16 49:10

**wintertime** 39:6

**witnessed** 57:19

**witnesses** 57:24

**woke** 62:7

**wondering** 32:10 58:24

**word** 83:11 103:6, 7

**wording** 70:22 103:6

**words** 51:2 53:6 83:11

**work** 18:11 31:14 37:19 43:7,9 58:16 59:2,8,12,17 61:19 65:20,22 69:18 73:19 74:2,16 81:21 86:1 92:16, 17 95:2 105:16

**worked** 12:14 39:24

**working** 58:3 61:20

**workplace** 68:13 72:11

**works** 22:18 65:21,24 70:4 77:10

**write** 101:21

**wrong** 70:22

_____

**Y**

**year** 14:6 28:10

**years** 8:2 9:8,20 10:17 11:24 12:18 13:4 20:23 21:4 27:18 34:24 40:19, 22,23 41:2

