**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD MOLINARI, on behalf of himself and a class of similarly situated individuals, | 18-cv-01526 |
| Plaintiff, | Honorable Judge Sara L. Ellis |
| v. | |
| FINANCIAL ASSET MANAGEMENT SYSTEMS, INC., | |
| Defendant. | |

**Motion to Approve Class Counsel's Attorney's Fee and Expense Application**

NOW COMES Plaintiff RICHARD MOLINARI ("Plaintiff"), by and through his counsel, James C. Vlahakis (at times "Class Counsel"), and submits the following in support of Mr. Vlahakis' request for court approval of attorney's fees and expenses:

**I. Background & Summary of The Conditionally Certified Class Action**

1. On February 28, 2018, Plaintiff filed a putative Class Action Complaint against Defendant FINANCIAL ASSET MANAGEMENT SYSTEMS, INC. ("Defendant" or "FAMS") pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227, *et seq.* ("TCPA") and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, *et seq.* ("FDCPA") (hereafter "the Complaint", Dkt. 1). Section 227(b)(1)(A)(iii) of the TCPA "prohibits a creditor from making a call using ... an artificial or prerecorded message to a wireless telephone number for purposes of collecting a debt unless the call is made with the 'prior express consent' of the called party."[1]

2. The Complaint alleges that FAMS violated § 227(b)(1)(A)(iii) of the TCPA by using a third-party vendor, VoApps, Inc., to send pre-recorded voice messages to

---

[1] *Jamison v. First Credit Servs.*, 2013 U.S. Dist. LEXIS 105352, *2 (N.D. Ill. July 29, 2013).

Plaintiff's cellular telephone number (without his consent) in an attempt to collect a debt allegedly owed by his wife. Complaint, ¶¶ 31-33, 39, 44. The pre-recorded voice messages stated the following:

- Hello, this is FAMS, a debt collector. This is an attempt to collect a debt. Our records indicate that we have not yet received one or more payments necessary to continue the reduced interest program. We are happy to assist with any questions you may have in this process. Please call us at 866-330-2703. Again that number is 866-330-2703. Thank you.
- Hello this is FAMS, a debt collector, this is an attempt to collect a debt. Please call us at 866-330-2703. Again that number is 866-330-2703. Thank you.

Complaint A, ¶¶ 40, 41.

3. None of the pre-recorded messages included Defendant's full legal name.

4. Count IV of the Complaint alleges that FAMS violated Section 227(b)(1)(A)(iii) of the TCPA by sending the same or similar non-consensual pre-recorded messages to over forty (40) cellular numbers assigned to Illinois based area codes. Complaint, Count IV, ¶¶ 97-98. Count VI of the Complaint asserted various class-action based violations of the FDCPA based upon FAMS's use of the above pre-recorded messages. In part, Plaintiff's contends that FAMS's use of its truncated name violated Section 1692e(14) of the FDCPA which prohibits debt collectors from using "any business, company, or organization name other than the true name of the debt collector's business, company, or organization."

5. Defendant answered the Complaint, generally denied liability and raised various affirmative defenses. Dkt. 16.

6. The parties engaged in written discovery, including the issuance of a subpoena to VoApps, Inc.. Plaintiff's counsel deposed two corporate representatives of FAMS, as well as deposing VoApps' corporate representative who was also the inventor of VoApps' patented technology. The three corporate depositions took place in Atlanta,

Georgia. Plaintiff was also deposed.

7. The Parties attempted (unsuccessfully) to resolve the Litigation with the assistance of Magistrate Judge Jeffrey I. Cummings. Dkts. 36-37, 43.

8. Defendant agreed to settle during the second round of class certification briefing. Dkts. 97, 99. During the course of settlement discussions, parties expanded the proposed pre-recorded message class to include all Illinois area codes.

9. As discussed below, Class Counsel analyzed spreadsheets produced by Defendant and VoApps, which demonstrated that between November 17, 2015 and December 4, 2017 VoApps "successfully" sent 16,352 pre-recorded messages to 1,419 Illinois-based cellular phone numbers. Dkt. 128, ¶22, Dkt. 93-7, ¶¶20-63.

