**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RICHARD MOLINARI, on behalf of himself and a class of similarly situated individuals,<br><br>  Plaintiff,<br><br>v.<br><br>FINANCIAL ASSET MANAGEMENT SYSTEMS, INC.,<br><br>  Defendant. | 18-cv-01526<br><br>Honorable Judge Sara L. Ellis |

**MOTION FOR FINAL APPROVAL OF THE PARTIES' CLASS ACTION SETTLEMENT**

NOW COMES Plaintiff RICHARD MOLINARI ("Plaintiff"), by and through his counsel James C. Vlahakis, and submits this Motion For Final Approval of the Parties' Class Action Settlement Agreement:

### I. Introduction and Brief Summary of Relevant Facts

1. Plaintiff filed a putative Class Action Complaint ("Complaint") against FAMS pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227, *et seq.* ("TCPA") and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, *et seq.* ("FDCPA") alleging that Defendant sent truncated pre-recorded messages to Plaintiff's personal cellular number without his consent. Dkt. 1, Complaint, ¶¶ 31-33, 39, 44.

2. "Section (b)(1)(A)(iii) of the TCPA makes it unlawful to make any call to cellular telephone using any 'automated telephone dialing system' ('ATDS') or an 'artificial or prerecorded voice' message without the consent of the person being called." The Complaint alleges that Defendant violated § 227(b)(1)(A)(iii) of the TCPA by sending non-consensual pre-recorded messages to Plaintiff's cellular phone and the cellular numbers of associated with other Illinois residents. Complaint, Count IV, ¶¶ 97-98. Defendant has denied that its conduct violated the TCPA.

1

3. Plaintiff also moved to certify Count VI of the Complaint on the basis that FAMS's pre-recorded messages did not identify its full legal name. Defendant denies that such action states a claim let alone violates the FDCPA.

4. Federal Rule of Civil Procedure ("FRCP") 23(e) states that the "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." As discussed below, the Parties engaged in arms-length negotiations and submit that the proposed settlement terms satisfy all of the required elements of FRCP 23.

5. The Parties moved to certify two distinct, but related, classes involving the TCPA claims in Count IV and the FDCPA claims in Count VI. Dkt. 125.

**II. Procedural Background Leading to the Parties' Joint Motion to Certify**

6. FAMS filed an Answer, denying that it violated the TCPA and FDCPA. Dkt. 16. FAMS has also asserted various affirmative defenses. *Id.* Thereafter, the Parties engaged in written and oral discovery and class certification motion practice to stake out their respective positions. Dkts. 18-19, 25, 29, 31, 34-35, 39, 41, 50, 50-1, 52-53, 57, 68, 69, 75, 81. The Parties attempted (unsuccessfully) to resolve the Litigation with the assistance of Magistrate Judge Jeffrey I. Cummings. Dkts. 36-37, 43.

7. Plaintiff filed a motion to certify on October 19, 2019. Dkt. 50, 51. The Court denied Plaintiff's motion without prejudice. Dkt. 83, 84 (*Molinari v. Fin. Asset Mgmt. Sys.*, 2020 U.S. Dist. LEXIS 134045, 2020 WL 4345418 (N.D. Ill. July 29, 2020)).

8. Thereafter, Plaintiff filed a *renewed* Motion for Class Certification on September 14, 2020. Dkt. 90. The proposed class was defined to include cellular telephone numbers associated with the Northern District of Illinois: 224, 312, 331, 630, 708, 773, 779, 815 and 847. Dkt. 93, p. 25. During the course of settlement discussions, Parties expanded the proposed pre-recorded message class to include *all* Illinois area

codes. On March 22, 2021, the Parties alerted the Court that they has reached a proposed class action settlement. Dkts. 106, 107.

9. The Parties retained KCC Class Action Services LLC ("KCC" and/or "Administrator") to assist them in identifying potential class members. See, e.g., Dkt. 108-09, 112. In granting preliminary approval of the proposed Class Action Settlement, the Court approved KCC to act as the Administrator.