## II. Summary of Conditional Certification Order

10. During a telephonic hearing which took place on November 16, 2021, this Honorable Court provisionally certified this case pursuant to FRCP 23(b)(3). Dkt. 127 (minute order). Thereafter, on November 22, 2021, the Court issued a formal order approving the proposed class action settlement. Dkt. 128 ("Order Conditionally Certifying the Class and Granting Preliminary Approval of Settlement" (hereafter "Conditional Certification Order"). In relevant part, the Court held as follows:

> [T]he terms of the proposed Agreement appears to be fair, adequate and reasonable as to all potential Class Members, when balanced against the probable outcome of further litigation, particularly in light of the fact that Defendant has agreed to pay up to $385,000 (the "Proposed Settlement Fund") to fund two settlement classes, compensate Mr. Molinari.
>
> The Court also recognizes that Defendant and/or Defendant's insurer shall pay for the costs of notice to the text of the note and administering the payment of the Proposed Settlement Fund. In particular, the Proposed Settlement Fund ($233,500 for the proposed TCPA Settlement Class and $10,000 for the proposed FDCPA Settlement Class) appears to result in Defendant paying more than a de minimis recovery to each Class Member who submits a claim form seeking compensation for statutory damages pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. resulting from

3

> Defendant's alleged use of pre-recorded messages. Further, in light of Defendant's reportedly low net worth, it appears that eligible Class Members will likely more than the maximum statutory liability provided for by Section 1692k(a)(2)(B) of the Fair Debt Collection Practices Act, which forms the basis for one of the settled claims, and limits Class Members in any FDCPA class action to no more than 1% of a debt collector's net worth or $500,000 whichever is greater.

Dkt. 128, ¶¶ 29-30.

11. The Conditional Certification Order also "preliminarily approve[d] awarding up to 33 1/3 ($127,050) of the proposed Settlement Fund to compensate provisional Class Counsel for his reasonably incurred attorney's fees and expenses that were incurred in this the hard-fought Litigation[.]" Dkt. 128, ¶ 35. The Conditional Certification Order also required Class Members to submit claim forms, objections and/or opt-outs by January 28, 2022. *Id.* at ¶ 36-h.

12. Class Counsel is entitled to $127,050 (33.33% of the Settlement Fund) to compensate him for his reasonably incurred attorney's fees and expenses.

### III. Standard of Review

13. "Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). District courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). After proper notice and a public a hearing, a court may approve a class action settlement if the court determines that the settlement is "fair, reasonable, and adequate." *See*, FRCP 23(e)(3).

14. In deciding whether to award fees and costs, in order to make sure that class members are treated fairly, a district court is required to analyze whether the requested fees and costs are reasonable under the circumstances. The reasoning behind this requirement is simple:

> the structure of class actions under Rule 23 . . . gives class action lawyers an incentive to negotiate settlements that enrich themselves

> but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class.

*Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010 (emphasis omitted). A district court may also "award reasonable . . . nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

15. In provisionally certifying this putative Class Action, the Court has already recognized that Class Counsel has negotiated a robust settlement fund of $243,500. Of this fund, $233,500 has been set aside for the proposed TCPA Settlement Class, and $10,000 for the proposed FDCPA Settlement Class. According to the Court:

> the Proposed Settlement Fund ($233,500 for the proposed TCPA Settlement Class and $10,000 for the proposed FDCPA Settlement Class) appears to result in Defendant paying more than a de minimis recovery to each Class Member who submits a claim form seeking compensation for statutory damages pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. resulting from Defendant's alleged use of pre-recorded messages. Further, in light of Defendant's reportedly low net worth, it appears that eligible Class Members will likely more than the maximum statutory liability provided for by Section 1692k(a)(B) of the Fair Debt Collection Practices Act, which forms the basis for one of the settled claims, and limits Class Members in any FDCPA class action to no more than 1% of a debt collector's net worth or $500,000 whichever is greater.