10. In moving for conditional certification, the Parties informed the Court that records show that from November 17, 2015 to December 4, 2017, the time period of the proposed TCPA class definition, FAMS's third-party vendor "successfully" delivered 16,352 pre-recorded messages to 1,419 cellular numbers with Illinois area codes.

## II. Summary of Relevant Facts

11. Plaintiff recognizes that the Court is familiar with the facts of this Litigation as set forth in the Court's prior Order, Dkt. 84, *Molinari v. Fin. Asset Mgmt. Sys.*, 2020 U.S. Dist. LEXIS 134045, 2020 WL 4345418 (N.D. Ill. July 29, 2020). In relevant part, the Court described this Litigation as involving the following facts:

> FAMS also used a third-party vendor, VoApps, Inc. ("VoApps"), to deliver several direct-to-voicemail messages to [Molinari's cellular telephone] number. Molinari contends that these actions, which FAMS undertook in an effort to collect on a student loan debt allegedly owed by Molinari's wife, violated the [TCPA]; [and] the [FDCPA].
> ***
> FAMS uses a third party, LexisNexis, to obtain potentially updated telephone numbers for debtors it is trying to reach.
>
> The process (simplified for purposes of this opinion) is as follows. FAMS sends a batch of debtors' demographic information to LexisNexis. Based on this information, LexisNexis identifies and collects telephone numbers for these debtors by "skip tracing," which is generally a process "whereby companies search credit histories and other public databases to obtain contact information for debtors listed on loan applications." LexisNexis then sells the telephone numbers to FAMS. LexisNexis categorizes a skip-traced phone number into one of two tiers based on its "confidence" that the number is the identified debtor's phone number, with Tier 1 indicating a higher level of confidence than Tier 2. FAMS can determine whether it

3

obtained a phone number via skip trace based on whether its records designate the number as "Tier 1" or "Tier 2."

FAMS believes that the Tier 1 and Tier 2 phone numbers it purchases from LexisNexis correspond to the debtors it wants to contact. Nonetheless, the system is not perfect: while speaking to the user of a phone number obtained from LexisNexis, an FAMS employee may discover that the user is not the debtor he or she is trying to reach. In this case, FAMS requires the employee on the call to designate or otherwise document the phone number as a "bad" number. When FAMS determines that a phone number is "bad," it redacts the first six digits of the phone number. This signals to someone who subsequently views the number that the number should not be used, and it ensures that FAMS' system does not reload the number again if the same number is later obtained from LexisNexis.

FAMS contacts the phone numbers it receives from LexisNexis [by] contract[ing] with VoApps for a service called DirectDROP Voicemail ("DDVM"), whereby VoApps delivers pre-recorded messages that terminate directly to a recipient's mobile voicemail service. VoApps' DDVM technology is intended to "drop" a pre-recorded message directly into a targeted individual's voicemail platform without "dialing the target's cell phone number or otherwise causing her handheld device to ring." Although the targeted individual "receive[s] a message-waiting notification as though she received a normal voicemail," VoApps delivers the message to the "target's cellular device without directly using the cellular network."

In March 2017, Navient placed a student loan debt for collection with FAMS. The debt belonged to Nicolette Campbell, which is the maiden name of Molinari's wife. LexisNexis performed a skip trace on "Nicolette E. Campbell" and identified a phone number ending in 8132 (the "8132 Number") as Campbell's number. FAMS obtained the 8132 Number (which LexisNexis had designated as "Tier 1") from LexisNexis, believing it to be Campbell's phone number.

On November 16, 2017, FAMS used the LiveVox HCI system to call the 8132 Number in an effort to collect payment from Campbell on her debt. The same day, VoApps sent a pre-recorded message using its DDVM technology to the 8132 Number's voicemail box.

***

Over the next two-plus months, FAMS called the 8132 Number 100 more times using the LiveVox HCI system. Meanwhile, VoApps continued to "drop" pre-recorded messages to the 8132 Number's voicemail box. On November 24 and December 4, 2017, VoApps sent the following message to the 8132 Number's voicemail box: "Hello this is FAMS, a debt collector, this is an attempt to collect a debt. Please call us at 866-330-2703. Again that number is 866-330-2703. Thank you." VoApps sent approximately seven other pre-recorded voicemail messages to the 8132 Number's voicemail box, but the record does not show the content of these messages or the dates they were sent.