Dkt. 128, ¶30.

16. Pursuant to the Settlement Agreement, Class Counsel seeks attorney's fees of $127,050, which is 33.33% of the Settlement Fund. The requested fee is in line with the percentage typically awarded in consumer class actions involving TCPA and non-TCPA litigation. *See,* Section IV-A of this Motion.

17. Notably, all costs associated with the administration of the class notice (with the exception of the court-approved text message notice[2]) and the managing and

---

[2] Class Counsel contracted with the Administrator for the costs associated with the text message based notice.

5

distribution of settlement funds is being funded by Defendant (and/or insurer). Dkt. 128, ¶30. Accordingly, the funds set aside for class members from the common fund ($233,500 for the proposed TCPA Settlement Class and $10,000 for the proposed FDCPA Settlement Class) *will not be reduced* by the costs of notice and/or the administration/distribution of settlement funds.

### IV. Methods For Calculating Reasonable Attorney's Fees

18. A lawyer who helps "recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also, Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007) (discussing that compensating class counsel for their time in prosecuting a class action to settlement "is based on the equitable notion that those who have benefited from litigation should share in its costs."). "[B]ecause the defendant [in a common fund recovery] is paying a specific sum in exchange for release of liability to all plaintiffs, equitable principles permit the Court to 'determine[] the amount of attorney's fees that plaintiffs' counsel may recover' from the fund 'based on the notion that not one plaintiff, but all those who have benefitted from litigation should share its costs.'" *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) (internal citation and quotation marks omitted).

19. Cases involving TCPA litigation typically involve awarding class counsel a percentage of recovery from a common settlement fund, or what courts have described as a percentage-of-the-recovery approach. *See, e.g., Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500-03 (N.D. Ill. 2015) (awarding 36% of the common funds); *Aranda v. Caribbean Cruise Line, Inc.*, 2017 U.S. Dist. LEXIS 54080, *4-*5, *29 (N.D. Ill. April 10, 2017) (awarding 36% of the first $10 million dollars of the common fund); *Wright v. Nationstar Mortg. LLC,* 2016 WL 4505169, 2016 U.S. Dist. LEXIS 115729, *52-*62 (N.D. Ill. Aug.

29, 2016) (awarding 30% of the $12 million dollar common fund); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 U.S. Dist. LEXIS 59092, 2015 WL 2147679, at *1 (N.D. Ill. May 6, 2015) (awarding 30% of the first $10 million of a common fund); *Saf-T-Gard Int'l., Inc., v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. Jan 14, 2011) (awarding one-third of the common fund in a multimillion dollar TCPA class action).

20. As an alternative to a common fund/percentage-of-the-recovery approach, courts may use the lodestar method to calculate reasonable attorney's fees. The lodestar method, which "calculates fees based on number of hours worked", has been criticized by some courts for involving "an arbitrary process" *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 199 (N.D. Ill. 2018) (citing *In re Union Carbide Corp. Consumer Prods. Bus. Secs. Litig.*, 724 F. Supp. 160, 170 (S.D.N.Y. 1989). In utilizing the percentage-of-recovery method to approve attorneys' fees a TCPA based class action, Judge Chang held that "[t]he percentage-of-recovery method also avoids the need to determine a 'risk multiplier,' which, as other courts have noted, can be an arbitrary process." *Id.*

21. Notably, "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration." *Florin*, 34 F.3d at 566. Commentators have also noted that "[t]he percentage method is easy to calculate, does not involve the court in fee audits, and does not create incentives to waste time." Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements*, 1 J. Empirical Legal Studies 27, 31-32 (Mar. 2004).