> The 8132 Number, however, is not Campbell's telephone number; it is the cellular telephone number of Campbell's husband, Molinari, who does not owe a debt to Navient. Molinari testified that FAMS' calls and messages caused him to experience headaches, chest pains, anxiety, and marital problems; disrupted his daily life by distracting him while working, driving, and sleeping; and invaded his privacy. On or around February 6, 2018, Molinari spoke with a FAMS employee over the phone and told the employee to stop calling him. After that conversation, FAMS designated the 8132 Number as "bad" and stopped contacting it.
>
> ***
>
> During discovery, FAMS produced spreadsheets that identified the phone numbers it obtained via LexisNexis' skip-trace process (the "FAMS Spreadsheets"). FAMS contends that these spreadsheets include not only cellular telephone numbers, but landline and VoIP phone numbers as well. FAMS also produced spreadsheets that it obtained from VoApps (the "VoApps Spreadsheets"). These spreadsheets show FAMS' pre-recorded message campaigns with VoApps and, particularly, whether VoApps successfully delivered its pre-recorded messages to certain [cellular] telephone numbers.

Dkt. 84, pp. 104, 2020 U.S. Dist. LEXIS 134045 at *1-*7 (internal citations and citations to cases omitted).

### III. Summary of Settlement Negotiations

12.    After months of arms-length settlement discussions (including previously negotiations lead by Magistrate Judge Cummings where Plaintiff and representatives of Defendant and Defendant's insurer were present, see Dkt. 43), the Parties have documented settlement terms to completely resolve the Litigation as a proposed class action. The Parties' proposed Settlement Agreement was filed on November 22, 2021. Dkt. 125. As discussed below, the proposed settlement terms are just and equitable.

### IV. Standard of Review

13.    "Federal courts naturally favor the settlement of class action litigation". *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). In order to certify a class in accordance with Rule 23(a), a court must conduct a rigorous analysis by a preponderance of the evidence that the putative class meets the criteria set forth by FRCP 23(a). FRCP 23(a) requires the moving party or parties to sufficiently demonstrate numerosity,

commonality, typicality and adequacy. The Court found that the proposed class action settlement preliminary satisfied FRCP 23(a)(1)-(4) and conditionally certified the proposed TCPA and FDCPA classes. See, Dkt. 128, pp. 2, 9.

14. In addition to the elements of FRCP 23(a), a proposed class should be "ascertainable". *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). The Court found that the proposed classes were ascertainable. See, Dkt. 128, pp. 2-3, 6.

15. The Court also found that the proposed class action settlement satisfied FRCP 23(b)(3) which states that "a class action may be maintained if ... (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FRCP 23(b). See, Dkt. 128, pp. 9-10.

16. As reflected by the Court's Conditional Certification Order, the terms of the proposed settlement satisfy the elements of numerosity, commonality and typicality as required by FRCP 23(a)(1)-(3). Further, as required by FRCP 23(a)(4), the Court determined that Plaintiff is an adequate class representative and appointed attorney James C. Vlahakis as class counsel. See, Dkt. 128, p. 2.

17. For purposes of effectuating this settlement, the Court preliminarily and conditionally certifies a **TCPA Settlement Class** consisting of:

> All persons who were sent pre-recorded messages to Illinois based cellular telephone numbers according to the records maintained by Defendant and its Vendor VoApps, Inc. (between November 17, 2015 and December 4, 2017) where the pre-recorded messages were "successfully" delivered in an attempt to collect a consumer debt.