22. District courts have discretion to choose either the lodestar or a percentage approach to calculating attorney's fees. *Florin*, 34 F.3d at 566. A district court "is not required to check its percentage-of-fee determination against the lodestar." *Leung*, 326 F.R.D. at 204 (N.D. Ill. 2018) (citing *Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 636 (7th Cir. 2011). In applying a percentage-of-the-recovery method, the court in

*Leung* approved class counsel's request for 33.3% of the gross fund. *Id. See also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("we have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

23. In summary, the decision to use a percentage method or a lodestar method falls within the discretion of the district court. *Id.* ("because of the district court's familiarity with this litigation, we leave the decision as to which method is the most efficient and suitable to this case up to the district court.").

### A. Attorney's Fees Under the Percentage-of-the-Recovery Method

24. Class Counsel is seeking to recovery 33.33% of the Settlement Fund pursuant to a percentage-of-the-recovery method. As discussed below, this methodology is reasonable, fair and comports with judicial economy. Compensating class counsel under a percentage-of-the-recovery method is fair and reasonable in TCPA litigation:

> The Court agrees with the Plaintiffs that a percentage-of-recovery method is proper, because when considering the market rate for counsel's services in an ex ante position, "the normal practice in consumer class actions" is to "negotiate[] a fee arrangement based on a percentage of the recovery." *In re Capital One*, 80 F. Supp. 3d at 795. "This is so because fee arrangements based on the lodestar method require plaintiffs to monitor counsel and ensure that counsel are working efficiently on an hourly basis, something a class of [several] million lightly-injured plaintiffs likely would not be interested in doing." *Kolinek*, 311 F.R.D. at 501. Similarly, because of the coordination problems with so many plaintiffs, it is unlikely that class members would want to pay attorneys' fees in advance.

*Wright v. Nationstar Mortg. LLC,* 2016 WL 4505169, 2016 U.S. Dist. LEXIS 115729, *52-*53 (N.D. Ill. Aug. 29, 2016). *See also, In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015).

25. Judge Kennelly explained why awarding 36% of a common fund was an appropriate way to compensate class counsel in TCPA litigation:

> As other courts have observed, the normal practice in consumer class actions is to negotiate a fee arrangement based on a percentage of the plaintiffs' ultimate recovery. This is so because fee arrangements based

8

> on the lodestar method require plaintiffs to monitor counsel and ensure that counsel are working efficiently on an hourly basis, something a class of nine million lightly-injured plaintiffs likely would not be interested in doing.

*Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015) (citations omitted).

26. Class Counsel's <u>unopposed</u> request for 33.33% of the settlement fund is well within the range approved by courts in this judicial district. *See, also, Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97-cv-7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (noting that a "customary contingency fee" ranges "from 33 1/3% to 40% of the amount recovered") (citing *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986)). *See also, Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"). The proposed recovery to Class Counsel comports with Seventh Circuit precedent. *Pearson, v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) ("in consumer class actions ... attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel").

**B. Class Counsel's Request for 33.33% of the Class Funds is Reasonable**

27. In addition to the common fund set aside by FAMS to provide compensation for the TCPA based class, the FDCPA authorizes reasonable attorney's fees to a prevailing party. 15 U.S.C. §§ 1692k(a)(3). In determining whether proposed legal fees are reasonable, a district court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (quoting *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988)). A court reviewing an award of attorney's fees should look at the complexity of the legal issues involved, the degree of success obtained in relation to

the defense raised, and the public interest advanced by the litigation. *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 856-57 (7th Cir. 2009).

28. Class Counsel submits that the settlement of this putative class action against has resulted in an exceptional result in light of the various defenses that FAMS originally raised in opposing certification. Exceptional results in the face of a zealous defendant support awarding the proposed fee recovery. *See, e.g., Vandervort v. Balboa Capital Corp.*, 8 F.Supp.3d 1200, 1209 (C.D. Cali. 2014)(finding that vigorous opposition and "the unprecedented nature of the class certified and the settlement reached for the class present an exceptional result warranting an upward departure from the benchmark."). *See also, Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (finding of exceptional results supported class counsel's fee petition where "counsel pursued [the] case in the absence of supporting precedents").