18. The Class Members are ascertainable because spreadsheets identify 16,352 pre-recorded messages that were "successfully" sent to 1,419 distinct cellular phone numbers between November 17, 2015 and December 4, 2017. *Id.* at p. 13-14. As

6

reflected by the attached declaration submitted by Janeth Antonio (a "Senior Project Manager" employed by the Administrator), the Administrator analyzed certain data files for the purpose of providing notice to proposed Class Members. *See*, Dkt. 130-1, "Declaration of Janeth Antonio Re: Notice Procedures", ¶ 5 ( "Antonio Declaration"). According to Ms. Antonio's declaration, "[t]he data files included Phone Numbers, Caller ID Phone Numbers, Phone Number Source, Message IDs, Local IDs, VoApps Results, VoApps Codes, and VoApps Timestamp." *Id.* As Ms. Antonio has explained, the Administrator "combined and analyzed the data, which resulted in 1,419 unique telephone numbers." *Id.* Thereafter, the Administrator "performed a reverse phone search to obtain names and addresses associated with Class Phones", resulting in "1,382 records that yielded results." *Id.* Net, the Administrator "formatted the list for mailing purposes and processed the names and addresses through the National Change of Address Database ("NCOA") to update any addresses on file with the United States Postal Service" and "[a] total of 63 addresses were found and updated via NCOA." *Id.*

19. For purposes of effectuating this settlement, this Court preliminarily and conditionally certify a **FDCPA Settlement Class** consisting of:

> All persons who were sent pre-recorded messages to Illinois based cellular telephone numbers according to the records maintained by Defendant and its Vendor VoApps, Inc. (between December 4, 2016 and December 4, 2017) where the pre-recorded messages were "successfully" sent in an attempt to collect a consumer debt where the pre-recorded messages utilized Defendant's truncated name, "FAMS" rather than its full legal name.

20. Spreadsheets identify 1,328 "successfully" transmitted pre-recorded messages sent to 364 distinct cellular phone numbers between December 4, 2016 and December 4, 2017.

21. Excluded from the Proposed Classes are: (a) Class members who timely exclude themselves from the Settlement Agreement; (b) employees of Defendant and its

7

vendor VoApps, Inc.; (c) employees of the Court and the Clerk's Office; and (d) employees of the Administrator; (e) employees of proposed class counsel; (f) any person who is already subject to an existing release; and (g) any person who has filed for bankruptcy protection under Title 11 of the United States Code as of the date of the Conditional Certification Order. Dkt. 128, p. 11.

### IV. The Court Should Find that Notice to the Class Was Proper.

22. When a class is certified through settlement, due process and Federal Rule of Civil Procedure 23 require that the presiding court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(c)(2) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2).

23. The Court preliminarily approved three (3) forms of notice: (a) post-card; (b) internet (involving a Long-Form notice); and (c) text based. See, Dkt. 128, pp. 1-3.

24. On December 12, 2021, the Administrator printed and mailed 1,382 Post-Card based Notices to the Class Members at the most current address as determined by the Administrator. Dkt. 130-1, Antonio Declaration at ¶6. Each Post-Card Notice referred recipients to a website that hosted a more detailed Long-Form Notice. After mailing the Postcard Notice to the Class Members, the Administrator received 259 Postcard Notices returned by the USPS with undeliverable addresses. *Id.* at ¶8. Through credit bureau and/or other public source databases, the Administrator performed address searches for these undeliverable Notice Packets and was able to find updated addresses for twenty-four (24) Class Members. *Id.* The Administrator promptly re-mailed Notice Packets to the found new addresses. *Id.*

25. On December 16, 2021, the Administrator sent a short-form/Text-Based notice to 1,419 cellular telephone numbers. Dkt. 130-1, Antonio Declaration at ¶9. Of the 1,419 text messages sent, 1,151 were reported to have been delivered. *Id.* Each Text-Based Notice referred to a dedicated website for more information. A true and correct copy of the Text Message Notice is attached Ms. Antonio's Declaration as Exhibit D.

26. On or about November 11, 2021, the Administrator established a website www.FAMStextmessageclassaction.com dedicated to this matter to provide information to the Class Members and to answer frequently asked questions. Dkt. 130-1, Antonio Declaration at ¶10. The website URL was set forth in the Postcard Notice, Long Form Notice, Claim Form, Opt-Out Form, and Text Campaign. *Id.* Visitors of the website were able to download copies of the Notice, Claim Form, and other case-related documents. *Id.* Additionally, visitors could also submit claims online or opt-out. *Id.* True and correct copies of the Long Form Notice, Claim Form, and Opt-Out Form are attached Ms. Antonio's Declaration (Dkt. 130-1) as Exhibits E, F, and G.