29. Notably, courts have refused to certify TCPA class action involving skip-traced cellular numbers, which led to the transmission of pre-recorded voice messages to unintended recipients/wrong-parties. *See, e.g., Jamison v. First Credit Servs.*, 290 F.R.D. 92, 96, 107 (N.D. Ill. 2013) (denying certification of TCPA litigation where "parties would need to scour [defendant's] records" to determine consent). *See also, Balschmiter v. TD Auto Finance LLC,* 303 F.RD. 508, 524-25 (E.D. Wis. Nov. 20, 2014) (denying certification where plaintiff was unable to show an ascertainable class).

30. The *Jamison* case helps to illustrate the legal and factual hurdles that Class Counsel was able to navigate to get this case to settle on a class-wide basis. Class Counsel litigated the *Jamison* case as counsel for the debt collector. Dkt. 93-7, ¶14. Just like this case, the debt collector in *Jamison* used a skip-trace service to obtain the cellular number of the class representative and the putative class members. *Jamison*, 290 F.R.D. at 96. Thereafter, just like this case, the pre-recorded messages were sent to

the cellular numbers of unintended recipients/wrong-parties. *Id.* The debt collector in *Jamison* contacted the class representative and 2,886 putative class members with pre-recorded messages. *Id.* Just like with Mr. Molinari, the proposed class representative in *Jamison* was a "wrong party", having received a pre-recorded message where the debt collector was attempting to reach proposed class representative's sister. *Id.*

31. Notably, unlike the present case where FAMS has claimed that its vendor's technology did not call the cellular numbers at issue, the debt collector in *Jamison* left pre-recorded voice messages after it called the cellular number at issue. Unlike the simple facts of *Jamison*, FAMS defended this case by arguing that it vendor's technology was exempt from the TCPA's prohibitions against calling cellular phone numbers and leaving pre-recorded voice messages. Class Counsel overcame FAMS's clever defense.

32. FAMS relied on affidavit of VoApps' David King, the founder of VoApps and the inventor of the patented technology at issue. Dkt. no. 57-4, ¶¶3-4. Mr. King testified that VoApps' so-called "Adaptive Signaling" technology does not result in calls being made to cellular numbers. *Id.* at ¶¶14-29, 32b, 32c. As explained in Mr. King's affidavit:

> 28. The Adaptive Signaling technology that delivers DDVM bypasses the traditional way of leaving voicemail messages for consumers. Instead of a call being made from Adapti-Sig to a cellular handset, the technology only makes a call between the Adapti-Sig servers and the servers comprising the voicemail service provider's voicemail platform, each of which are owned by business operators. This call is a landline-to-landline connection, … and no call is placed to the consumer's cellular phone number. Instead, the only call made is to the consumer's voicemail service provider's business class, landline number assigned to its proprietary voicemail platform.
>
> 29. Thus, the DDVM technology (referred to as Adapti-Sig) initiates a landline connection to a business class telephone number assigned to the voicemail service provider's platform—not to the telephone number assigned to the consumer's cellular telephone service. Once this connection is established, a voice path is directed to the connection, and the pre-recorded message is played into the voice mailbox by the Media Cluster. In other words, the DDVM technology does not make any call within the meaning of ITU standards to the telephone number assigned to the consumer's cellular telephone service.

Dkt. 57-4, ¶28-29.

33. In particular, VoApps claimed that its "Voicemail Messaging" system was "Designed to be 100% Compliant with Telecom Legislation and Regulations". Dkt. 93-2, p. 2 (VoApps "White Paper", entitled "Mobile Voicemail Messaging: The Legal, Effective Solution"). Here is how VoApps claimed its technology to be TCPA compliant:

> Mobile Voicemail Messaging, a technology service solution that drops a pre-recorded voice message directly into a cellphone voicemail box. The consumer's phone is never called, it does not ring and he is not charged for the voicemail delivery – only becoming aware that he has been contacted when he sees his voicemail notification.
>
> This service is completely legal and designed to be compliant with all federal laws and regulations. That's a bold statement in an industry wrought with uncertainty, conflicting court cases and generally bad case law. The legality of Mobile Voicemail Messaging hinges on two major points: 1) the Federal Communications Commission (FCC) has defined voicemail as an Enhanced Information Service and has chosen not to regulate these enhanced services; and 2) the Mobile Voicemail Messaging service creates a landline to landline call directly to the telephone company's voicemail server, therefore there is no direct contact with the consumer.