27. As of March 1, 2022, there have been 396 users, 566 sessions/hits (active visits to the website), and 2,262 page views of the website. Antonio Declaration at ¶10.

28. The Administrator also established and continues to maintain a toll-free telephone number for potential Class Members to call and obtain information about the Settlement, request a Notice Packet, and/or seek assistance from a live operator during regular business hours. Dkt. 130-1, Antonio Declaration at ¶11. The telephone hotline became operational on December 1, 2021 and as of March 1, 2022, KCC has received a total of 2 calls to the telephone hotline. *Id.*

29. Plaintiff submits that the Post Card and Text Based Class Notices gave fair notice to the proposed class members, the terms of the settlement, and the ways in

which class members could participate (or not) in the settlement, thus satisfying the requirements of due process as embodied by Fed. R. Civ. P. 23(c)(1)-(2)(B).

### V. No Exclusion or Objections Have Been Submitted.

30. Class Members were informed that requests for exclusion from the proposed class action settlement had to be postmarked no later than January 28, 2022. Dkt. 130-1, Antonio Declaration at ¶13. As March 3, 2022, no exclusions have been submitted. *Id.* Further, the postmark deadline for Class Members to object to the settlement was January 28, 2022. *Id.* at ¶14. As of the date of this declaration, KCC has received zero objections to the settlement. *Id.*

### VI. The Court Should Enter a Final Order Holding that the Settlement Fund is Adequate and that Notice to Class Members Was Adequate.

31. Defendant agreed to fund a Class Settlement Fund of $385,000.00 (the "Settlement Fund") to (a) pay claims, (b) provide a service award to Plaintiff and (c) compensate Plaintiff's counsel for reasonable attorney's fees and costs. Defendant shall pay all costs associated with the notice under this Agreement and the costs of administering the Class Settlement.

32. The Settlement Fund was created to provide compensation to Class Members who submitted online and paper/mail-based claim forms on a claims-made basis, meaning that Class Members who wished to claim their share of the Settlement Fund were required to submit a claim form. The claim forms required putative Class Members to attest that they were the user or subscriber of a particular cellular number at the time that pre-recorded messages were sent to a particular cellular number

33. The postmark deadline for Class Members to file claims was January 28, 2022. Dkt. 130-1, Antonio Declaration at ¶12. To date, the Administrator received 89 claim forms. *Id.* The Administrator determined that seventy-nine (79) claims were valid

and timely filed, three (3) were considered duplicate, and one (1) was denied because the claimant did not match back to the Class List.

34. Six (6), valid claims were submitted after the deadline. Antonio Declaration at ¶12. Plaintiff submits that it would be fair and equitable to allow the late (but valid) claims to be submitted[1]. If the Court elects to approve the six (6) late but otherwise valid claims, this would result in eighty-five (85) valid claims. *Id.*

35. Because the total number of "successfully" delivered pre-recorded messages have been accounted for by date and time, the Administrator has been able to allocate settlement proceeds to class members based upon the total number of "successfully" delivered pre-recorded messages to each designated Illinois based cellular telephone number. As to the proposed TCPA Settlement Class, each Class Member who submitted a valid claim form shall receive compensation for an equal figure for each pre-recorded messages for any distinct time-period.

36. The Administrator has preliminarily calculated the Class Member settlement awards. Dkt. 130-1, Antonio Declaration at ¶15. These calculations are based on the assumptions that the gross settlement amount is $385,000 and from that amount, deductions are made for: (a) attorneys' fees ($127,050); and (b) named plaintiff awards ($14,450). *Id.* The remaining amount ($243,500; the "Net Settlement Fund") will be allocated pursuant to the terms of the settlement to those Class Members preliminarily approved for payment. *Id.* The FDCPA class shares $10,000 of the Net Settlement Fund, which is to be allocated on a pro rata basis to class members who have submitted a valid claim. *Id.* If the Court approves the six (6) late but otherwise valid claims, each FDCPA class member will receive approximately $434.72 (as their

---

[1] As of the filing of this Motion, Class Counsel was awaiting the opinion of Defendant on this issue.