Dkt. 93-2, p. 3.

34. Boldly, VoApps claimed that its technology was "DESIGNED TO BE 100% COMPLIANT WITH VOICEMAIL LEGISLATION AND REGULATIONS" that that its use of voicemail technology "is notably exempt from FTC and FCC laws and regulations." Dkt. 93-2, p. 4. VoApps' "White Paper" also claimed that it had "vetted" its technology "through all legal channels", including referring to having meetings with the FTC and the FCC where both "agencies understood and found no issues with our position." Dkt. 93-2, p. 6. VoApps concluded its "White Paper" by stating, "[t]he DirectDROP Technology we built is perfectly legal" and by stating "that there is not a more defensible and effective solution for contacting individuals". *Id.* at pp. 6-7.

35. FAMS also opposed certification by arguing that numerosity did not exist and that class members could not be ascertained. Dkt. 57, Def's Response in Opposition

to Plaintiff's first Motion to Certify, pp. 1-5, 17-18. In particular, it argued that the spreadsheets it produced in discovery *could not be utilized to ascertain class members*:

> Molinari's makes two incorrect statements regarding the skip traced list. He states that the skip traced list identifies only cellular telephone numbers. That is not true – it identifies cell, landline and VoIP numbers. Molinari requested a list of all telephone number FAMS obtained via skip trace. The request was not limited to only cellular telephone numbers. FAMS produced exactly what was requested – a list of skip traced telephone numbers. A review of that list using commercially available searches show that the list consists of cellular, landline and VoIP telephone numbers. Molinari's next incorrectly states that FAMS produced "spreadsheets [that] show [] VoApps successfully transmit (sic) pre-recorded message to these skip-traced cellular telephone numbers." That is not true. As stated above, the skip trace list only identifies telephone numbers obtained via skip trace. It does not identify which of those numbers FAMS
>
> Instead, Molinari relies only on a spreadsheet identifying skip traced numbers and several hundred spreadsheets identifying prerecorded messages. Molinari fails to address how anyone could possibly obtain this data let alone how anyone could then analyze the data to identify a class. Trying to identify this information, even if possible, would be a herculean effort with no guarantee it would yield any reliable results. actually called or left a message. FAMS used a third-party vendor named VoApps, Inc. ("VoApps") to deliver messages. FAMS separately produced several hundred VoApps spreadsheets showing all of its prerecorded message campaigns. The VoApps spreadsheets are not limited to only VoApps messages which were the result of skip traced numbers. Nothing in the VoApps documents would indicate whether FAMS obtained the specific number via skip trace.

Dkt. 57, pp. 4-5, 22 (internal citations omitted).

36. Class Counsel's zealous advocacy proved that Class Members could be ascertained from the spreadsheets produced in discovery. According to Class Counsel:

> I have invested hundreds of hours' time in litigating this matter, from preparing the complaint, researching the propriety of VoApps' messaging system, drafting case specific discovery, responding to discovery and conducting and defending deposition.
>
> In this case I have obtained critical discovery necessary to advocate for the Class Members' best interests. Most importantly, as set forth below, the proposed classes are ascertainable based upon the data that was produced by FAMS during the discovery phase of this case. In contrast to the defense of *Jamison*, Defendant has admitted that it only used its skip-trace vendor to obtain cellular numbers that it did not previously

13

have for the debtor.

Dkt. 93-7, ¶¶18-19. In summary, the spreadsheets identified (a) telephone numbers obtained from FAMS's skip-trace vendor and (b) VoApps confirmation of "successfully" transmitted pre-recorded voicemails to *cellular* numbers. Dkt. 93-7, ¶¶20-63.