pro-rata share) and each TCPA class member will receive approximately $263.54 *for each* successfully delivered pre-recorded message from the remaining settlement fund ($233,500). *Id.*[2]

37. All distribution checks to the Class will expire after forty-five (45) days.[3]

38. Plaintiff submits that the proceeds of any uncashed distribution checks shall be distributed to the Loyola University of Chicago Community Law Center ("LUCCLC")[4], unless the Court prefers to have the sum of the uncashed checks be redistributed to class members on a pro-rata basis. In light of the relatively high amount of compensation that is poised to be distributed to Class Members and in light of the *additional* costs of a second distribution of possible funds resulting from uncashed checks, Plaintiff submits that it would be more economical to distribute any remaining funds to LUCCLC.

### VII. The Court Should Grant Final Approval to the Appointment of Mr. Molinari as Class Representative and His $14,500 Service Award.

39. Plaintiff proposed (and FAMS did not oppose) that the Court appoint Plaintiff to serve as the Class Representative and provide Plaintiff with a service award of up to $14,500 as a result of his role in helping cause the Litigation to reach this phase. The Court preliminarily approved awarding Plaintiff the proposed Service Award

---

[2] Should the Court-awarded fees or costs differ than those shown above, or if the list of Class Members approved for payment and/or their class data changes, the estimated award allocation calculations will change accordingly. *Id.*

[3] Distribution payments of this nature are considered tax reportable to the IRS. Class members whose payments exceed the reportable threshold of $600 will be solicited a substitute W9 letter. Dkt. 130-1, Antonio Declaration at ¶16. A draft W9 letter is attached to Ms. Antonio's Declaration as Exhibit H.

[4] LUCCLC "serves clients whose main source of income is public assistance or Supplemental Security Income as well as those classified as the 'working poor,' who are people struggling to meet their obligations even though they have jobs." www.luc.edu/law/academics/clinical-programs/communitylawcenterclinic/ "Since its founding, [LUCCLC] has represented more than 3000 individuals while providing students with the opportunity to serve real clients with real problems." *Id.*

given his role in: (a) answering written discovery; (b) producing his telephone and the pre-recorded messages at issue for inspection; (c) preparing for and attending his in-person deposition; (d), attending court-mandated settlement conferences; and (e) by actively participating in this litigation with his counsel. Dkt. 128, pp. 2, 9-11.

40. With no objections, the Court should reaffirm appointing Plaintiff Molinari as Class Representative and grant final approval of his service award of $14,500.

### VIII. The Proposed Settlement Funds Are Appropriate.

41. By way of a separate motion (Dkt. 129), Plaintiff's counsel asked to receive (and Defendant will not oppose) up 33% of the Proposed Settlement Fund to compensate Plaintiff's counsel for his legal fees and costs. Dkt. 129. Plaintiff reasserts (and Defendant does not opposed) that this method of recovery is proper. *See, e.g., Bridgeview Health Care Ctr., Ltd. v. Clark*, 2015 U.S. Dist. LEXIS 95918, *3, 2015 WL 4498741, *2 (N.D. Ill. July 23, 2015) (awarding one-third of common fund in TCPA class action).

42. If the Court grants final approval of Plaintiff's conditionally approved incentive award of $14,500, and holds that one-third of the Proposed Settlement Fund should be used to compensate Plaintiff's counsel, this would reduce the Proposed Settlement Fund by $127,050, leaving $243,450 to distribute to Class Members within the TCPA Class and FDCPA Class.

43. Plaintiff submits that Proposed Settlement Fund is reasonable considering it is possible that Defendant could have prevailed on liability, resulting in Class Members receiving no compensation. As reflected in Section VI, the projected payments to Class Members far exceeds other court-approved TCPA settlements. *See, e.g., Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493-94 (N.D. Ill. 2015) (approving TCPA settlement of $30.00 per class member).

13

44. The FDCPA caps the recovery of statutory damages at "such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector". 15 U.S.C. § 1692k(a)(2)(B). Further, Section 1692k(a)(3) provides that "in the case of any successful action to enforce the foregoing liability", a court is authorized to award the prevailing plaintiff "the costs of the action, together with a reasonable attorney's fee as determined by the court."