37. For the sake of judicial economy, the Court does not need to apply a lodestar method to "cross-check" the propriety of utilizing the percentage-of-the-recovery method. *Beesley v. Int'l Paper Co.*, 2014 WL 375432, 2014 U.S. Dist. LEXIS 12037, 10 (N.D. Ill. Jan. 31, 2015) (finding that the "use of a lodestar cross-check has fallen into disfavor"); *Will v. Gen. Dynamics Corp.*, 2010 WL 48181742010 U.S. Dist. LEXIS 123349, *10 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive.").

38. As reflected above, Class Counsel is entitled to 33.33% of the settlement funds based upon his zealous prosecution of this class action. If the Court desires to use the lodestar method to "cross-check" the propriety of utilizing the percentage-of-the-recovery method, Class Counsel shall submit appropriate summaries of billable entries in excess of 500 hours.[3] At a recently approved rate of $745 an hour[4], Class Counsel's billable time would far exceeded his proposed compensation of $127,050.

---

[3] District courts do not need to act as forensic accountants when approving a fee submission:

> trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.

*Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (internal quotations omitted).

[4] On May 15, 2018, I was appointed to the Steering Committee of a putative class action entitled, *In re Apple Performance Litigation,* 18-md-02827-EJD. See, Dkt. 99 at pp. 6-7 (5/15/18 order appointing Class Counsel). This case alleged that Apple, Inc. improperly "throttled" older model iPhones without the consent of their users. The district court granted certification of a multi-million dollar settlement and approved my attorney fee submission at a rate of $745 per hour. *See*, Dkt. 609, at p. 15 (March 17, 2021 court order, incorporating Dkt. 553 at p. 41 (Class Counsel's time entries)). I certify that I have billed over 500 hours prosecuting this matter, including the preparation of this Motion. The cited docket entries are attached as Group Ex. A.

39. CAFA Notice was properly submitted and today's date, January 28, 2022, is the due date for objections to the proposed class action settlement and the Court's provisional award of attorney's fees. As of January 27, 2022, no objection was submitted to either item. The absence of any objection supports granting final approval to the proposed recovery of fees. *See, e.g., Carrel v. MedPro Grp., Inc.*, 2018 U.S. Dist. LEXIS 126474, *9-*10 (N.D. Ind. July 27, 2018).

### C. Class Counsel is Entitled to Reimbursable Expenses

40. Class Counsel is entitled to reimbursement of expenses. See 15 U.S.C. §§ 1692k(a)(3) and FRCP 54(d). Recoverable costs involve (1) filing fees, (2) transcript fees and (3) printing fees. 28 U.S.C. § 1920. Courts regularly award reimbursement of the expenses incurred in prosecuting class actions. Class Counsel is also entitled to recovery travel expenses incurred in deposing corporate representatives of FAMS and VoApps in Atlanta, Georgia. *Kaplan v. Houlihan Smith & Co.*, 2014 U.S. Dist. LEXIS 83936, *12, 2014 WL 2808801, *4 (N.D. Ill. June 20, 2014) (awarding expenses "for which a paying client would reimburse its lawyer", including travel expenses). In most cases, recovery of costs simply involves submitting a bill with "the level of detail that paying clients [would] find satisfactory" to allow the court to determine whether the costs are reasonable and necessary. *See, e.g., Synthroid* I, 264 F.3d at 722.

41. Exhibit B documents $6,474.08 in costs and expenses.

WHEREFORE, for the reasons set forth above, this Honorable Court should award Class Counsel $127,050 (33.33% of the Settlement Fund) to compensate him for his reasonably incurred attorney's fees and expenses.

Respectfully submitted,

*Counsel for Plaintiff/Class Representative
Richard Molinari and the Class Members*

*/s/ James C. Vlahakis*

Sulaiman Law Group, Ltd.
2500 South Highland Ave., Suite 200
Lombard, Illinois 60148
630-575-8181
jvlahakis@sulaimanlaw.com