45. Unlike the FDCPA, the TCPA has no cap on class action statutory damages. Rather, a court is authorized by the TCPA to award at least $500 in statutory damages for each discrete violation of the TCPA's prohibitions of non-consensual pre-recorded messages to a recipient's cellular telephone number. 47 U.S. Code § 227(b)(3)(B). Defendant represents that the total FDCPA Settlement Fund ($10,000.00) is more than 1% of its net worth. Based upon this fact, Plaintiff submits that the FDCPA Settlement Fund fair and reasonable settlement, where each Class Member who submitted a valid claim for will receive approximately $434.72. Dkt. 130-1, ¶15.

46. Plaintiff submits that the above-described compensation to Class Members who submitted valid claim forms is appropriate and move for a final order approving the proposed Settlement.

### IX. The Court Should Grant Final Approval to the Appointment of Class Counsel and Award 1/3rd of Settlement Funds to Compensate Him.

47. Defendant does not oppose this Court granting final approval to having attorney James C. Vlahakis serve as Class Counsel. As set forth in Plaintiff's separately filed Memorandum of Law, Mr. Vlahakis diligently and zealously litigated the entirety of this case in a solo capacity. Dkt. 126. In relevant part, Mr. Vlahakis deposed two of FAMS's corporate representatives in Atlanta, Georgia, as well as the founder of VoApps who invented and patented VoApps' DDVM technology. *Id.*

48.     Plaintiff submits that the determined efforts of his counsel have led to the formation of the proposed resolution of this hotly contested class action. In conformity with the requirements of FRCP 23(g)(1)(A)(i)-(iv) and 23(g)(1)(B)-(C), Plaintiff requests, and Defendant does not oppose, the Court entering a final order appointing James C. Vlahakis as counsel for the Class Members. As noted above, attorney Vlahakis has petitioned the Court to approve up to 33% of the proposed Settlement Fund to compensate attorney Vlahakis for his attorney's fees and costs incurred in prosecuting this litigation. Dkt. 129. No class members objected to the amount of the proposed compensation to Class Counsel. Accordingly, the Court should award Class counsel $127,050 for reasonably incurred legal fees and recoverable costs.

## X.  Compliance with the Class Action Fairness Act ("CAFA").

49.     CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official[.]" *See*, 28 U.S.C. § 1715(a)-(b).

50.     Notification was provided to the appropriate state and federal officials in accordance with Sections 1715(a) and (b) of CAFA and as of March 3, 2022, none of the notified state and federal officials submitted any response to the Administrator. See, Dkt. Declaration of Antonio, Dkt. 130-1, ¶¶2-4.

## XI. Conclusion

51.     For the reasons set forth above, Plaintiff requests that this Honorable Court grant final approval to the proposed Class Action Settlement. A proposed Final Approval Order is attached hereto as Dkt. 130-2.

52.     If the Court grants the relief requested, Plaintiff will submit a report to the court attesting to the distribution of the above-identified settlement funds to class

members. The report will also detail the distribution of any uncashed checks in conformance with the Court's directions relative to whether (a) funds left over from any uncashed checks should be distributed to LUCCLC as the Parties have proposed or (b) redistributed to Class Members as discussed in Paragraph 34 of this Motion.

**WHEREFORE**, pursuant to FED. R. CIV. P. 23(c)(2), Plaintiff and his counsel respectfully request that the Court (**a**) grant final approval of the Parties' Settlement Agreement, (**b**) approve the amount of the Proposed Settlement Fund, (**c**) reaffirm the appointment Plaintiff Richard Molinari as a Class Representative, (**d**) award Plaintiff a service award of $14,500, (**e**) reaffirm the appointment of attorney James C. Vlahakis as Class Counsel and (**f**) award Mr. Vlahakis $127,050 (1/3rd of the Settlement Fund) to compensate him for reasonably incurred legal fees and recoverable costs.

Respectfully submitted,

For Plaintiff

/s/ *James C. Vlahakis*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
630-575-8181
jvlahakis@sulaimanlaw.com